RON BENDER (SBN 143364)
BETH ANN R. YOUNG (SBN143945)
KURT RAMLO (SBN 166856)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234; Facsimile: (310) 229-1244
Email: rb@lnbyb.com; bry@lnbyb.com; kjm@lnbyb.com

Attorneys for Chapter 11 Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
### (LOS ANGELES DIVISION)

| | |
|---|---|
| In re:<br><br>ART AND ARCHITECTURE BOOKS OF THE 21ST CENTURY, dba ACE GALLERY,<br><br><br>Debtor and Debtor in Possession. | Case No. 2:13-bk-14135-RK<br><br>Chapter 11<br><br>**NOTICE OF MOTION AND MOTION FOR AN ORDER APPROVING GENERAL RELEASE AND SETTLEMENT AGREEMENT REGARDING BEVERLY HILLS LEASE AGREEMENT AND PROMISSORY NOTES; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF DOUGLAS CHRISMAS IN SUPPORT**<br><br>Date: April 29, 2014<br>Time: 2:30 p.m.<br>Place: Courtroom 1675<br>255 East Temple Street<br>Los Angeles, California 90012 |

1

1

## TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................4

I.       STATEMENT OF FACTS............................................................................................4

II.      DISCUSSION ...........................................................................................................14

         A.       The Settlement Agreement Is Fair And In The Best Interests Of
                  The Estate.......................................................................................................14

III.     CONCLUSION .........................................................................................................20

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**FEDERAL CASES**

Cosoff v. Rodman (In re W.T. Grant Co.)
    699 F.2d 599 (2d Cir. 1983), cert. denied 464 U.S. 822 (1983)..............................................17

In re Blair
    538 F.2d 849 (9th Cir. 1976) .....................................................................................16

*In re* Lee Way Holding Co.
    120 B.R. 881 (Bankr. S.D. Ohio 1990) ......................................................................17

In re Walsh Construction, Inc.
    669 F.2d 1325 (9th Cir. 1982) ..................................................................................16

Martin v. Kane (*In re* A & C Properties)
    784 F.2d 1377 (9th Cir. 1986), cert.denied 479 U.S. 854 (1986) .....................................16, 17

Newman v. Stein
    464 F.2d 689 (2d Cir. 1972), cert. denied sub nom. Benson v. Newman, 409 U.S. 1039
    (1972) .................................................................................................................17

Protective Committee for Independent Stockholders of TNT Trailer Fairy, Inc. v.
    Anderson
    390 U.S. 414 (1968) ...............................................................................................16

seealsoAnaconda-Ericsson Inc. v. Hessen (*In re* Teltronics Services, Inc.)
    762 F.2d 185 (2d Cir. 1985) .....................................................................................17

Woodson v. Fireman's Fund Ins. Co. (*In re* Woodson)
    839 F.2d 610 (9th Cir. 1988) ....................................................................................16

**FEDERAL STATUTES**

11 U.S.C. § 105(a).........................................................................................................2

11 U.S.C. § 1121 ...........................................................................................................2

**FEDERAL RULES**

Fed.R.Bankr.P. 9013-1 (f) ..............................................................................................2

Fed.R.Bankr.P. 9019 ......................................................................................................2

**PLEASE TAKE NOTICE** that, on April 29, 2014 at 2:30 p.m., in Courtroom 1675, located at 255 East Temple Street, Los Angeles, California 90012, the Court will hold a hearing to consider approval of the motion (the "Motion"), pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, filed by Art and Architecture Books of the 21st Century, dba Ace Gallery, Chapter 11 debtor and debtor in possession in the above-entitled bankruptcy case (the "Debtor"), for entry of an order approving that certain "Settlement Agreement Regarding Beverly Hills Lease And Promissory Notes" (the "Settlement Agreement") by and between the Debtor and Douglas Chrismas, on the one hand, and Culver Center Partners-West #1, LLC ("CCP-West"), Culver Center Partners, LLC ("CCP," collectively with CCP-West, the "Landlords"), Frederick M. Nicholas ("F. Nicholas"), Anthony Nicholas ("A. Nicholas"), Simon Rubinstein ("Rubinstein") and The Hapsmith Company ("Hapsmith," collectively with CCP-West, CCP, F. Nicholas, A. Nicholas and Rubinstein, the "CCP-West Parties") on the other hand (the Debtor Parties and the CCP-West Parties, collectively referred to herein as the "Parties"). A true and correct copy of the Settlement Agreement is attached as Exhibit "1" to the annexed Declaration of Douglas Chrismas.

**PLEASE TAKE FURTHER NOTICE** that the Motion is based upon applicable Local Bankruptcy Rules, 11 U.S.C. §§ 105(a) and 1121, this Notice, the supporting Memorandum of Points and Authorities, the attached Declaration of Douglas Chrismas (the "Chrismas Declaration"), the arguments and statements of counsel to be made at the hearing on the Motion, and other admissible evidence properly brought before the Court.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-1 (f), any opposition to the Motion must be filed with the Clerk of the United States Bankruptcy Court and served upon the United States Trustee as well as counsel for the Debtor at the address located in the upper left-hand corner of the first page of this Notice and Motion by no later than 14 days before the hearing on the Motion.

**PLEASE TAKE FURTHER NOTICE** that the failure to file and serve a timely response to the Motion may be deemed by the Court to be consent to the granting of the relief requested in the Motion.

**WHEREFORE**, the Debtor respectfully requests that this Court enter an order:

(a)      granting the Motion;

(b)      approving the Settlement Agreement; and

(c)      granting such other and further relief as the Court deems just and proper.

Dated:  April 8, 2014

ART AND ARCHITECTURE BOOKS OF
THE 21ST CENTURY, dba ACE GALLERY

By:   */s/ Krikor J. Meshefejian*
            Ron Bender
            Beth Ann R. Young
            Krikor J. Meshefejian
            LEVENE, NEALE, BENDER, YOO &
            BRILL L.L.P.
            Attorneys for Chapter 11 Debtor and Debtor
            in Possession

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      STATEMENT OF FACTS

1.      The Debtor is the owner and operator of a retail art gallery known as "Ace Gallery."  The Debtor's headquarters and main art gallery are located at 5500 Wilshire Blvd, Los Angeles, California.  However, the Debtor also leases commercial property located at 9430 Wilshire Boulevard, Beverly Hills, California 90212, pursuant to that certain AIR Commercial Real Estate Association Standard Industrial/Commercial Single Tenant Lease – Net dated June 20, 2007 (the "Beverly Hills Lease" or the "Lease Agreement"), for 9430 Wilshire Blvd., Beverly Hills, CA 90212 (the "Beverly Hills Property"), between the Debtor as lessee and CCP and CCP-West as the lessors.

2.      The Beverly Hills Property is located immediately adjacent to the "Golden Triangle" area of Beverly Hills.  The Debtor showcases and sells artwork from the Beverly Hills Property, and hosts events at the Beverly Hills Property.

3.      As part of the Beverly Hills Lease, the Debtor contends that it has an option to purchase the Beverly Hills Property, with various exercise prices depending on when the option is exercised (the "Purchase Option"), and the CCP-West Parties dispute this contention.  Instead, the CCP-West Parties contend that the Purchase Option has either terminated and/or been assigned, and the Debtor disputes this contention.

4.      On or about June 20, 2007, the Debtor and CCP and CCP-West entered into that certain Addendum No. 1 to Standard Industrial Commercial Single-Tenant Lease-Net (the "First Addendum").

5.      On or about June 20, 2007, the Debtor and CCP and CCP-West also entered into that certain Addendum No. 2 to Lease between Culver Center Partners, LLC and Culver Center-West #1, LLC and Art and Architecture Books of the 21st Century, Inc. (the "Second Addendum").

6.    On or about July 1, 2012, the Debtor and CCP and CCP-West entered into that certain Addendum No. 3 to Standard Industrial Commercial Single-Tenant Lease – Net (the "Third Addendum").  The First Addendum, Second Addendum and Third Addendum are collectively referred to herein as the "Lease Addendums."

7.    The Debtor and Chrismas as borrowers entered into that certain Promissory Note with the face amount of $1,650,000 on December 24th 2007 with F. Nicholas, A. Nicholas and Rubinstein as the lenders ("Note #1") and that certain Promissory Note with the face amount of $550,000 on January 16th 2008 with F. Nicholas as the lender ("Note #2, and collectively, with Note #1, the "Notes").  The unpaid principal of the Notes is presently the sum of $1,950,000 and the maturity date of the Notes is June 30th 2015.

8.    On February 19, 2013, the Debtor filed its Chapter 11 bankruptcy case in the United States Bankruptcy Court, Central District of California, Los Angeles Division, bearing Case No. 2:13-bk-14135RK (the "Bankruptcy Case").

9.    The Notes are reflected in the Debtor's Bankruptcy Case on the Claims Docket at Claim No. 24 (Note #1) and Claim No. 22 (Note #2, collectively with Note #1, the "Note Claims").

10.    On August 20, 2013 the CCP-West Parties and the Debtor filed in the Bankruptcy Case that certain *Stipulation between Debtor and Lessor Regarding Debtor's Assumption of its Non-Residential Real Property Lease for the Premises Located at 9430 Wilshire Blvd., Beverly Hills California* (the "Stipulation").

11.    On September 4, 2013, the CCP-West Parties and the Debtor filed in the Bankruptcy Case that certain revised *Stipulation between Debtor and Lessor Regarding Debtor's Assumption of its Non-Residential Real Property Lease for the Premises Located at 9430 Wilshire Blvd., Beverly Hills California* (the "Revised Stipulation").

12.    On September 11, 2013, the Bankruptcy Court in the Bankruptcy Case entered its Order Approving the Revised Stipulation (the "Beverly Hills Lease Assumption Order").

13.    Certain disputes and issues have arisen between the parties regarding the Lease Agreement, the Notes, the Note Claims and the Beverly Hills Lease Assumption Order.    The parties desire to resolve those disputes and issues through this Settlement Agreement.

14.    During the course of many months, the Parties negotiated a resolution of their disputes, and have entered into the "Settlement Agreement Regarding Beverly Hills Lease And Promissory Note" (the "Settlement Agreement").    The Settlement Agreement is subject to Bankruptcy Court approval.    A true and correct copy of the Settlement Agreement is attached as Exhibit "1" to the Declaration of Douglas Chrismas.

15.    The salient terms of the Agreement are as follows[1]:

For good and valuable consideration, receipt of which is hereby acknowledged, the Parties agree as follows:

**1.    Modifications to the Lease Agreement**: The CCP-West Parties and the Debtor Parties agree that the terms of the Lease Agreement, including the Purchase Option, are modified as set forth below.    Terms of the Lease Agreement, including the Purchase Option, that are not modified herein shall remain in full force and effect.    The terms of the Lease Agreement are modified as follows:

a.    The term of the Lease Agreement is hereby extended and shall run through January 30, 2016.

b.    The monthly Base Rent (as defined in the Lease Agreement) shall remain unchanged through June 30, 2014.

---

[1] Capitalized terms not otherwise defined have the same meaning ascribed to such terms in the Agreement.

c.    The monthly Base Rent shall increase to the sum of $101,250.00 per month for the period of July 1, 2014 through June 30, 2015.

d.    The monthly Base Rent shall increase to the sum of $108,000.00 for the period of July 1, 2015 through June 30, 2016.

e.    If Debtor extends the Lease Agreement to a date after June 30, 2016, then the monthly Base Rent will increase to the sum of $114,750.00 for the period of July 1, 2016 through December 31, 2016.

f.    So long as Debtor does not default on the provisions herein, the Debtor shall have the option to extend the Lease Agreement from January 30, 2016 to December 31, 2016, subject to CCP-West Parties' lender (the "Lender") agreeing to extend the loan to the CCP West Parties secured by the Beverly Hills Property, by (i) providing the CCP-West Parties with written notice (a "Lease Extension Notice") no later than October 1, 2015, of the option to extend the term of the Lease Agreement through December 31, 2016; and (ii) upon Debtor exercising the option to extend the Lease Agreement through December 31, 2016, Debtor paying all of the Lender's fees, costs and expenses related to the CCP-West Parties' request to extend the current loan on the Beverly Hills Property, not to exceed the sum of $100,000.00, payable by the Debtor within five (5) business days of the CCP-West's Parties' submission to the Debtor of written notice of the Lender's fees, costs and expenses, not to exceed the sum of $100,000.  If the CCP-West Parties have provided the Debtor Parties with written notice by no later than October 30, 2015 that the Lender will not extend the loan through December 31, 2016, the Debtor Parties may elect to provide or arrange for a replacement loan or other financing through December 31, 2016 for the CCP-West Parties, at no cost to the CCP-West Parties, on

terms which are substantially the same as those of the existing loan.  If the Debtor timely provides or arranges for such replacement loan or other financing, the CCP-West Parties agree to waive the requirement of obtaining the Lender's consent as a condition to extend the Lease Agreement.

  **2.**  **Lease Addendums.**  Upon execution of the Settlement Agreement, except as otherwise set forth in the Settlement Agreement,

  a. As to the terms and conditions of Addendum No. 1, a copy of which is attached as Exhibit "A" to the Settlement Agreement, the terms and conditions of Addendum No. 1 to the Lease Agreement remain in full force and effect, except as to the requirement in paragraph 60 of Addendum No. 1 for providing notice to Paul, Hastings, Janofsky & Walker LLP, which provision is hereby excluded and of no further force and effect.

  b. As to the terms and conditions of Addendum No. 3, a copy of which is attached as Exhibit "C" to the Settlement Agreement, the terms and conditions of Addendum No. 3 to the Lease Agreement at paragraphs 1, 2, 3, 6 and 7 are of no further force and effect and are superseded by those terms and conditions as set forth herein; and paragraphs 4, 5 and 8 of Addendum No. 3 remain in full force and effect.

  c. As to the terms and conditions of Addendum No. 2, a copy of which is attached as Exhibit "B" to the Settlement Agreement and incorporated into the Settlement Agreement by reference and made a part thereof, the terms and conditions of Addendum No. 2 as set forth in the paragraphs identified herein are removed, incorporated by reference and/or modified, as follows:

  1. Paragraphs 1 and 2 are removed from the Settlement Agreement and are of no force and effect;

2.        Paragraphs 4, 6, 8, 9, 10, 11, 12, 13 and 14, are retained in the Settlement Agreement and are incorporated herein by reference, made a part thereof, and remain in full force and effect; and

3.        Paragraphs 3, 5, 7 and 15 are clarified, or removed and replaced in the Settlement Agreement with the following language:

a)    Paragraph 3 is revised and replaced with the following:

"Debtor must provide CCP and CCP-West with at least thirty (30) days' notice of Debtor's exercise of the Option ("Option Exercise"), together with evidence of a deposit in the sum of $100,000 in the form of a cashier's check made payable to the escrow company (the "Option Deposit") delivered to Chicago Title, First American Title, or Commonwealth Lawyers Title (as selected jointly by Debtor and the CCP-West Parties, the "Escrow Company").  The Option Deposit shall be applicable to the purchase price if the Option Exercise closes.  Upon such delivery of the Option Deposit to the Escrow Company, Paragraphs 4 through 6, 8 and 9, and Paragraph 7 as modified herein, shall constitute instructions to the Escrow Company, subject to any further request by the Escrow Company for any additional instructions which may be reasonably requested by the Escrow Company relating to the Option Exercise, including the Escrow Company's general provisions to the extent not inconsistent with the terms hereof."

b)    Paragraph 5 is clarified and revised to define "Seller" as "CCP

9

and CCP-West, or their assignee" which definition of "Seller"
shall apply to any other reference to "Seller" in any other
applicable Paragraph of Addendum No. 2 which is surviving
the Settlement Agreement;

c) Paragraph 7 is revised and replaced with the following:

"If Debtor, after asserting the Option Exercise herein defaults
in its obligation to close within 90 days from the
commencement of the Escrow, which shall be calculated from
the date of delivery of the Option Deposit to the Escrow
Company, time being of the essence, the Option Deposit shall
be retained by CCP and CCP-West as liquidated damages (and
not as a penalty) in lieu of other damages against the Debtor
(but notwithstanding any default in the Option Exercise,
Debtor retains the option rights and any related requirements in
as modified in this Settlement Agreement, and as provided for
in the Lease Agreement), and Debtor shall have no further right
to purchase the premises pursuant to the Option Exercise then
pending, and Debtor's right to purchase the premises shall be
limited to Debtor's rights and obligations pursuant to the notice
of a new exercise of the Purchase Option, including without
limitation, the obligation to make a new deposit in the amount
of $100,000."

d) Paragraph 15 is revised and replaced with the following:

"Each of the parties warrants to the other that there **currently**

is no broker or finder involved in this transaction, and agrees to indemnify the other party and hold it free and harmless from any claim, liability, commission or expense arising from any breach of this warranty."

      **3.**     **Option Price and Option Periods**.  So long as Debtor is not in default on the provisions set forth in the Settlement Agreement, the CCP-West Parties, and each of them, agree that the Purchase Option as modified by the Settlement Agreement shall remain in full force and effect with the option price and option periods detailed as follows:

    a.    Option 1 – To close during the period 4/1/14 – 12/31/14:

       Purchase Price:   $17,800,000.00

    b.    Option 2 - To close during the period 1/1/15 – 6/30/15:

       Purchase price:   $18,575,000.00

    c.    Option 3 – To close during the period 7/1/15 – 12/31/15:

       Purchase Price:  $19,250,000.00

    d.    Option 4 – To close during the period 1/1/16 – 6/30/16:

       Purchase Price: $20,500,000.00

    e.    Option 5 – To close during the period 7/01/16 – 12/31/16:

       Purchase Price: $21,500,000.00.

      **4.**     **Exercise of Purchase Option.**  The Parties agree that:

    a.    The Debtor shall have the right to exercise its Purchase Option at any time during the term (or the extended term) of the Lease Agreement as set forth in paragraphs 2 and 4 of the Agreement, so long as the Debtor provides at least (30) days' notice of Debtor's exercise of the Option, together with evidence of a deposit in the sum of $100,000 to the Escrow Company.

11

b.      The purchase price payable for the Purchase Option shall be determined based upon the date that the Escrow for the Option Exercise closes, and not the date that the Escrow is opened.

c.      The Escrow for any Option Exercise must close before the end of the period for the Option 5, which is December 31, 2016.  The Parties agree that any Escrow pending upon the expiration of Option 5 may thereafter be unilaterally terminated by either Party.  The Debtor Parties expressly waive any right to request an extension of the deadline set forth in Option 5, which may be extended only upon the express written agreement of the Debtor and the Landlords.

5.      **Contacting Third Parties.**   Within three (3) business days from the signing of the Settlement Agreement, the CCP-West Parties, and each of them, shall provide the Debtor and/or its nominee with written authorization to contact the City of Beverly Hills, County of Los Angeles, and/or any other applicable state or county departments, governing entities, and/or any of political subdivisions thereof, in connection with any and all applications and efforts to obtain permits, entitlements or zoning changes or variances, or any approvals and/or permissions for or involved in a prospective development of the Beverly Hills Property.

6.      **The Notes and Note Claims.**

a.      The unpaid principal under the Notes is presently $1,950,000 (the "Loan Balance") and by signing the Settlement Agreement the CCP-West Parties, and each of them, hereby waive any and all interest on the Loan Balance accrued through the date of execution of the Settlement Agreement.  The CCP-West Parties shall have an allowed unsecured claim in the Debtor's Bankruptcy Case in satisfaction of the Notes and the Note Claims for the amount of the Loan Balance plus interest thereon commencing from and after the date of the Settlement Agreement, which shall accrue on the Loan Balance

at the rate of 5% per annum (non-compounding) (the "Allowed Claim").  The Allowed

Claim shall be paid through the Debtor's plan of reorganization in accordance with those

other unsecured creditors holding allowed claims.

b.      If at any time after the end of the term of the Lease Agreement as

modified above, as may be extended in accordance with the Settlement Agreement or

otherwise, the Allowed Claim has not been paid in full in accordance with Debtor's plan

of reorganization, or the Beverly Hills Property has not been sold, then Chrismas shall

continue to be personally liable for any unpaid portion of the Loan Balance plus all

accrued interest which is in arrears, notwithstanding anything contained in the Settlement

Agreement to the contrary, including without limitation paragraphs 10 and 12 of the

Settlement Agreement.

c.      Should the Beverly Hills Property be sold under paragraph 4, the Loan

Balance shall be paid to the CCP West Parties in full from the proceeds of the sale

through escrow.

**7.      Default and Cure Rights.**  In the event of a default under the terms of the

Lease Agreement or the Settlement Agreement,

a.      The Debtor shall have seven (7) business days to cure any monetary

default, commencing on the first business day following the Debtor's receipt of the

Landlords' written notice of monetary default to the Debtor (the "Monetary Cure

Period").  Any monetary default with respect to the Lease Agreement or the Settlement

Agreement which remains uncured following the Monetary Cure Period shall cause an

automatic termination of the Lease Agreement and Purchase Option.

b.      The Debtor shall have forty-five (45) calendar days to cure any non-

monetary default, commencing on the first business day following the Debtor's receipt of

13

the Landlords' written notice of non-monetary default to the Debtor, except that if the

nature of the non-monetary default is such that more than forty-five (45)  days are

reasonably required for its cure, then the non-monetary default shall not be deemed to be

uncured if the Debtor commences such cure within the forty-five (45)-day period and

thereafter cures such default within an additional ninety (90)-day period.  Any such non-

monetary default which remains uncured following the periods set forth herein shall

cause an automatic termination of the Lease Agreement and Purchase Option, provided,

however, that if there is a good-faith dispute regarding whether a non-monetary default

exists or has been cured such dispute shall be determined by the Bankruptcy Court, or if

the Bankruptcy Case has been closed, then a California court of competent jurisdiction,

and the Debtor shall have five (5) business days from any such adverse determination to

commence cure and shall complete such cure within ninety (90) days thereafter.  CCP

and CCP-West have the right to permit a cure by the Debtor of any such non-monetary

default after the expiration of the time for cure provided for herein and subsequently

charge the Debtor for any reasonable cost and expense incurred in curing the non-

monetary default after such period.

        **8.**    **Releases and Waivers.**  Paragraphs 10, 11, and 12 contain mutual general

releases and waivers for the benefit of the Parties.

## II.    DISCUSSION

**A.**    **The Settlement Agreement Is Fair And In The Best Interests Of The Estate.**

        The Settlement Agreement is fair and in the best interests of the estate because it resolves

the Debtor's and the CCP-West Parties' disputes in connection with the Beverly Hills Lease and

the Claims.  The resolution of such disputes will pave the way for the Debtor to be able to enter

into the transactions contemplated in the Debtor's Plan Of Reorganization (Dated March 18,

2014) related to the exercise of the Debtor's option to purchase the Beverly Hills Property (a "Beverly Hills Property Transaction").    The Debtor projects that the cash proceeds to the bankruptcy estate after taking into account transaction costs, and other expenses related to a Beverly Hills Property Transaction, will be approximately $22,000,000, with some of that amount to be funded prior to the effective date of a plan of reorganization, and the remaining amount to be funded after the effective date (after the Debtor obtains entitlements to develop and sell the Beverly Hills Property which the Debtor expects will occur within approximately three years of the Plan Effective Date).    Such cash proceeds will allow the Debtor to confirm a plan of reorganization in this case.  By way of the Settlement Agreement, the Debtor will be positioned to enter into a Beverly Hills Property Transaction without the need to resort to expensive and time consuming litigation with the CCP West Parties.

Although the Settlement Agreement provides for an increase in rental rates, and an increase in the cost to exercise options to purchase the Beverly Hills Property, the incremental increase in rental rates and costs to exercise purchase options are not significant when compared to the costs that the Debtor believes it would be forced to incur in litigating its disputes with the CCP-West Parties, and the potential costs to the estate if the Debtor did not prevail in litigation with the CCP-West Parties.

Moreover, although the Settlement Agreement provides the CCP-West Parties with an allowed unsecured claim in the Bankruptcy Case in satisfaction of the Notes and the Note Claims for the amount of the Loan Balance plus interest thereon commencing from and after the date of the Settlement Agreement, which shall accrue on the Loan Balance at the rate of 5% per annum (non-compounding) (the "Allowed Claim"), pursuant to the Settlement Agreement, the CCP-West Parties have waived any and all interest on the Loan Balance accrued through the date of execution of the Settlement Agreement.  The Debtor submits that the resolution of one of the largest general unsecured claims in the Bankruptcy Case, the waiver of any interest accrued through the date of execution of the Settlement Agreement, and the preservation of the Purchase Option and Lease Agreement (as modified) justifies allowance of the Claims and the potential

1  payment of the Claims through a sale of the Beverly Hills Property as contemplated in paragraph

2  4 of the Settlement Agreement.

3       Accordingly, the Debtor believes that the Agreement is in the best interests of the Debtor's

4  bankruptcy estate.

5       The purpose of any compromise agreement is to allow the debtor in possession and the

6  creditors to avoid the expenses and burdens associated with litigating sharply contested and

7  uncertain claims. In re Walsh Construction, Inc., 669 F.2d 1325, 1328 (9th Cir. 1982) (citing In re

8  California Associated Prods., 183 F.2d 946, 949-50 (9th Cir. 1950)).  The law favors compromise

9  and not litigation for its own sake. In re Blair, 538 F.2d 849, 851 (9th Cir. 1976).

10       The Court of Appeals for the Ninth Circuit has long recognized that "[t]he bankruptcy

11  court has great latitude in approving compromise agreements." Woodson v. Fireman's Fund Ins.

12  Co. (In re Woodson), 839 F.2d 610, 620 (9th Cir. 1988).  "The purpose of a compromise

13  agreement is to allow the [debtor in possession] and the creditors to avoid the expenses and

14  burdens associated with litigating sharply contested and dubious claims." Martin v. Kane (In re A

15  & C Properties), 784 F.2d 1377, 1380-81 (9th Cir. 1986), cert.denied 479 U.S. 854 (1986).

16  Accordingly, in approving a settlement agreement, the Bankruptcy Court need not conduct an

17  exhaustive investigation of the claims sought to be compromised.  See United States v. Alaska

18  National Bank (In re Walsh Constr., Inc.), 669 F.2d 1325, 1328 (9th Cir. 1982).

19       The Supreme Court in Protective Committee for Independent Stockholders of TNT Trailer

20  Fairy, Inc. v. Anderson, 390 U.S. 414, 425 (1968), held that a bankruptcy court, in considering

21  whether to approve a compromise, should apprise itself of all facts necessary for an intelligent and

22  objective opinion of the probabilities of ultimate success should the claim be litigated.  It also

23  explained that the court should form an educated estimate of the complexity, expense and likely

24  duration of such litigation, the possibility of collection on any judgment that might be obtained,

25  and all other factors relevant to the full and fair assessment of the wisdom of the proposed

26  compromise.  The Court need not, however, conduct an exhaustive investigation into the validity

27  of the claims to be compromised nor is the Court expected to conduct a mini-trial on the merits. In

28  re Walsh Construction, Inc., 669 F.2d at 1328.  It is sufficient that the Bankruptcy Court find that

the settlement was negotiated in good faith and is reasonable, fair, and equitable. See In re A & C Properties, supra, 784 F.2d at 1381.

The Court of Appeals for the Ninth Circuit has identified the following factors for consideration in determining whether a proposed settlement agreement is reasonable, fair, and equitable:

(a)    the probability of success in the litigation;

(b)    the difficulties, if any, to be encountered in the matter of collection;

(c)    the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and

(d)    the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

In re A & C Properties, supra, 784 F.2d at 1381 (the "A & C Factors").

Consideration of these factors does not require the Bankruptcy Court to determine whether a settlement presented is the best one that could possibly have been achieved.  Rather, the Bankruptcy Court need only canvass the issues to determine whether the settlement falls "below the lowest point in the zone of reasonableness."  Newman v. Stein, 464 F.2d 689, 698 (2d Cir. 1972) (emphasis added), cert. denied sub nom. Benson v. Newman, 409 U.S. 1039 (1972); seealsoAnaconda-Ericsson Inc. v. Hessen (In re Teltronics Services, Inc.), 762 F.2d 185, 189 (2d Cir. 1985); Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983), cert. denied 464 U.S. 822 (1983).  Finally, although the Bankruptcy Court should give deference to the reasonable views of creditors, "objections do not rule.  It is well established that compromises are favored in bankruptcy." In re Lee Way Holding Co., 120 B.R. 881, 891 (Bankr. S.D. Ohio 1990).

Based on an analysis of the settlement in light of the A & C factors, the Debtor believes the Agreement is fair, reasonable, and in the best interests of its creditors and the estate.  In this case, the Agreement was negotiated at arms' length over a course of many months by the respective Parties to settle anticipated litigation.

1.    The probability of success in the litigation.

While the Debtor believes that it would prevail in connection with litigation with the CCP-

West Parties, the Debtor believes that there are nevertheless significant costs and risks associated with litigation with the CCP-West Parties, which render the Settlement Agreement a far superior alternative to litigation. Absent the Settlement Agreement, the Debtor would likely be required to engage in litigation with the CCP-West Parties regarding whether the Purchase Option terminated prior to the Debtor's assumption of the Beverly Hills Lease, pursuant to a "Letter of Agreement" that the CCP-West Parties claim that the Debtor entered into that granted the CCP-West Parties the right to terminate the Purchase Option if the Debtor defaulted in the payment of the Notes. The Debtor disputes all of the CCP-West Parties' allegations and claims, and believes that it has infallible arguments that the Purchase Option never terminated.[2] However, there is the risk that additional information is discovered that could render the Debtor's arguments less persuasive, and there is the possibility, however minute, that the CCP-West Parties will be able to persuade a court that the Purchase Option terminated. The risk, even if minute, is too large for the Debtor to bear considering that the primary and most immediate source of recoveries to creditors in this case is proposed to be a Beverly Hills Property Transaction, which requires the Purchase Option. The Debtor is unwilling to risk an outcome that destroys the Debtor's ability to undertake a Beverly Hills Property Transaction, instead preferring the certainty provided to the Debtor pursuant to the Settlement Agreement.

In summary, success is uncertain, will be costly to attain, and would not provide benefits substantially greater than the benefits provided to the Debtor under the Settlement Agreement. Accordingly, this factor weighs in favor of approving the Settlement Agreement.

2.      The difficulties, if any, to be encountered in the matter of collection.

This factor is not particularly relevant in this instance, since the disputes at issue do not contemplate collection from the CCP-West Parties.

---

[2] The Debtor also believes that it could enter into and consummate a Beverly Hills Property Transaction even if the termination litigation with the CCP-West Parties were not yet complete. If the Debtor were do so, however, that would likely result in additional litigation with the CCP-West Parties and all of the attendant risks, costs, and possible delay. The Settlement Agreement avoids theses potential burdens as well.

1          3.    <u>The complexity of the litigation involved, and the expense, inconvenience, and</u>

2              <u>delay necessarily attending it.</u>

3          In this case, the Settlement Agreement does far more than rise above "the lowest point in

4    the range of reasonableness." Indeed, it is eminently fair to the estate and the unsecured creditors

5    and benefits both. The litigation being resolved by the Settlement Agreement is complex, time-

6    intensive, and will be very expensive to manage. Indeed, it has already spanned a period of many

7    months, and the primary substantive disputes have not even been formally presented to the Court

8    or litigated. If the litigation regarding the Debtor's ability to exercise the Purchase Option moved

9    forward, an adversary proceeding and evidentiary hearings would likely be necessary, and would

10    likely take at least six months to one year to resolve. If the Debtor's litigation with AERC (the

11    Debtor's other landlord) is any indication of the costs to the estate of such litigation, the estate will

12    likely incur more than $750,000 only in attorneys' fees in connection with litigation with the

13    CCP-West Parties. The proposed Settlement Agreement as a whole represent a beneficial outcome

14    for this estate without the risk, cost and delay associated with continuing litigation.

15          4.    <u>The paramount interest of the creditors and a proper deference to their</u>

16              <u>reasonable views.</u>

17          Creditors will benefit from the Settlement Agreement because the Settlement Agreement

18    provides the Debtor the opportunity to enter into a Beverly Hills Property Transaction and exit

19    Chapter 11 in the near future. The Debtor believes that the Official Committee of Unsecured

20    Creditors will support the Settlement Agreement because the Settlement Agreement promotes the

21    estate's financial interests, and as a result, promotes general unsecured creditors' financial

22    interests. Thus, the Settlement Agreement is in the best interests of creditors and should be

23    approved by this Court.

24    ///

25    ///

26    ///

27    ///

28    ///

## III.

## CONCLUSION

**WHEREFORE**, the Debtor respectfully requests that this Court enter an order:

(a)    granting the Motion;

(b)    approving the Settlement Agreement; and

(c)    granting such other and further relief as the Court deems just and proper.

Dated:  April 8, 2014

ART AND ARCHITECTURE BOOKS OF
THE 21ST CENTURY, dba ACE GALLERY

By:    _/s/ Krikor J. Meshefejian_
Ron Bender
Beth Ann R. Young
Kurt Ramlo
Krikor J. Meshefejian
LEVENE, NEALE, BENDER, YOO &
BRILL L.L.P.
Attorneys for Chapter 11 Debtor and Debtor
in Possession

## DECLARATION OF DOUGLAS CHRISMAS

I, Douglas Chrismas, hereby declare as follows:

1.      I am the President of Art And Architecture Books Of The 21st Century, dba Ace Gallery, chapter 11 debtor and debtor in possession (the "Debtor").  As President of the Debtor, I am involved in virtually all aspects of the Debtor's operations and financial condition.  I am also the Director and Chief Curator of the Debtor.  Capitalized terms not otherwise defined have the same meaning ascribed to such terms in the Motion above.

2.      I have personal knowledge of the facts set forth herein, and, if called to testify, could and would competently testify to such facts.

3.      The Debtor is the owner and operator of a retail art gallery known as "Ace Gallery."  The Debtor's headquarters and main art gallery are located at 5500 Wilshire Blvd, Los Angeles, California.  However, the Debtor also leases commercial property located at 9430 Wilshire Boulevard, Beverly Hills, California 90212, pursuant to that certain AIR Commercial Real Estate Association Standard Industrial/Commercial Single Tenant Lease – Net dated June 20, 2007 (the "Beverly Hills Lease" or the "Lease Agreement"), for 9430 Wilshire Blvd., Beverly Hills, CA 90212 (the "Beverly Hills Property"), between the Debtor as lessee and CCP and CCP-West as the lessors.

4.      The Beverly Hills Property is located immediately adjacent to the "Golden Triangle" area of Beverly Hills.  The Debtor showcases and sells artwork from the Beverly Hills Property, and hosts events at the Beverly Hills Property.

5.      As part of the Beverly Hills Lease, the Debtor contends that it has an option to purchase the Beverly Hills Property, with various exercise prices depending on when the option is exercised (the "Purchase Option"), and the CCP-West Parties dispute this contention.  Instead, the CCP-West Parties contend that the Purchase Option has either terminated and/or been assigned, and the Debtor disputes this contention.

6.      On or about June 20, 2007, the Debtor and CCP and CCP-West entered into that certain Addendum No. 1 to Standard Industrial Commercial Single-Tenant Lease-Net (the "First Addendum").

7.      On or about June 20, 2007, the Debtor and CCP and CCP-West also entered into that certain Addendum No. 2 to Lease between Culver Center Partners, LLC and Culver Center-West #1, LLC and Art and Architecture Books of the 21st Century, Inc. (the "Second Addendum").

8.      On or about July 1, 2012, the Debtor and CCP and CCP-West entered into that certain Addendum No. 3 to Standard Industrial Commercial Single-Tenant Lease – Net (the "Third Addendum").  The First Addendum, Second Addendum and Third Addendum are collectively referred to herein as the "Lease Addendums."

9.      The Debtor and I as borrowers entered into that certain Promissory Note with the face amount of $1,650,000 on December 24th 2007 with F. Nicholas, A. Nicholas and Rubinstein as the lenders ("Note #1") and that certain Promissory Note with the face amount of $550,000 on January 16th 2008 with F. Nicholas as the lender ("Note #2, and collectively, with Note #1, the "Notes").  The unpaid principal of the Notes is presently the sum of $1,950,000 and the maturity date of the Notes is June 30th 2015.

10.     On February 19, 2013, the Debtor filed its Chapter 11 bankruptcy case in the United States Bankruptcy Court, Central District of California, Los Angeles Division, bearing Case No. 2:13-bk-14135RK (the "Bankruptcy Case").

11.     The Notes are reflected in the Debtor's Bankruptcy Case on the Claims Docket at Claim No. 24 (Note #1) and Claim No. 22 (Note #2, collectively with Note #1, the "Note Claims").

12.     On August 20, 2013 the CCP-West Parties and the Debtor filed in the Bankruptcy Case that certain *Stipulation between Debtor and Lessor Regarding Debtor's Assumption of its Non-Residential Real Property Lease for the Premises Located at 9430 Wilshire Blvd., Beverly Hills California* (the "Stipulation").

13.    On September 4, 2013, the CCP-West Parties and the Debtor filed in the Bankruptcy Case that certain revised *Stipulation between Debtor and Lessor Regarding Debtor's Assumption of its Non-Residential Real Property Lease for the Premises Located at 9430 Wilshire Blvd., Beverly Hills California* (the "Revised Stipulation").

14.    On September 11, 2013, the Bankruptcy Court in the Bankruptcy Case entered its Order Approving the Revised Stipulation (the "Beverly Hills Lease Assumption Order").

15.    Certain disputes and issues have arisen between the parties regarding the Lease Agreement, the Notes, the Note Claims and the Beverly Hills Lease Assumption Order.   The parties desire to resolve those disputes and issues through this Settlement Agreement.

16.    During the course of many months, the Parties negotiated a resolution of their disputes, and have entered into the "Settlement Agreement Regarding Beverly Hills Lease And Promissory Note" (the "Settlement Agreement").   The Settlement Agreement is subject to Bankruptcy Court approval.  A true and correct copy of the Settlement Agreement is attached as Exhibit "1" to this Declaration.

17.    I believe that the Settlement Agreement is fair and in the best interests of the estate because it resolves the Debtor's and the CCP-West Parties' disputes in connection with the Beverly Hills Lease and the Claims.  The resolution of such disputes will pave the way for the Debtor to be able to enter into the transactions contemplated in the Debtor's Plan Of Reorganization (Dated March 18, 2014) related to the exercise of the Debtor's option to purchase the Beverly Hills Property (a "Beverly Hills Property Transaction").   I project that the cash proceeds to the bankruptcy estate after taking into account transaction costs, and other expenses related to a Beverly Hills Property Transaction, will be approximately $22,000,000, with some of that amount to be funded prior to the effective date of a plan of reorganization, and the remaining amount to be funded after the effective date (after the Debtor obtains entitlements to develop and sell the Beverly Hills Property which the Debtor expects will occur within approximately three years of the Plan Effective Date).  Such cash proceeds will allow the Debtor to confirm a plan of reorganization in this case.  By way of the Settlement Agreement, the Debtor will be positioned to

enter into a Beverly Hills Property Transaction without the need to resort to expensive and time

consuming litigation with the CCP West Parties.

18.    Although the Settlement Agreement provides for an increase in rental rates, and an

increase in the cost to exercise options to purchase the Beverly Hills Property, the incremental

increase in rental rates and costs to exercise purchase options are not significant when compared

to the costs that the Debtor would be forced to incur in litigating its disputes with the CCP-West

Parties, and the potential costs to the estate if the Debtor did not prevail in litigation with the

CCP-West Parties.

19.    Moreover, although the Settlement Agreement provides the CCP-West Parties with

an allowed unsecured claim in the Bankruptcy Case in satisfaction of the Notes and the Note

Claims for the amount of the Loan Balance plus interest thereon commencing from and after the

date of the Settlement Agreement, which shall accrue on the Loan Balance at the rate of 5% per

annum (non-compounding) (the "Allowed Claim"), pursuant to the Settlement Agreement, the

CCP-West Parties have waived any and all interest on the Loan Balance accrued through the date

of execution of the Settlement Agreement.  I submit that the resolution of one of the largest

general unsecured claims in the Bankruptcy Case, the waiver of any interest accrued through the

date of execution of the Settlement Agreement, and the preservation of the Purchase Option and

Lease Agreement (as modified) justifies allowance of the Claims and the potential payment of the

Claims through a sale of the Beverly Hills Property as contemplated in paragraph 4 of the

Settlement Agreement.

20.    While I believe the Debtor would prevail in connection with litigation with the

CCP-West Parties, I believe that there are nevertheless significant costs and risks associated with

litigation with the CCP-West Parties, which render the Settlement Agreement a far superior

alternative to litigation.  Absent the Settlement Agreement, the Debtor would likely be required to

engage in litigation with the CCP-West Parties regarding whether the Purchase Option terminated

prior to the Debtor's assumption of the Beverly Hills Lease, pursuant to a "Letter of Agreement"

that the CCP-West Parties claim that the Debtor entered into that granted the CCP-West Parties

the right to terminate the Purchase Option if the Debtor defaulted in the payment of the Notes.

The Debtor disputes all of the CCP-West Parties' allegations and claims, and believes that it has infallible arguments that the Purchase Option never terminated. However, there is the risk that additional information is discovered that could render the Debtor's arguments less persuasive, and there is the possibility, however minute, that the CCP-West Parties will be able to persuade a court that the Purchase Option terminated. The risk, even if minute, is too large for the Debtor to bear considering that the primary and most immediate source of recoveries to creditors in this case is proposed to be a Beverly Hills Property Transaction, which requires the Purchase Option. I am unwilling to risk an outcome that destroys the Debtor's ability to undertake a Beverly Hills Property Transaction, instead preferring the certainty provided to the Debtor pursuant to the Settlement Agreement.

21. In summary, success is uncertain, will be costly to attain, and would not provide benefits substantially greater than the benefits provided to the Debtor under the Settlement Agreement.

22. Indeed, the litigation being resolved by the Settlement Agreement is complex, time-intensive, and will be very expensive to manage, based on my experience in this case with the Debtor's other landlord. Indeed, negotiations with the CCP-West Parties spanned a period of many months, and the primary substantive disputes have not even been formally presented to the Court or litigated. If the litigation regarding the Debtor's ability to exercise the Purchase Option moved forward, I understand that an adversary proceeding and evidentiary hearings would likely be necessary, and would likely take at least six months to one year to resolve. If the Debtor's litigation with AERC (the Debtor's other landlord) is any indication of the costs to the estate of such litigation, the estate will likely incur more than $750,000 only in attorneys' fees in connection with litigation with the CCP-West Parties. The proposed Settlement Agreement as a whole represent a beneficial outcome for this estate without the risk, cost and delay associated with continuing litigation.

23. Additionally, creditors will benefit from the Settlement Agreement because the Settlement Agreement provides the Debtor the opportunity to enter into a Beverly Hills Property Transaction and exit Chapter 11 in the near future. I understand that the Official Committee of

Unsecured Creditors will support the Settlement Agreement because the Settlement Agreement promotes the estate's financial interests, and as a result, promotes general unsecured creditors' financial interests.

24.    Under the circumstances set forth above, I submit that the Settlement Agreement is in the best interests of the estate, and meets the requirements of Court approval of a settlement under Rule 9019 of the Federal Rules of Bankruptcy Procedure.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 8, 2014, at Los Angeles, California.

DOUGLAS CHRISMAS

26

**EXHIBIT "1"**

## SETTLEMENT AGREEMENT REGARDING

## BEVERLY HILLS LEASE AGREEMENT AND PROMISSORY NOTES

This Settlement Agreement ("Settlement Agreement" or "Agreement") Regarding the Beverly Hills Lease (the "Lease Agreement") and the two Promissory Notes relating to the Lease Agreement is entered into on this 7 day of April, 2014, between Art And Architecture Books Of The 21st Century, dba Ace Gallery, the Chapter 11 debtor and debtor in possession (the "Debtor") and Douglas Chrismas ("Chrismas," collectively, with Debtor, the "Debtor Parties") on the one hand, and Culver Center Partners-West #1, LLC ("CCP-West"), Culver Center Partners, LLC ("CCP," collectively with CCP-West, the "Landlords"), Frederick M. Nicholas ("F. Nicholas"), Anthony Nicholas ("A. Nicholas"), Simon Rubinstein ("Rubinstein") and The Hapsmith Company ("Hapsmith," collectively with CCP-West, CCP, F. Nicholas, A. Nicholas and Rubinstein, the "CCP-West Parties") on the other hand (the Debtor Parties and the CCP-West Parties, collectively referred to herein as the "Parties"), with regard to the following:

## RECITALS

A.    The Debtor is the owner and operator of a retail art gallery known as "Ace Gallery." Debtor's headquarters and main art gallery is located at 5500 Wilshire Blvd, Los Angeles, California. However, the Debtor also leases commercial property located at 9430 Wilshire Boulevard, Beverly Hills, California 90212, pursuant to that certain AIR Commercial Real Estate Association Standard Industrial/Commercial Single Tenant Lease – Net dated June 20, 2007 (the "Beverly Hills Lease"), for 9430 Wilshire Blvd., Beverly Hills, CA 90212 (the "Beverly Hills Property"), between the Debtor as lessee and CCP and CCP-West as the lessors (the "Lessors").

1/19



B.     The Beverly Hills Property is located immediately adjacent to the "Golden Triangle" area of Beverly Hills. The Debtor showcases and sells artwork from the Beverly Hills Property, and hosts events at the Beverly Hills Property.

C.     As part of the Beverly Hills Lease, the Debtor contends that it has an option to purchase the Beverly Hills Property, with various exercise prices depending on when the option is exercised (the "Purchase Option"), and the CCP-West Parties dispute this contention. Instead, the CCP-West Parties contend that the Purchase Option has either terminated and/or been assigned, and the Debtor disputes this contention.

D.     On or about June 20, 2007, the Debtor and CCP and CCP-West entered into that certain Addendum No. 1 to Standard Industrial Commercial Single-Tenant Lease-Net (the "First Addendum").

E.     On or about June 20, 2007, the Debtor and CCP and CCP-West also entered into that certain Addendum No. 2 to Lease between Culver Center Partners, LLC and Culver Center-West #1, LLC and Art and Architecture Books of the 21st Century, Inc. ("Second Addendum").

F.     On or about July 1, 2012, the Debtor and CCP and CCP-West entered into that certain Addendum No. 3 to Standard Industrial Commercial Single-Tenant Lease – Net (the "Third Addendum"). The First Addendum, Second Addendum and Third Addendum are collectively referred to herein as the "Lease Addendums."

G.     The Debtor and Chrismas as borrowers entered into that certain Promissory Note with the face amount of $1,650,000 on December 24th 2007 with F. Nicholas, A. Nicholas and Rubinstein as the lenders ("Note #1") and that certain Promissory Note with the face amount of $550,000 on January 16th 2008 with F.





Nicholas as the lender ("Note #2, and collectively, with Note #1, the "Notes"). The unpaid principal of the Notes is presently the sum of $1,950,000 and the maturity date of the Notes is June 30th 2015.

H.   On February 19, 2013, the Debtor filed its Chapter 11 bankruptcy case in the United States Bankruptcy Court, Central District of California, Los Angeles Division, bearing Case No. 2:13-bk-14135RK (the "Bankruptcy Case").

I.   The Notes are reflected in the Debtor's Bankruptcy Case on the Claims Docket at Claim No. 24 (Note #1) and Claim No. 22 (Note #2, collectively with Note #1, "the Note Claims").

J.   On August 20, 2013 the CCP-West Parties and the Debtor filed in the Bankruptcy Case that certain *Stipulation between Debtor and Lessor Regarding Debtor's Assumption of its Non-Residential Real Property Lease for the Premises Located at 9430 Wilshire Blvd., Beverly Hills California* (the "Stipulation").

K.   On September 4, 2013, the CCP-West Parties and the Debtor filed in the Bankruptcy Case that certain revised *Stipulation between Debtor and Lessor Regarding Debtor's Assumption of its Non-Residential Real Property Lease for the Premises Located at 9430 Wilshire Blvd., Beverly Hills California* (the "Revised Stipulation").

L.   On September 11, 2013, the Bankruptcy Court in the Bankruptcy Case entered its Order Approving the Revised Stipulation (the "Beverly Hills Lease Assumption Order").

M.   Certain disputes and issues have arisen between the Parties regarding the Lease Agreement, the Notes, the Note Claims and the Beverly Hills Lease Assumption Order. The parties desire to resolve those disputes and issues through this Settlement



3/19



Agreement.

For good and valuable consideration, receipt of which is hereby acknowledged, the Parties agree as follows:

1.    **Recitals Incorporated.**  The foregoing recitals in paragraphs "A" through "M" above are incorporated herein by this reference and made a part of this Agreement as if set forth at length herein.

2.    **Modifications to the Lease Agreement, Including the Purchase Option**: The CCP-West Parties and the Debtor Parties agree that the terms of the Lease Agreement, including the Purchase Option, are modified as set forth below.  Terms of the Lease Agreement, including the Purchase Option, that are not modified herein shall remain in full force and effect.  The terms of the Lease Agreement are modified as follows:

a.    The term of the Lease Agreement is hereby extended and shall run through January 30, 2016.

b.    The monthly Base Rent (as defined in the Lease Agreement) shall remain unchanged through June 30, 2014.

c.    The monthly Base Rent shall increase to the sum of $101,250.00 per month for the period of July 1, 2014 through June 30, 2015.

d.    The monthly Base Rent shall increase to the sum of $108,000.00 for the period of July 1, 2015 through June 30, 2016.

e.    If Debtor extends the Lease Agreement to a date after June 30, 2016, then the monthly Base Rent will increase to the sum of $114,750.00 for the period of July 1, 2016 through December 31, 2016.

4/19

f.      So long as Debtor does not default on the provisions herein, the Debtor shall have the option to extend the Lease Agreement from January 30, 2016 to December 31, 2016, subject to CCP-West Parties' lender (the "Lender") agreeing to extend the loan to the CCP West Parties secured by the Beverly Hills Property, by (i) providing the CCP-West Parties with written notice (a "Lease Extension Notice") no later than October 1, 2015, of the option to extend the term of the Lease Agreement through December 31, 2016; and (ii) upon Debtor exercising the option to extend the Lease Agreement through December 31, 2016, Debtor paying all of the Lender's fees, costs and expenses related to the CCP-West Parties' request to extend the current loan on the Beverly Hills Property, not to exceed the sum of $100,000.00, payable by the Debtor within five (5) business days of the CCP-West's Parties' submission to the Debtor of written notice of the Lender's fees, costs and expenses, not to exceed the sum of $100,000.  If the CCP-West Parties have provided the Debtor Parties with written notice by no later than October 30, 2015 that the Lender will not extend the loan through December 31, 2016, the Debtor Parties may elect to provide or arrange for a replacement loan or other financing through December 31, 2016 for the CCP-West Parties, at no cost to the CCP-West Parties, on terms which are substantially the same as those of the existing loan.  If the Debtor timely provides or arranges for such replacement loan or other financing, the CCP-West Parties agree to waive the requirement of obtaining the Lender's consent as a condition to extend the Lease Agreement.

3.      **Lease Addendums.**   Upon execution of this Settlement Agreement, except as otherwise set forth in this Agreement,

a.      As to the terms and conditions of Addendum No. 1, a copy of which is

5/19



attached hereto as Exhibit "A," the terms and conditions of Addendum No. 1 to the Lease

Agreement remain in full force and effect, except as to the requirement in paragraph 60

of Addendum No. 1 for providing notice to Paul, Hastings, Janofsky & Walker LLP,

which provision is hereby excluded and of no further force and effect.

   b.    As to the terms and conditions of Addendum No. 3, a copy of which is

attached hereto as Exhibit "C," the terms and conditions of Addendum No. 3 to the Lease

Agreement at paragraphs 1, 2, 3, 6 and 7 are of no further force and effect and are

superseded by those terms and conditions as set forth herein; and paragraphs 4, 5 and 8 of

Addendum No. 3 remain in full force and effect.

   c.    As to the terms and conditions of Addendum No. 2, a copy of which is

attached hereto as Exhibit "B" and incorporated herein by this reference and made a part

hereof, the terms and conditions of Addendum No. 2 as set forth in the paragraphs

identified herein are removed, incorporated by reference and/or modified, as follows:

   1.    Paragraphs 1 and 2 are removed from this Agreement and are of no

force and effect;

   2.    Paragraphs 4, 6, 8, 9, 10, 11, 12, 13 and 14, are retained in this

Agreement and are incorporated herein by this reference, made a part hereof, and

remain in full force and effect; and

   3.    Paragraphs 3, 5, 7 and 15 are clarified, or removed and replaced in

this Agreement with the following language:

   a)   Paragraph 3 is revised and replaced with the following:

      "Debtor must provide CCP and CCP-West with at least thirty

      (30) days' notice of Debtor's exercise of the Option ("Option

6|19

Exercise"), together with evidence of a deposit in the sum of $100,000 in the form of a cashier's check made payable to the escrow company (the "Option Deposit") delivered to Chicago Title, First American Title, or Commonwealth Lawyers Title (as selected jointly by Debtor and the CCP-West Parties, the "Escrow Company"). The Option Deposit shall be applicable to the purchase price if the Option Exercise closes. Upon such delivery of the Option Deposit to the Escrow Company, Paragraphs 4 through 6, 8 and 9, and Paragraph 7 as modified herein, shall constitute instructions to the Escrow Company, subject to any further request by the Escrow Company for any additional instructions which may be reasonably requested by the Escrow Company relating to the Option Exercise, including the Escrow Company's general provisions to the extent not inconsistent with the terms hereof."

b) Paragraph 5 is clarified and revised to define "Seller" as "CCP and CCP-West, or their assignee" which definition of "Seller" shall apply to any other reference to "Seller" in any other applicable Paragraph of Addendum No. 2 which is surviving this Agreement;

c) Paragraph 7 is revised and replaced with the following:

"If Debtor, after asserting the Option Exercise herein defaults in its obligation to close within 90 days from the

7/19



commencement of the Escrow, which shall be calculated from the date of delivery of the Option Deposit to the Escrow Company, time being of the essence, the Option Deposit shall be retained by CCP and CCP-West as liquidated damages (and not as a penalty) in lieu of other damages against the Debtor (but notwithstanding any default in the Option Exercise, Debtor retains the option rights and any related requirements in as modified in this Settlement Agreement, and as provided for in the Lease Agreement), and Debtor shall have no further right to purchase the premises pursuant to the Option Exercise then pending, and Debtor's right to purchase the premises shall be limited to Debtor's rights and obligations pursuant to the notice of a new exercise of the Purchase Option, including without limitation, the obligation to make a new deposit in the amount of $100,000.

d) Paragraph 15 is revised and replaced with the following:

"Each of the parties warrants to the other that there **currently** is no broker or finder involved in this transaction, and agrees to indemnify the other party and hold it free and harmless from any claim, liability, commission or expense arising from any breach of this warranty."

4. **Purchase Option Price and Purchase Option Periods**. So long as Debtor is not in default on the provisions set forth herein, the CCP-West Parties, and each

8|19



of them, agree that the Purchase Option as modified herein shall remain in full force and effect with the option price and option periods detailed as follows:

- a. Option 1 – To close during the period 4/1/14 – 12/31/14:

  Purchase Price:  $17,800,000.00

- b. Option 2 - To close during the period 1/1/15 – 6/30/15:

  Purchase price:  $18,575,000.00

- c. Option 3 – To close during the period 7/1/15 – 12/31/15:

  Purchase Price:  $19,250,000.00

- d. Option 4 – To close during the period 1/1/16 – 6/30/16:

  Purchase Price: $20,500,000.00

- e. Option 5 – To close during the period 7/01/16 – 12/31/16:

  Purchase Price: $21,500,000.00.

5. **Exercise of Purchase Option.**  The Parties agree that:

a. The Debtor shall have the right to exercise its Purchase Option at any time during the term (or the extended term) of the Lease Agreement as set forth in paragraphs 2 and 4 above, so long as the Debtor provides at least (30) days' notice of Debtor's exercise of the Option, together with evidence of a deposit in the sum of $100,000 to the Escrow Company.

b. The purchase price payable for the Purchase Option shall be determined based upon the date that the Escrow for the Option Exercise closes, and not the date that the Escrow is opened.

c. The Escrow for any Option Exercise must close before the end of the period for the Option 5, which is December 31, 2016. The Parties agree that any Escrow

9|19

pending upon the expiration of Option 5 may thereafter be unilaterally terminated by either Party. The Debtor Parties expressly waive any right to request an extension of the deadline set forth in Option 5, which may be extended only upon the express written agreement of the Debtor and the Landlords.

6. **Contacting Third Parties.** Within three (3) business days from the signing of this Agreement, the CCP-West Parties, and each of them, shall provide the Debtor and/or its nominee with written authorization to contact the City of Beverly Hills, County of Los Angeles, and/or any other applicable state or county departments, governing entities, and/or any of political subdivisions thereof, in connection with any and all applications and efforts to obtain permits, entitlements or zoning changes or variances, or any approvals and/or permissions for or involved in a prospective development of the Beverly Hills Property.

7. **The Notes and Note Claims.**

a. The unpaid principal under the Notes is presently $1,950,000 (the "Loan Balance") and by signing this Settlement Agreement the CCP-West Parties, and each of them, hereby waive any and all interest on the Loan Balance accrued through the date of execution of this Agreement. The CCP-West Parties shall have an allowed unsecured claim in the Debtor's Bankruptcy Case in satisfaction of the Notes and the Note Claims for the amount of the Loan Balance plus interest thereon commencing from and after the date of this Agreement, which shall accrue on the Loan Balance at the rate of 5% per annum (non-compounding) (the "Allowed Claim"). The Allowed Claim shall be paid through Debtor's plan of reorganization in accordance with those other unsecured creditors holding allowed claims.

10|19



b.     If at any time after the end of the term of the Lease Agreement as modified above, as may be extended in accordance with this Settlement Agreement or otherwise, the Allowed Claim has not been paid in full in accordance with Debtor's plan of reorganization, or the Beverly Hills Property has not been sold, then Chrismas shall continue to be personally liable for any unpaid portion of the Loan Balance plus all accrued interest which is in arrears, notwithstanding anything contained herein to the contrary, including without limitation paragraphs 10 and 12 of this Settlement Agreement.

c.     Should the Beverly Hills Property be sold under paragraph 4, the Loan Balance shall be paid to the CCP West Parties in full from the proceeds of the sale through escrow.

8.     **Default and Cure Rights.**  In the event of a default under the terms of the Lease Agreement or this Settlement Agreement,

a.     Debtor shall have seven (7) business days to cure any monetary default, commencing on the first business day following Debtor's receipt of the Lessors' written notice of monetary default to Debtor (the "Monetary Cure Period").  Any monetary default with respect to the Lease Agreement or this Settlement Agreement which remains uncured following the Monetary Cure Period shall cause an automatic termination of the Lease Agreement and Purchase Option.

b.     Debtor shall have forty-five (45) calendar days to cure any non-monetary default, commencing on the first business day following Debtor's receipt of the Lessors' written notice of non-monetary default to Debtor, except that if the nature of the non-monetary default is such that more than forty-five (45) days are reasonably required for

11/19



its cure, then the non-monetary default shall not be deemed to be uncured if Debtor commences such cure within the forty-five (45)-day period and thereafter cures such default within an additional ninety (90)-day period.  Any such non-monetary default which remains uncured following the periods set forth herein shall cause an automatic termination of the Lease Agreement and Purchase Option, provided, however, that if there is a good-faith dispute regarding whether a non-monetary default exists or has been cured such dispute shall be determined by the Bankruptcy Court, or if the Bankruptcy Case has been closed, then a California court of competent jurisdiction, and Debtor shall have five (5) business days from any such adverse determination to commence cure and shall complete such cure within ninety (90) days thereafter.  CCP and CCP-West have the right to permit a cure by Debtor of any such non-monetary default after the expiration of the time for cure provided for herein and subsequently charge Debtor for any reasonable cost and expense incurred in curing the non-monetary default after such period.

9.    **Notices.**  Any notice or communications required or permitted to be given under the terms of this Agreement must be in writing and shall be sent via email or facsimile, with a copy sent the same day via reputable overnight courier service (postage prepaid) (e.g., FedEx, DHL, UPS) and shall be deemed effective upon receipt or refusal of acceptance thereof by the Debtor or its legal counsel Steckbauer Weinhart, LLP at the address provided below.  All notices to the parties must be delivered to the addresses listed below, which addresses may be changed by written notice from time to time (it being understood that in no event shall the effective notice to Tenant be deemed given if delivered to the Lease Premises):

12/19

**CCP, CCP-West, F. Nicholas, A. Nicholas, Rubinstein and Hapsmith**:

Culver Center Partners – West #1, LLC
　　　　8563 Higuera Street
　　　　Culver City, CA 90232
Attn: Frederick Nicholas and/or Simon Rubenstein

via facsimile: (310) 815-3201
via email: fmnicholas@hapsmithco.com
　　　　with a copy to: simonbcg@gmail.com

**Debtor and Chrismas**:

　　　　Ace Gallery
　　　　Attn: Douglas Chrismas
　　　　5514 Wilshire Boulevard, 2nd Floor
　　　　Los Angeles, CA 90036

via facsimile:  (323) 202-1082
via email: acegallery@acegallery.net
　　　　with a copy to: accounting@acegallery.net, and

　　　　**and a copy to:**

　　　　William W. Steckbauer
　　　　Steckbauer Weinhart, LLP
　　　　333 South Hope Street
　　　　36th Floor
　　　　Los Angeles, CA 90071

via facsimile:  213-229-2868

10.　**Release of Debtor Parties.** Pursuant to the terms of this Agreement, upon the execution of this Agreement and entry of a final order of the Bankruptcy Court approving this Agreement, the CCP-West Parties, and each of them and their members, successors and assigns (collectively, the "Releasing Parties") do hereby release, remise, and discharge the Debtor Parties (the "Released Parties") from any and all claims, demands, debts, liabilities, contracts, obligations, accounts, torts, causes of action, or





claims for relief, whether known or unknown or suspected or unsuspected by the Releasing Parties, or any of them, which any of the Releasing Parties may have, claim to have, or have at any time heretofore had or claimed to have had, or that may hereafter accrue against the Released Party by reason of any transaction, occurrence, act, or omission prior to the date of this Agreement.

11. **Release of the CCP-West Parties.** Upon the execution of this Agreement and entry of a final order of the Bankruptcy Court approving this Agreement, the Debtor Parties do hereby release, remise, and discharge the CCP-West Parties from any and all claims, demands, debts, liabilities, contracts, obligations, accounts, torts, causes of action, or claims for relief, whether known or unknown or suspected or unsuspected by the Debtor Parties which the Debtor Parties may have, claim to have, or have at any time heretofore had or claimed to have had, or that may hereafter accrue against the CCP-West Parties, and each of them, by reason of any transaction, occurrence, act, or omission prior to the date of this Agreement.

12. **Waiver of Unknown Claims.** The Parties understand and recognize that they may discover or obtain information in the future pertaining to matters being released under this Agreement which they did not know or have as of the date of this Agreement. The releases set forth in paragraphs 10 and 11 above are expressly intended to cover and include a release of any claims which arise out of, relate to, are connected with, or are incidental to any such information which may be discovered or obtained in the future. As to the matters released in paragraphs 10 and 11 above, the Parties therefore expressly waive the provisions of Section 1542 of the Civil Code of the State of California (and any

14|19



federal or state statute or common law principle to similar effect) which provides as follows:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.**

The Parties expressly agree that, notwithstanding the provisions of Civil Code Section 1542, the releases set forth in paragraph 10 and 11 above shall be given full force and effect according to each and all of their expressed terms and provisions, including those relating to unknown and unspecified claims, demands and rights, lawsuits, or other causes of action. This paragraph does not apply to cause of action that may arise on or after the date this Agreement is executed.

13. **Integration**. The terms of this Agreement supersede and replace any terms of any other agreement which are inconsistent with the terms of this Agreement. This Agreement constitutes the entire agreement between and among the Parties with respect to the subject matter hereof. There are no promises, representations or other agreements between the Parties concerning the subject matter of this Agreement, except as specifically set forth herein. The Parties expressly acknowledge that in entering into this Agreement, it/he has not relied upon any statement or representation pertaining to the matters set forth herein made by or on behalf of the other Party.

14. **Successors**. This Agreement and all of its terms shall apply to, be binding upon, inure to the benefit of and be enforceable against the Parties and their respective successors and assigns, including any chapter 11 or chapter 7 trustee of Debtor.

15/19

15.    **Governing Law.**  Except to the extent superseded by federal law, this Agreement shall, in all respects, be interpreted, enforced, and governed by and under the laws of the State of California.  This Agreement is to be deemed to have been jointly prepared by the Parties, and any uncertainty or ambiguity existing herein shall not be interpreted against either of the Parties, but according to the application of the rules of interpretation of contracts, if any such uncertainty or ambiguity exists.

16.    **Disputes**.  Any dispute arising out of the performance of the terms of this Agreement shall be resolved by the Bankruptcy Court, or if the Bankruptcy Case has been closed, then a California court of competent jurisdiction.

17.    **Fees and Expenses**.  The Parties shall pay its/his own expenses, including legal fees and costs, incurred in connection with the negotiation, preparation and execution of this Agreement.  In the event that either Party institutes any action or proceeding to enforce, construe, or interpret any rights granted hereunder, the prevailing Party in such action or proceeding shall be entitled, in addition to any other relief granted by the applicable court or other applicable judicial body, to reasonable attorney's fees and court costs.

18.    **Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument.  Facsimile or electronically transmitted signatures to this Agreement shall be deemed to have the same force and effect as original signatures.

16|19

19.    **Further Assurances**.  The Parties agree to promptly perform such further acts and to execute and deliver any and all further documents that may reasonably be necessary or desirable to effectuate the purpose of this Agreement.

20.    **Knowledge and Authority**.  The Parties warrant and represent that it/he has (a) voluntarily and knowingly made this Agreement, (b) read this Agreement and understands all of its terms, (c) the authority to make this Agreement, and (d) made this Agreement, with full knowledge of its significance, without relying upon any warranties or representations, except those set forth herein.  Each person who signs this Agreement represents and warrants that it/he has the authority and capacity to act on behalf of the Party for whom it/he is signing and to bind such Party and all who might claim through it/him to the terms of this Agreement, recognizing that the enforceability and effectiveness of this Agreement is subject to and dependent upon the Bankruptcy Court approving this Agreement.

21.    **No Admission of Liability**.  This Agreement is a compromise.  It is not an admission by any Party of any wrongful conduct or liability.

22.    **Advice of Counsel**.  The Parties represent that it/he has received independent advice from legal counsel of its/his own choosing with respect to the advisability of entering into this Agreement or has had the opportunity to obtain such counsel and has declined to exercise its/his right to do so.

23.    **No Assignment**.  The Parties represent and warrant that they have not assigned, transferred, or purported to assign or transfer, in whole or in part, any interest in any of the rights and claims that are the subject of this Agreement.

17/19

24.    **Court Approval**.  The Debtor shall promptly submit this Agreement to the Bankruptcy Court for approval pursuant to a 9019 Motion.  If the Bankruptcy Court does not approve this Agreement, this Agreement shall become null and void and of no force or effect and the rights of both Parties are preserved.

25.    **No Amendment**.  This Agreement cannot be amended or modified in any respect, except by a written instrument executed by all of the Parties or their respective successors, assigns or designated representatives.

**It is so agreed:**

**Culver Center Partners-West #1, LLC**

By _____
   Frederick M. Nicholas
Its: Managing Member

signatures continued on the next page
**Culver Center Partners, LLC**

By _____
   Frederick M. Nicholas
Its: Managing Member

_____
Frederick M. Nicholas, an individual

_____
Anthony Nicholas, an individual

_____  7, 2014.
Simon Rubinstein, an individual

18/19



The Hapsmith Company

By _____

Frederick M. Nicholas

Its: Managing Member

Art and Architecture Books of the 21st Century, DBA Ace Gallery

By _____

Douglas Chrismas

Its: _____

_____

Douglas Chrismas, an individual

19/19

**EXHIBIT A**

## ADDENDUM NO. 1 TO STANDARD INDUSTRIAL COMMERCIAL SINGLE-TENANT LEASE—NET

Addendum to Lease dated for reference purposes June        , 2007 by and between Culver Center Partners, LLC and Culver Center-West #1, LLC, as Lessor, and Art & Architecture Books of the 21st Century, Inc., as Lessee

51. Re Paragraph 1.3, the parties agree that the actual Commencement Date of the Lease shall be the earlier of (a) July 1, 2007, and (b) the date upon which Lessor acquires title to the Project.

52. N/A

53. N/A

54. N/A

55. Re Paragraphs 1.8, 8 generally, and 8.5 and 8.9 specifically- Lessee is the "Insuring Party" for all purposes.

56. Re Paragraph 6.1 — Lessor agrees so long as Lessee has the right to exercise any Option contained in Addendum No. 2 to the Lease, or the right to purchase the Premises pursuant to any Option which Lessee has duly exercised, Lessor shall cooperate with Lessee in promptly executing any and all documents reasonably required in connection with Lessee's applications to obtain permits, entitlements, any zone change, variances or governmental approvals for development of the Premises as a mixed use project with a museum and/or retail uses together with residential (either rental or condominium) uses and with maximum height; provided, however, that Lessor shall not be required to incur any expenses in connection with such applications and shall not be required to execute any covenant or document which could be recorded with the Office of the Los Angeles County Recorder. If, within the periods provided in Addendum No. 2, Lessee has not exercised any Option or has forfeited his right to exercise his Options, Lessee agrees that it will reasonably cooperate with Lessor, at no expense to Lessee, if Lessor seeks to obtain any permits, entitlements, variances or other similar requirements.

57. Re Paragraph 7.3(b)—Lessor's consent shall not be unreasonably withheld or conditioned.

58. Re Paragraph 10.4—Lessee acknowledges and agrees that the taxes payable hereunder shall also include, without limitation, all occupancy, rental, gross receipts or any other use tax, however denominated, payable on account of the Lease of the Premises and/or Lessee's use and occupancy.

59. Re Paragraph 12.1(a) and 16(a)—Notwithstanding anything to the contrary herein, only Lessor shall be entitled to encumber the Premises for financing, including without limitation construction financing. Lessee shall have no right to encumber the Premises or Lessee's leasehold interest with any financing or any lien or encumbrance of any kind without Lessor's prior written consent, which consent may be withheld or conditioned in Lessor's sole discretion. In the event that Lessor shall seek financing for the Premises, Lessee agrees to execute an estoppel certificate in form acceptable to Lessor's lender. Any such Lessor financing shall be subject and subordinate to the Option rights provided for in Addendum No. 2, as provided in Paragraph 30.1 of the Lease.

60. Re Paragraph 23.1—Addresses for notices:

If to Lessor:

Culver Center Partners, LLC & Culver Center-West #1, LLC
c/o Frederick M. Nicholas
3844 Culver Center Street, Suite B
Culver City, California 90232
Facsimile No. 310-815-3201

With copy to:

Simon Rubinstein
Culver Center Partners
3844 Culver Center Street, Suite B
Culver City, CA 90232

If to Lessee:

Art & Architecture Books of the 21st Century Inc.
c/o Mr. Douglas Chrismas, President
5514 Wilshire Boulevard, Los Angeles, California 90036

Facsimile No. 323-202-1082

With a copy to:

Paul, Hastings, Janofsky & Walker LLP
515 S. Flower Street, 25th Floor
Los Angeles, California 90071
Attention: Robert I. McMurry, Partner

61. Re Paragraph 13.1(d)—In the event that the Premises is cited by any governmental agency for any violation of Applicable Requirements, Lessee shall promptly notify Lessor in writing. The failure by Lessee to provide Lessor with reasonable written evidence, within twenty (20) days of written notice to Lessee by Lessor, that such violation has been remedied within the time limit allowed by law and in compliance with the Applicable Requirements, shall be a Breach hereunder.

62. Re Paragraph 39.4—Lessee understands, acknowledges and agrees that Lessee shall have no right to exercise any Option provided for in Addendum No. 2 to the Lease if, at any time, there is a Breach of the Lease (as the term "Breach" is defined in Paragraph 13.1 of the Lease) that remains uncured.   Lessee acknowledges that its only options are the Options to purchase, and that Lessee has no option to extend the term of the Lease or lease any other premises from Lessor. Lessee further understands and acknowledges that except to the extent set forth in Addendum No. 2 attached hereto, the Option is personal to Lessee and cannot be assigned. Any attempt by Lessee to assign the Option without the prior written consent of Lessor (unless permissible per Addendum No. 2) shall be a Breach hereunder.

63. Lessee agrees that at the expiration or other termination of this Lease, Lessee shall, at Lessor's request and at Lessee's sole expense, remove all signage and exterior fixtures, including anything installed on the roof by Lessee, and shall repair any and all damage caused by such removal.

64. In the event of any conflict between the terms of this Addendum and the terms of the Standard Industrial Commercial Single-Tenant Lease—Net form, as revised, the terms of this Addendum shall govern.

LEGAL_US_W # 56460016_5

65. If there shall be more than one Lessor under this Lease, they shall all be bound hereby and shall be jointly and severally liable and responsible for all obligations (including, without limitation, indemnities) and liabilities of Lessor under this Lease and under all agreements executed by Lessor as may be further required hereunder.

66. That certain Lease, dated as of March __, 2005, by and between Lessee, as lessee, and Wilshire Investor Group, LLC, a California limited liability company, as lessor, for the lease of the same premises as is governed by this Lease shall terminate immediately prior to the commencement of this Lease.

67. This Addendum No. 1 may be executed in counterparts.

LESSOR:

Culver Center Partners, LLC and Culver Center-West #1, LLC
California limited liability companies

By_____

Frederick M. Nicholas, Managing Member

LESSEE:

Art & Architecture Books of the 21st Century, Inc.,

A California corporation

By_____

Douglas Chrismas, President

LEGAL_US_W # 56460016.5

# EXHIBIT "B"

ADDENDUM NO. 2 TO LEASE DATED: JUNE _____ , 2007, BETWEEN CULVER CENTER PARTNERS, LLC AND CULVER CENTER-WEST #1, LLC AND ART AND ARCHITECTURE BOOKS OF THE 21st CENTURY, INC.

### OPTIONS TO PURCHASE

1.      Subject to the terms and conditions of the Lease, Lessor grants to Lessee the following options ("Options") to purchase the Premises:

**OPTION NO. 1**: To close during the month of July, 2009 for a purchase price of $13,500,000.00.

**OPTION NO. 2**: To close during the month of December, 2009 for a purchase price of $13,837,500.00.

**OPTION NO. 3**: To close during the month of July, 2010 for a purchase price of $14,183,438.00.

**OPTION NO. 4**: To close during the month of December, 2010 for a purchase price of $14,538,024.00.

**OPTION NO. 5**:  To close during the month of July, 2011 for a purchase price of $14,901,475.00.

**OPTION NO. 6**: To close during the month of December, 2011 for a purchase price of $15,274,011.00.

**OPTION NO. 7**: To close during the month of July, 2012 for a purchase price of $15,655,861.00.

2.  With respect to each Option, Lessee shall have the right to require closing on any business day during the applicable calendar month except a date prior to July 1, 2009, provided that Lessee has satisfied all conditions of the Escrow (hereinafter named) to be performed by Buyer, including the deposit of all funds and documents as herein provided on a timely basis.

3.  Each Option herein must be exercised at least sixty (60) days in advance of the month in which the closing is to occur by Lessee delivering to Lessor written Notice of the Exercise of Option, together with a deposit in the form of a cashier's check in the amount of $100,000 made payable to Land America Lawyers Title Company ("Option Escrow"), which deposit shall be applicable to the purchase price if Option Escrow closes. Lessor shall cause such cashier's check and a copy of this Addendum No. 2 to be promptly delivered to the Option Escrow (located at 915 Wilshire Boulevard, Suite 2100, Los Angeles, California 90017). Upon such delivery, Paragraphs 1 through 9 hereof shall constitute instructions to the Escrow, however, within ten (10) days after exercise or upon request, the parties shall execute any additional instruction, which maybe reasonably requested by the Option Escrow, including its general provisions to the extent not inconsistent with the terms hereof.

4.  Lessee shall deposit the balance of the purchase price (purchase price less $100,000 deposit), together with any other amounts required of Buyer herein, by wire funds at least one (1) business day prior to the date of closing.

5.  At close of Option Escrow, Seller shall cause to be issued to Buyer a standard (CLTA) coverage owner's policy of title insurance of Land America Lawyers Title Company, with liability, in the amount of the purchase price, insuring the title to the Property vested in Buyer, or its nominee, free and clear, of all liens and encumbrances except: (i) liens for current real estate taxes, including supplemental taxes, not yet due and payable, (ii) and any other exceptions acceptable to Buyer. Lessor shall ensure that any loan that is secured by the Property shall be prepayable at any time on or after July 1, 2009 and, in the event Lessee exercises any of its Options as defined in Section 1 herein, Lessor shall pay all costs and expenses incurred to pay off and release the mortgage including defeasance charges and /or yield maintenance charges or prepayment penalties at the time of exercising any of the Options. Lessor shall be responsible in such event for consummating any such defeasance transaction at its sole cost and expense.

2
Addendum No. 2 to Lease
LEGAL_US_W # 56460019 5

6. Lessee shall have the right to freely assign any Option herein at any time, under any circumstance without Lessor's prior written consent. Lessor acknowledges that such Options are not personal to Lessee and that Lessee may transfer its rights separately from the Lease, provided however that all obligations of Lessee under the Lease have been satisfied in full and Lessee is not in Default of any terms and conditions of the Lease.

7. IF LESSEE, AFTER EXERCISING AN OPTION HEREIN, DEFAULTS IN ITS OBLIGATION TO CLOSE WITHIN THE APPLICABLE CALENDAR MONTH, TIME BEING OF THE ESSENCE, THE DEPOSIT SHALL BE RETAINED BY LESSOR AS LIQUIDATED DAMAGES (AND NOT AS A PENALTY) IN LIEU OF OTHER DAMAGES AGAINST LESSEE (BUT RESERVING THE PROVISIONS SET FORTH IN THE LEASE REGARDING OPTION RIGHTS AND REQUIREMENTS), AND LESSEE SHALL HAVE NO FURTHER RIGHT TO PURCHASE THE PREMISES PURSUANT TO THE APPLICABLE OPTION; AND LESSEE'S RIGHT TO PURCHASE THE PREMISES SHALL BE LIMITED TO ITS RIGHTS AND OBLIGATIONS PURSUANT TO THE PURCHASE OF FUTURE OPTIONS, IF ANY, INCLUDING, WITHOUT LIMITATION, THE OBLIGATION TO MAKE A NEW DEPOSIT IN THE AMOUNT OF $100,000.

_____
SELLER'S INITIALS

_____
BUYER'S INITIALS

8.    Escrow shall cause Base Rent to be pro-rated to close of Escrow pursuant to a rent statement submitted to Escrow by the parties.

9.  Seller shall be charged with the cost of the title policy provided for herein and documentary transfer tax. Escrow fees to be shared one-half by each party. All other costs shall be shared in customary manner for a sale Escrow.

10.    The following terms shall apply to a sale pursuant to an Option:

(a) Seller makes no representations or warranties to Buyer, express or implied, with respect to the condition of the Property, the habitability, size, usable area, occupation or management of the Property, the available uses of the Property, the boundary lines of

3
Addendum No. 2 to Lease
LEGAL_US_W # 56460019.5

any encroachments or easements affecting the Property, the presence or availability of water, sewage disposal or utility services to the Property, the amount or nature of any taxes, special assessments, governmental bonds or similar charges or liabilities affecting the Property, including, without limitation, assessments under the authority of the Mello-Roos Community Facilities Act of 1982 or similar legislation, the compliance of the Property with any applicable statutes (including, without limitation, the Fair Housing Act of 1968, as amended, and the Americans with Disabilities Act of 1990), laws, codes, ordinances, regulations, or requirements relating to zoning, subdivision, planning, building, fire, health, safety, hazardous materials or environmental matters, or the compliance of the Property with covenants, conditions and restrictions (whether or not of record), other local, municipal, regional, state or federal requirements, or other statutes, laws, codes, ordinances, regulations or requirements.

(b) Buyer represents that it is a knowledgeable, experienced and sophisticated business professional and that it has relied and shall rely solely on (i) its own expertise and that of Buyer's consultants in purchasing the Property, and (ii) Buyer's own knowledge of the Property based on its occupation of the entire Property as a tenant under the Lease and its investigations and inspections of the Property. Buyer has conducted, or by the closing will conduct, such inspections and investigations of the Property as Buyer shall deem necessary, including, but not limited to, the physical and environmental conditions thereof, and shall rely upon same. Upon closing, Buyer shall, except as otherwise specifically set forth herein, assume the risk that adverse matters, including, but not limited to, adverse physical and environmental conditions, may not have been revealed by Buyer's inspections and investigations.   Buyer acknowledges and agrees that upon the Close of Escrow, Seller shall sell and convey to Buyer, and Buyer shall accept the Property "AS IS, WHERE IS" with all faults and defects (latent and apparent). The terms and conditions of this Paragraph shall expressly survive the closing, not merge with the provisions of any closing documents and shall be incorporated into the grant deed. Seller is not liable or bound in any manner by any written or oral statements, representations, warranties or information pertaining to the Property or discussions regarding the condition of the Property furnished by Seller, any real estate broker, contractor, agent, employee, servant or any other person, unless the same are specifically set forth in this Agreement. Buyer acknowledges that the Purchase Price(s) of the Property reflect the "AS IS" nature of this

4

Addendum No. 2 to Lease
LEGAL_US_W # 56460019.5

sale and any faults, liabilities, defects or other adverse matters that may be associated with the Property. Buyer has fully reviewed the disclaimers and waivers set forth in this Agreement with its counsel and understands the significance and effect thereof. Buyer acknowledges and agrees that the disclaimers and other agreements set forth herein are an integral part of this Agreement, and that Seller would not have agreed to sell the Property to Buyer for the Purchase Price(s) without the disclaimers and other agreements set forth in this Paragraph.

(c) Seller hereby informs Buyer that the Buildings may have been constructed during or prior to 1975, and the construction method may have been that of pre-cast tilt-up concrete. In accordance with California law, Buyer acknowledges receipt of a copy of the Commercial Property Owner's Guide to Earthquake Safety published by the State of California Seismic Safety Commission (the "Guide").  In connection with the Commercial Property Earthquake Weakness Disclosure Report (the "Disclosure Report"), which is made apart of the Guide, Seller hereby notifies Buyer that with respect to Question Nos. 1 through 4 in such Disclosure Report, Seller does not know the answer to such questions. Buyer has already conducted or shall conduct its own investigation with respect to any and all matters referenced or described in this subparagraph (c).

(d) Buyer acknowledges that the Property may be within a special study zone as designated under the Alcquist-Priolo Geologic Hazard Act (Section 2621 of the California Public Resources Code). If the Property is so located, construction or development on real property of any structures intended for human occupancy may be subject to the findings of a geological report prepared by a geologist registered in the State of California. Buyer hereby expressly assumes such risk and hereby releases Seller and its agents and representatives, and each of them, from any and all loss, injury or damage which will of may be sustained by Buyer as a consequence of the Property being within any such special study zone.

(e) <u>RELEASE</u>: Except for Seller's performance obligations under this Option and under the Lease dated as of June 30, 2007, by and between the parties hereto, including all addenda and amendments thereto, Buyer hereby enters into and makes the following general release:

Buyer and anyone claiming by, through or under Buyer hereby waives its rights to recover from and fully and irrevocably releases Seller, its employees, officers, directors, members, representatives, agents, managers, property managers, servants, attorneys, affiliates, parent, subsidiaries, successors and, assigns, and all persons, firms, corporations and organizations on its behalf ("Released Parties") from any and all claims that it may now have or hereafter acquire against any of the Released Parties for any costs, loss, liability, damage, expenses, demand, action or cause of action arising from or related to any construction defects, errors, omissions or other conditions, latent or otherwise, including environmental matters or tenant issues, affecting the Property, or any portion thereof. This release includes claims of which Buyer is presently unaware or which Buyer does not presently suspect to exist which, if known by Buyer, would materially affect Buyer's release to Seller. Buyer specifically waives the provision of <u>California Civil Code</u>, Section 1542, which provides as follows:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY
AFFECTED HIS SETTLEMENT WITH THE DEBTOR".**

In this connection and to the extent permitted by law, Buyer hereby agrees, represents and warrants, which representation and warranty shall survive the closing and not be merged with the deed, that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to cause of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees, represents and warrants, which representation and warranty shall survive the closing and not be merged with the deed, that the price and other terms of this Agreement, and the waivers and releases herein have been negotiated and agreed to in light of that realization and that Buyer, nevertheless, hereby intends to release, discharge and acquit Seller from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder.

Seller has given Buyer material economic concessions regarding this transaction in exchange for Buyer agreeing to the provision of this Sub-Paragraph (e). Seller and Buyer have each initialed this Sub-Paragraph (e) to further indicate their awareness and acceptance of each and every provision hereof.

SELLER'S INITIALS:                 BUYER'S INITIALS:

(f) Buyer and Seller agree that each party shall reasonably cooperate with the other party at no expense to the cooperating party, in such requesting party's IRC Section 1031 Exchange.

11.     The parties shall execute such other and further documents and instructions as may be reasonably required to carry out the terms hereof.

12.     In the event either party shall institute legal action to interpret or enforce the terms and conditions of this Option, the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs of suit.

13.   It is understood that after Lessee has exercised any Option herein, its obligations to purchase the Premises shall be non-contingent.

14.   In the event that after the exercise of any Option, improvements on the Premises are damaged or destroyed as the result of any casualty, Lessee shall nonetheless be obligated to purchase the Premises, provided, however, that any insurance proceeds payable as a result of such casualty shall be assigned or paid to Buyer at close of escrow.

15.     Each of the parties warrants to the other that there is no broker or finder involved in this transaction, and agrees to indemnify the other party and hold it free and harmless from any claim, liability, commission or expense arising from any breach of this warranty.

Addendum No. 2 to Lease
LEGAL_US_W # 56460019.5

16. This Addendum No. 2 may be executed in counterparts.

LESSOR:

Culver Center Partners, LLC and Culver Center-West #1, LLC
California limited liability companies

By

Frederick M. Nicholas
Managing Member

LESSEE:

Art & Architecture Books of the 2lst Century, Inc.,

By

Douglas Chrismas
President

8

Addendum No. 2 to Lease
LEGAL_US_W # 56460019.5

# EXHIBIT "C"

## ADDENDUM NO. 3 TO STANDARD INDUSTRIAL COMMERCIAL SINGLE-TENANT LEASE—NET

Addendum to Lease dated for reference purposes July 1st 2012 is made and entered into by and between Culver Center Partners, LLC and Culver Center-West #1, LLC, as Lessor, and Art & Architecture Books of the 21St Century, Inc., as Lessee (collectively the **"Parties"**) in reference to the following:

WHEREAS, Lessee and Lessor entered into that certain Commercial Single-Tenant Lease dated June 20th 2007 with Addendum 1 and Addendum 2 (Collectively the **"Lease"**) for that certain real property, including all improvements therein or to be provided by Lessor under the terms of the lease, and commonly known as 9430 Wilshire Boulevard, Beverly Hills, CA 90212 located in the County of Los Angeles, State of California **("Premises")** and that lease term has expired;

WHEREAS, the terms of the Lease and both Addenda provide to Lessee Options to Purchase the Premises;

WHEREAS, the term of the Lease has expired on June 30th 2012;

WHEREAS, Lessee and Lessor desire to enter into this Addendum 3 to extend the Lease and provide to Lessee additional Options to Purchase the Premises as follows:

1. **Lease Extension.**  The Parties, have agreed to extend the term of the Lease from its current expiration date of June 30th 2012 through June 30th 2015 (**"Lease Extension"**) and hereby amend Paragraph 1.5 of the Current Lease to reflect this extension.

2. **Rental Increase.**   Lessor and Lessee agree that commencing August 1st 2012, the monthly rent shall increase to $72,100 for the first year with a 3% increase per year thereafter, i.e. $74,263 for the 2nd year and $76,490 for the 3rd year.

3. **Additional Purchase Options for Lessee.**   Lessor has agreed to provide to Lessee the following additional Options to Purchase the Premises:

   **Option No. 8:** To close during the month of December of 2012 for a purchase price of $16,047,257.00

   **Option No. 9:** To close during the month of July of 2013 for a purchase price of $16,448,438.00

   **Option No. 10:** To close during the month of December of 2013 for a purchase price of $16,859,649.00

   **Option No. 11:** To close during the month of July of 2014 for a purchase price of $17,281,140.00

**Option No. 12:** To close during the month of December of 2014 for a purchase price of $17,713,168.00

**Option No. 13:** To close during the month of July of 2015 for a purchase price of $18,155,997.00

4.    **Costs connected to the Option.**    Should the property be subject to any potential governmental eminent domain, Lessee shall bear all costs of appraisal, attorneys' fees and other related charges, including related charges of Lessor, in the event Lessee exercises any option to purchase the property.

5.    **Payment of eminent domain funds.**    Should funds be paid on account of the Property in any eminent domain proceeding prior to Lessee's exercise of its option to purchase the Property, the said funds shall be paid to Lessor, and Lessee shall receive a credit towards the purchase price of the Property under whichever option Lessee may exercise. If Lessee, for any reason, does not exercise its option to purchase the Property, the said funds shall remain the property of Lessor.

6.    **Monetary Default.** Should Lessee be in monetary default on any payment of rent, real estate and business taxes and insurance, Lessor shall have the right to terminate the Option rights of Lessee provided for herein. Notwithstanding the above, Lessee shall have the right to cure such default (with immediate reinstatement of all of Lessee's Purchase Option rights) within a 30-day period from receipt of notice of default from Lessor.

7.    **Amendment of paragraph 3 in Addendum No. 2.**    Lessee and Lessor hereby mutually agree to amend paragraph 3 of that certain Addendum No. 2 to the Lease between Lessee and Lessor to change the exercise timing of the Purchase Option from at least 60 (sixty) days in advance of the month in which the closing is to occur to at least 30 (thirty) days in advance of the date on which the closing is to occur.

8.    **Other terms and conditions.** Except as detailed above all other terms and conditions of the Current Lease and its Addenda remain unchanged. This Addendum No. 3 is hereby incorporated in the Lease. This Addendum No. 3 may be executed in counterparts.

<Intentionally left blank, continued on signature page>

**LESSOR:**

Culver Center Partners, LLC and Culver Center-West #1, LLC
California limited liability companies

By _____

    Frederick M. Nicholas, Managing Member

**LESSEE:**

Art & Architecture Books of the 21ST Century, Inc.,

A California corporation

By _____

    Douglas Chrismas, President

By _____

    Douglas Chrismas, Individually

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled: **MOTION FOR AN ORDER APPROVING GENERAL RELEASE AND SETTLEMENT AGREEMENT REGARDING BEVERLY HILLS LEASE AGREEMENT AND PROMISSORY NOTES; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF DOUGLAS CHRISMAS IN SUPPORT** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.    TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document.  On **April 8, 2014**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Jason Balitzer    jbalitzer@sulmeyerlaw.com,
  jbalitzer@ecf.inforuptcy.com;dwalker@ecf.inforuptcy.com
- Ron Bender    rb@lnbyb.com
- Bruce Bennett    bbennett@jonesday.com
- Carol Chow    CChow@Stutman.com
- Mark C Fields    fields@markfieldslaw.com
- Marina Fineman    mfineman@stutman.com
- Michael F Frank    mfrankatty@aol.com
- Thomas M Geher    tmg@jmbm.com, we1@jmbm.com;fc3@jmbm.com
- Eric D Goldberg    egoldberg@stutman.com
- Asa S Hami    ahami@sulmeyerlaw.com,
  agonzalez@sulmeyerlaw.com;agonzalez@ecf.inforuptcy.com;ahami@ecf.inforuptcy.com
- Mary D Lane    mal@msk.com, mec@msk.com
- Daniel A Lev    dlev@sulmeyerlaw.com,
  asokolowski@sulmeyerlaw.com;dlev@ecf.inforuptcy.com;dwalker@ecf.inforuptcy.com
- Sidney P Levinson    slevinson@jonesday.com,
  kfloyd@ecf.inforuptcy.com;kfloyd@jonesday.com
- Alvin Mar    alvin.mar@usdoj.gov
- Krikor J Meshefejian    kjm@lnbrb.com
- Alan I Nahmias    anahmias@mbnlawyers.com, jdale@mirmanbubman.com
- Christine M Pajak    cpajak@stutman.com
- Danielle A Pham    dpham@stutman.com, daniellepham@gmail.com
- Kurt Ramlo    kr@lnbyb.com, john@lnbyb.com
- Christopher O Rivas    crivas@reedsmith.com
- Victor A Sahn    vsahn@sulmeyerlaw.com,
  agonzalez@sulmeyerlaw.com,agonzalez@ecf.inforuptcy.com;asokolowski@sulmeyerlaw.com;vsahn@ecf.inforuptcy.com
- Michael C Schneidereit    mschneidereit@jonesday.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Steven Werth    swerth@sulmeyerlaw.com,
  asokolowski@sulmeyerlaw.com;slee@sulmeyerlaw.com;slee@ecf.inforuptcy.com;asokolowski@ecf.inforuptcy.com;swerth@ecf.inforuptcy.com
- Beth Ann R Young    bry@lnbyb.com

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**2.  SERVED BY UNITED STATES MAIL**: On **April 8, 2014**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

*None.*

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **April 8, 2014**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

***Served via Attorney Service***
The Hon. Judge Robert N. Kwan
United States Bankruptcy Court
255 East Temple Street
Los Angeles, CA 90012

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| April 8, 2014 | Stephanie Reichert | /s/ Stephanie Reichert |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                          **F 9013-3.1.PROOF.SERVICE**