| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| RON BENDER (SBN 143364)<br>BETH ANN R. YOUNG (SBN143945)<br>KURT RAMLO (SBN 166856)<br>KRIKOR J. MESHEFEJIAN (SBN 255030)<br>LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.<br>10250 Constellation Boulevard, Suite 1700<br>Los Angeles, California 90067<br>Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244<br>Email:  rb@lnbyb.com; bry@lnbyb.com; kr@lnbyb.com; kjm@lnbyb.com<br><br>☐ *Individual appearing without attorney*<br>☒ *Attorney for:* Chapter 11 Debtor in Possession | |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

| In re:<br><br>ART AND ARCHITECTURE BOOKS OF THE 21ST CENTURY, dba ACE GALLERY,<br><br><br><br>Debtor(s). | CASE NO.: 2:13-bk-14135-RK<br>CHAPTER: 11<br><br><br>**NOTICE OF SALE OF ESTATE PROPERTY** |
|---|---|

| **Sale Date:** 05/21/2015 | **Time:** 9:00 am |
|---|---|

**Location:** United States Bankruptcy Court, Courtroom "1675", 255 E. Temple Street, Los Angeles, CA 90012

**Type of Sale**:  ☐ Public   ☒ Private   **Last date to file objections**: May 19, 2015

**Description of property to be sold**:  The real property and related improvements located at 9430 Wilshire Boulevard, Beverly Hills, CA, as discussed in the attached Motion.

**Terms and conditions of sale**:  Please see attached Motion.

**Proposed sale price**: $ 40,000,000.00

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

**Overbid procedure (*if any*)**: None.  This sale is not subject to overbidding.

**If property is to be sold free and clear of liens or other interests, list date, time and location of hearing:**

Date:  May 21, 2015

Time: 9:00 a.m.

Place: United States Bankruptcy Court

Courtroom "1675"

255 E. Temple Street

Los Angeles, CA 90012

**Contact person for potential bidders (*include name, address, telephone, fax and/or email address*):**

Not Applicable.

Date: 05/15/2015

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

RON BENDER (SBN 143364)
BETH ANN R. YOUNG (SBN143945)
KURT RAMLO (SBN 166856)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: rb@lnbyb.com; bry@lnbyb.com; kr@lnbyb.com; kjm@lnbyb.com

Attorneys for Chapter 11 Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## (LOS ANGELES DIVISION)

| | |
|---|---|
| In re: | Case No. 2:13-bk-14135-RK |
| ART AND ARCHITECTURE BOOKS OF THE 21ST CENTURY, dba ACE GALLERY, | Chapter 11 |
| | **DEBTOR'S MOTION FOR ORDER AUTHORIZING DEBTOR TO EXERCISE PURCHASE OPTION AND ENTER INTO AGREEMENT WITH LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY FOR PURCHASE AND SALE OF REAL PROPERTY LOCATED AT 9430 WILSHIRE BOULEVARD, BEVERLY HILLS, CALIFORNIA 90212 AND TO ENTER INTO RELATED TRANSACTIONS PURSUANT TO 11 U.S.C. §363; AND GRANTING RELATED RELIEF;** |
| Debtor and Debtor in Possession. | |
| | **MEMORANDUM OF POINTS AND AUTHORITIES; AND** |
| | **DECLARATIONS OF DOUGLAS CHRISMAS IN SUPPORT THEREON** |
| | Date:    Hearing to be set by Court<br>Time:    Time to be set by Court<br>Place:  Courtroom 1675<br>           255 East Temple Street<br>           Los Angeles, California 90012 |

1

# **TABLE OF CONTENTS**

I.   SUMMARY OF TRANSACTIONS PROPOSED BY THE DEBTOR.................................. 2

   A.  Sale of the Beverly Hills Property ............................................................. 4

   B.  Execution of Lease Between LACMTA and Debtor ..................................... 4

   C.  Repurchase Option To the Debtor .............................................................. 4

   D.  Prompt Approval Of The Transactions Is Critical To The
      Success Of This Chapter 11 Case. ............................................................. 5

MEMORANDUM OF POINTS AND AUTHORITIES

I.   STATEMENT OF FACTS ............................................................................... 7

   A.  Background Information .......................................................................... 7

   B.  The Debtor's Purchase Option With Lessor CCP West and CCP .................. 8

   C.  The Lease Agreement ............................................................................. 9

   D.  The Repurchase Option........................................................................... 9

   E.  The Debtor's Proposed Plan of Reorganization.......................................... 9

II.  THE COURT SHOULD APPROVE ALL OF THE TRANSACTIONS
    CONTEMPLATED IN THE TRANSACTION DOCUMENTS
    PURSUANT TO 11 U.S.C. § 363(b)............................................................... 11

   A.  The Debtor's Entry Into the APA and Related Agreements,
      And Transfer Of The Purchase Option, is a Sound Exercise of the
      Debtor's Business Judgment.................................................................... 12

   B.  Debtor Should be Authorized to Sell the Beverly Hills
      Property to The LACMTA...................................................................... 13

      1.  Sound Business Purpose ................................................................. 13

      2.  Accurate and Reasonable Notice ..................................................... 15

      3.  Fair and Reasonable Price............................................................... 16

      4.  Good Faith .................................................................................... 17

i

C. Section 363(f) of the Bankruptcy Code Permits the Exercise of the Purchase Option and Sale of the Beverly Hills Property to Be Free and Clear of Any and All Liens, Claims and Interests ................................................................... 18

VI.    CONCLUSION .......................................................................................... 19

DECLARATION OF DOUGLAS CHRISMAS .......................................................... 20

ii

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*In re Abbotts Dairies of Pennsylvania, Inc.*,
   788 F.2d 143 (3d Cir. 1986)...................................................................12, 16, 17

*In re Alpha Industries, Inc.*,
   84 B.R. 703 (Bankr. D. Mont. 1988) ...................................................................17

*In re Apex Oil Co.*,
   92 B.R. 847 (Bankr. E.D. Mo. 1988) ...................................................................17

*In re Atlanta Packaging Products, Inc.*,
   99 B.R. 124 (Bankr. N.D. Ga. 1988) ...................................................................16

*Coastal Indus., Inc. v. U.S. Internal Revenue Service (In re Coastal Indus., Inc.)*,
   63 B.R. 361 (Bankr. N.D. Ohio 1986)...................................................................16

*Comm. of Equity SEC Holders v. Lionel Corp. (In re Lionel Corp.)*,
   722 F.2d 1063 (2d Cir. 1983)...................................................................11, 12, 13

*In re Continental Airlines, Inc.*,
   780 F.2d 1223 (5th Cir. 1986) ...................................................................13

*In re Delaware and Hudson Ry. Co.*,
   124 B.R. 169 (D. Del. 1991)...................................................................12, 15

*In re Filtercorp, Inc.*,
   163 F.3d 570 (9th Cir. 1998) ...................................................................18

*In re Huntington, Ltd.*,
   654 F.2d 578 (9th Cir. 1981) ...................................................................13

*In re Industrial Valley Refrig. and Air Cond. Supplies, Inc.*,
   77 B.R. 15 (Bankr. E.D. Pa. 1987) ...................................................................17

*In re Integrated Resources, Inc.*,
   135 B.R. 746 (Bankr. S.D.N.Y. 1992), *aff'd*, 147 B.R. 650 (S.D.N.Y. 1992) ...........................16

*In re Karpe*,
   84 B.R. 926 (Bankr. M.D. Pa. 1988) ...................................................................15, 16

*In re Martin (Myers v. Martin)*,
   91 F.3d 389 (3d Cir. 1996)...................................................................11

*In re Qintex Entertainment, Inc.*,
   950 F.2d 1492 (9th Cir. 1991) ...................................................................13

*In re Rock Indus. Mach. Corp.*,
    572 F.2d 1195 (7th Cir. 1978) ...................................................................................17

*In re The Seychelles, Partnership and Genius Corp. v. Banyan Corp.*,
    32 B.R. 708 (N.D. Tex. 1983)....................................................................................16

*In re Snyder*,
    74 B.R. 872 (Bankr. E.D. Pa. 1987) .........................................................................16

*Titusville Country Club v. Pennbank (In re Titusville Country Club)*,
    128 B.R. 396 (Bankr. W.D. Pa. 1991) .......................................................................13

*In re Walter*,
    83 B.R. 14 (9th Cir. B.A.P. 1988).........................................................................13, 14

*In re Wilde Horse Enterprises*,
    136 B.R. 830 (Bankr. C.D. Cal. 1991).................................................................16, 17

*Willemain v. Kivitz*,
    764 F.2d 1019 (4th Cir. 1985) ...................................................................................16

**FEDERAL STATUTES**

11 U.S.C.
    § 102(1)........................................................................................................................11
    § 363.......................................................................................................................13, 15
    § 363(b).........................................................................................................11, 13, 14, 16
    § 363(b)(1) .............................................................................................................11, 17
    § 363(f)................................................................................................................. *passim*
    § 1107..........................................................................................................................11

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 6004(a)(c).................................................................................................16

Art and Architecture Books of the 21st Century, dba Ace Gallery, Chapter 11 debtor and debtor in possession in the above-entitled bankruptcy case (the "Debtor"), hereby moves (the "Motion") for entry of an order:

(1)    Authorizing the Debtor to exercise the option to purchase (the "Purchase Option") for the real property located at 9430 Wilshire Boulevard, Beverly Hills, California 90212 (the "Beverly Hills Property");

(2)    Authorizing the Debtor to enter into that certain Asset Purchase Agreement (the "APA") and related agreements and authorizing all of the transactions set forth therein (the "Transactions" and the "Transaction Documents"),[1] including (a) the Debtor's sale of the Beverly Hills Property (the "Beverly Hills Property Sale") to the Los Angeles County Metropolitan Transportation Authority ("LACMTA") for the sum of $40,000,000, free and clear of interests pursuant to 11 U.S.C. § 363(f); and (b) the Debtor's entry into a lease of the Beverly Hills Property from the LACMTA following the closing of the Transactions;

(3)    granting such other relief as set forth in herein and in a proposed order form of order (the "Transaction Approval Order") to be submitted in advance of the hearing; and

(4)    granting such other relief as the Court deems just and proper.

## I.

## SUMMARY OF TRANSACTIONS PROPOSED BY THE DEBTOR

The Debtor is the owner and operator of a retail art gallery known as "Ace Gallery."  The Debtor's headquarters and main art gallery are located at 5500 Wilshire Blvd, Los Angeles,

---

[1] Copies of the Transaction Documents including the APA and the Lease will be filed in advance of the hearing on the Motion, and will comport with the terms of the Letter Agreement, a copy of which is attached as Exhibit "A" to the Declaration of Douglas Chrismas (the "Chrismas Declaration") filed concurrently herewith.

California.    The Debtor also leases the Beverly Hills Property pursuant to that certain AIR Commercial Real Estate Association Standard Industrial/Commercial Single Tenant Lease – Net dated June 20, 2007 (the "Beverly Hills Lease"), between the Debtor as lessee and Culver Center Partners West-#1 ("CCP-West") and Culver Center Partners, LLC ("CCP") as the lessors (collectively, the "Lessor").

Pursuant to that certain *Settlement Agreement Regarding Beverly Hills Lease Agreement And Promissory Notes* (the "Beverly Hills Settlement Agreement") between the Debtor and the Lessor under the Beverly Hills Lease, among other parties, which the Court previously approved, the Debtor has the Purchase Option to purchase the Beverly Hills Property.    Pursuant to the Beverly Hills Settlement Agreement, the cost for the Debtor to exercise the Purchase Option is the sum of $18,575,000 if the Debtor exercises the Purchase Option and closes such transaction by June 30, 2015.    The cost to the Debtor to exercise the Purchase Option will increase on July 1, 2015.[2]

On May 14, 2015, the Debtor and the LACMTA entered into that certain Letter Agreement (the "Letter Agreement"), which is subject to Bankruptcy Court approval.    (See, Exhibit "A" to the Chrismas Declaration.)    The salient terms of the Letter Agreement, which is subject to preparation of final documentation memorializing the Beverly Hills Property Sale and related transactions, will, if all conditions are satisfied, provide the Debtor with the sum of approximately $21,000,000 (the "Sale Proceeds") after exercising the Purchase Option which will enable the Debtor to (A) pay, among other things, (i) administrative claims, (ii) the Loan Balance owing to the Lessor's affiliates at the closing of the Transactions pursuant to the Beverly Hills Settlement Agreement, and (iii) any

---

[2] Specifically, the costs to exercise the purchase option increase every six months depending on when the Debtor exercises the purchase option, as follows: (a) Option 2 – To close during the period 1/1/15 – 6/30/15: Purchase Price: $18,575,000.00; (b) Option 3 – To close during the period 7/1/15 – 12/31/15: Purchase Price: $19,250,000.00; Option 4 – To close during the period 1/1/16 – 6/30/16: Purchase Price: $20,500,000.00; Option 5 – To close during the period 7/01/16 – 12/31/16: Purchase Price: $21,500,000.00.

3

potential award to AERC Desmond Towers ("AERC"); and also (B) propose a chapter 11 plan that will permit the Debtor to exit chapter 11 as a reorganized operating entity.

### A.  **Sale of the Beverly Hills Property**

The Debtor's sale of the Beverly Hills Property to the LACMTA for the price of $40,000,000 (the "Purchase Price"), shall be paid by the LACMTA to the Debtor through an escrow to close by June 15, 2015, or as soon thereafter as is practical, but not later than June 30, 2015.  From the Purchase Price, the Debtor will exercise the Purchase Option for acquiring the Beverly Hills Property in the sum of $18,575,000 (the "Option Price").  From the Sale Proceeds, the Debtor will have in excess of $21,000,000, to, among other things, re-pay the Loan Balance owed to the Lessor's affiliates, satisfy unpaid administrative claims, provide any Court-required cure payments to AERC Desmond's Tower, LLC and propose and confirm a plan of reorganization in this case.

### B.  **Execution of Lease Between LACMTA and Debtor**

As a part of the Transactions contemplated in the APA, the LACMTA will lease to the Debtor the existing art gallery at a rental rate of $70,000 per month (triple net) until the earlier of either (1) the date upon which the LACMTA requires the Beverly Hills Property for construction for the Wilshire/Rodeo Station; or (2) the date upon which the LACMTA receives notice from the Debtor that it intends to vacate the Beverly Hills Property.   The terms of the lease agreement will be based upon the LACMTA's standard lease form and will be filed with the Court prior to the hearing on this Motion.

### C.  **Repurchase Option To the Debtor**

As part of the Transactions, the LACMTA shall provide the Debtor or its assignee with an option to repurchase the Beverly Hills Property as described in Exhibit "A."  The repurchase price will be determined by appraisals performed in connection with the exercise of the repurchase option.

**D.  Prompt Approval Of The Transactions Is Critical To The Success Of This Chapter 11 Case.**

It is crucial that this Court approve these Transactions.  Absent Court approval, the Debtor will be unable to exercise the Purchase Option at this time, which is essential to have a closing of the Transactions prior to June 30, 2015, after which date the Option Price increases by almost $700,000. Approval now will also facilitate the Debtor's efforts at reorganize its financial affairs.

As this Court will likely recall, the Debtor previously negotiated two prior transactions (the "Cancelled Transactions") for the monetization of the Purchase Option which this Court approved, but which the buyer terminated.  Since the second failed transaction almost six months ago, the Debtor has retained the services of CBRE, a well-recognized and highly regarded commercial real estate broker, and has thoroughly marketed the Beverly Hills Property and related Purchase Option. Now, having actively engaged in this process, with the proposed Transactions set forth herein, the Debtor has been able to negotiate a deal of greater financial benefit.  Moreover, the proposed Transaction with the LACMTA is without any contingencies, which all other offers had, and also provides the Debtor with a repurchase option; and thus, is better for the Debtor than any of the offers the Debtor obtained through CBRE over the course of its almost six-month marketing period.  The Transactions, if approved, monetize one of the Debtor's most valuable assets for the benefit of the Debtor's estate.

**WHEREFORE**, the Debtor requests that the Court enter an order (in the form attached as Exhibit "B" to the Chrismas Declaration):

1.	Granting the Motion;

2.	Approving the Transaction Documents;

3.	Approving the Transactions;

4.	Entering the Transaction Approval Order;

5

5.      Authorizing the Debtor to enter into the APA with the LACMTA, the Lease with the LACMTA and the related agreements;

6.      Authorizing the Debtor to exercise the Purchase Option and sell the Beverly Hills Property to the LACMTA free and clear of interests pursuant to 11 U.S.C. § 363(f); and

7.      Granting such other relief as the Court deems just and proper.

Dated: May 14, 2015                    ART AND ARCHITECTURE BOOKS OF
                                       THE 21ST CENTURY, dba ACE GALLERY

                                       By:    /s/ Beth Ann R. Young
                                              Ron Bender
                                              Beth Ann R. Young
                                              Kurt Ramlo
                                              Krikor J. Meshefejian
                                       LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
                                       Attorneys for Chapter 11 Debtor and Debtor in Possession

6

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**STATEMENT OF FACTS**

**A.    Background Information.**

The Debtor is the owner and operator of a retail art gallery known as "Ace Gallery."  The Debtor's headquarters and main art gallery are located at 5500 Wilshire Blvd, Los Angeles, California.[3]  However, the Debtor also leases the Beverly Hills Property pursuant to the Beverly Hills Lease.

Pursuant to the Beverly Hills Settlement Agreement between the Debtor and the Landlord, among other parties, which the Court has approved, the Debtor has the Purchase Option to purchase the Beverly Hills Property.  Pursuant to the Beverly Hills Settlement Agreement, the cost for the Debtor to exercise the Purchase Option is the sum of $18,575,000 if the Debtor exercises the Purchase Option and closes such transaction by June 30, 2015.  The cost to the Debtor to exercise the Purchase Option will increase at various intervals after June 30, 2015.[4]

Through this Motion, the Debtor seeks authority to exercise the Purchase Option and sell the Beverly Hills Property to the LACMTA for the sum of $40,000,000 (the "Purchase Price").   After two failed transactions to sell the Beverly Hills Property in May 2014 and November 2014, and after actively marketing the Beverly Hills Property locally, nationally and internationally for almost six months through CBRE, a highly regarded commercial real estate broker, the Debtor has been able to negotiate a transaction to monetize the Purchase Option and generate approximately $21,000,000.00 in excess of the Option Price (the "Sale Proceeds") for the Debtor's estate along with a repurchase option.  The Transactions, as outlined above, if approved, will provide the Debtor with the required

---

[3] There is presently an Order which stays surrender of this Property pending the Debtor's appeal to the Ninth Circuit of various rulings adverse to the Debtor's interests in this Property.

[4] Specifically, the costs to exercise the Purchase Option increase every six months, as follows: (a) Option 2 – To close during the period 1/1/15 – 6/30/15: Purchase Price: $18,575,000.00; (b) Option 3 – To close during the period 7/1/15 – 12/31/15: Purchase Price: $19,250,000.00; Option 4 – To close during the period 1/1/16 – 6/30/16: Purchase Price: $20,500,000.00; Option 5 – To close during the period 7/01/16 – 12/31/16: Purchase Price: $21,500,000.00.

1    cash to not only pay creditors, but also fund a chapter 11 plan that will permit the Debtor to exit

2    chapter 11 as a reorganized operating entity.

3    **B.      The Debtor's Purchase Option With Lessor CCP West and CCP.**

4          On April 30, 2014, the Court entered an order approving the Beverly Hills Settlement

5    Agreement with the Debtor's Lessor, CCP West and CCP.  The salient terms of the Beverly Hills

6    Settlement Agreement, as they relate to the Debtor's proposed Transactions with the LACMTA, are

7    as follows[5]:

8          1.      The Debtor or its assignee must provide the Landlord with at least thirty (30) days'

9    notice of the Debtor's exercise of the Purchase Option ("Option Exercise"), together with evidence

10   of a deposit in the sum of $100,000 in the form of a cashier's check made payable to the escrow

11   company (the "Option Deposit") delivered to Chicago Title, First American Title, or Commonwealth

12   Lawyers Title (as selected jointly by Debtor and the CCP-West Parties, the "Escrow Company").

13   The Option Deposit shall be applicable to the purchase price if the Option Exercise closes.

14         2.      The Debtor or its assignee has the option to buy the Property for $18,575,000.00 so

15   long as the acquisition closes by June 30, 2015.  The price increases thereafter.  (See footnote 5.)

16         3.      The Debtor or its assignee shall have the right to exercise its Purchase Option at any

17   time during the term (or the extended term) of the Beverly Hills Lease Agreement as set forth in

18   Paragraphs 2 and 4 of the Beverly Hills Settlement Agreement, so long as the Debtor provides at

19   least (30) days' notice of Debtor's exercise of the Purchase Option, together with evidence of a

20   deposit in the sum of $100,000 to the Escrow Company.

21         4.      Should the Beverly Hills Property be sold under Paragraph 4 of the Beverly Hills

22   Settlement Agreement, the Loan Balance (as defined in the Beverly Hills Settlement Agreement)

23   shall be paid to the Landlord's affiliates in full through escrow.

24         5.      Pursuant to the Beverly Hills Settlement Agreement and the Beverly Hills Lease, the

25   ─────────────

26   [5] This is only a brief summary.  The actual terms and conditions of the Beverly Hills Settlement
     Agreement govern.  A true and correct copy of the Beverly Hills Settlement Agreement can be
27   reviewed at Docket No. 558, and nothing contained herein is intended to modify or alter that
     Settlement Agreement.

28
                                                 8

Purchase Option is freely transferable separate and apart from the Beverly Hills Lease.

**C.      The Lease Agreement.**

As a part of the Transactions contemplated in the APA, the LA will lease to the Debtor the existing art gallery at a rental rate of $70,000 per month until the earlier of either (1) the date upon which the LACMTA requires the Beverly Hills Property for construction for the Wilshire/Rodeo Station; or (2) the date upon which the LACMTA receives notice from the Debtor that it intends to vacate the Beverly Hills Property.  The terms of the lease agreement will be based upon the LACMTA's standard lease form and will be filed with the Court prior to the hearing on this Motion.

**D.      The Repurchase Option.**

As part of the Transactions, the LACMTA shall provide the Debtor or its assignee with an option to repurchase the Beverly Hills Property following completion of the LACMTA's use of the Beverly Hills Property.  The repurchase price will be determined by appraisals performed in connection with the exercise of the repurchase option.

**E.      The Debtor's Proposed Plan of Reorganization.**

Although the Committee has filed a plan of reorganization set for a confirmation hearing on May 21, 2015, the Debtor believes that approval of the Transactions will now permit the Debtor to propose a new plan that is substantially better for creditors and the Debtor's estate than the current Committee plan.[6]  The current Committee plan is a liquidating plan that abandons the Debtor's most valuable asset – the Mid-Wilshire Property.  In fact, as disclosed in the Committee's plan related filings on May 11, 2015, with one exception all impaired classes voted to reject the Committee's plan, including the class of general unsecured creditors.

---

[6] Concurrently with the filing of this Motion, the Debtor intends to file its Motion seeking to continue the Confirmation Hearing for a brief period of time of about 30 – 45 days so that the parties can focus on closing the Transactions contemplated herein and so that the Debtor can work with the Committee to propose a joint plan of reorganization.  Given the many objections to the Committee's Plan by parties *other than* the Debtor, a continuance of the confirmation hearing would seem to make sense in any event.

If this sale to the LACMTA is approved, and if the Transactions close prior to June 30, 2015, then the Debtor will have approximately $19,000,000[7] to fund a reorganization plan. With those funds in hand, the Debtor will be able to prepare and propose in a short period of time a plan of reorganization that will, on a date certain, (A) satisfy all secured claims, administrative expenses, and priority claims, (B) fully fund a claim reserve on account of the disputed claim of AERC, and (C) make a substantial distribution to general unsecured creditors.

Unlike the Committee's current plan, the Debtor's plan will provide for (A) Douglas Chrismas to continue in management of the Debtor's assets and operations, and (B) continued litigation concerning the Mid-Wilshire Property. The Debtor is fully committed to negotiating in good faith with the Committee to achieve a joint plan that will enable the plan to be confirmed as soon as possible. The Debtor believes the Committee has the same commitment, and the Debtor is very optimistic that a joint plan will be filed very quickly after consummation of the sale of the Beverly Hills Property.

Comparatively, if the Court does not approve the sale to the LACMTA at this time, it is unlikely that the Debtor or the Committee will be able to monetize the Purchase Option prior to June 30, 2015, which means that the purchase price for the Purchase Option will increase by almost $700,000 if it is exercised later, all of which directly prejudices the estate's interests. Alternatively, there is a risk of default under the Beverly Hills Lease, which might result in a termination of the Purchase Option. It is in the best interests of the estate and creditors that the Purchase Option be monetized ***now***.

\\\\

\\\\

---

[7] From the Sale Proceeds, the Debtor is required to pay to the Landlord's affiliates at closing of the Sale the remaining Loan Balance, estimated to be in the sum of approximately $2,050,000, which will leave the estate with approximately $19,000,000 of the Sale Proceeds to pay other creditors of the Debtor's estate.

## II.

## THE COURT SHOULD APPROVE ALL OF THE TRANSACTIONS

## CONTEMPLATED IN THE TRANSACTION DOCUMENTS

## PURSUANT TO 11 U.S.C. § 363(b)

As set forth above, the Debtor is requesting entry of an order[8]:

(1)    Authorizing the Debtor to (a) exercise the Purchase Option and (b) enter into the APA and related agreements with the LACMTA, and authorizing all of the transactions set forth therein, including the Debtor's sale of the Beverly Hills Property to the LACMTA free and clear of interests pursuant to 11 U.S.C. § 363(f); and

(2)    Authorizing the Debtor to enter into the New Lease Agreement with the LACMTA upon the Closing of the Transactions.

For the reasons set forth herein, the Debtor submits that it has demonstrated cause under the applicable provisions of the Bankruptcy Code, for the Court to grant the Debtor's Motion.

With certain exceptions not applicable in this case, Section 1107 states that "a debtor in possession shall have all the rights . . . and powers, and shall perform all the functions and duties . . . of a trustee. . . ." 11 U.S.C. § 1107.  Section 363(b)(1) of the Bankruptcy Code provides that a trustee (or debtor in possession in this case) "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Section 102(1) of the Bankruptcy Code defines "after notice and a hearing" as after such notice as is appropriate in the particular circumstances, and such opportunity for hearing as is appropriate in the particular circumstances.

To approve a use, sale or lease of property other than in the ordinary course of business, the court must find "some articulated business justification."  *See*, *e.g.*, *In re Martin (Myers v. Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) citing *In re Schipper (Fulton State Bank v. Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991); *Comm. of Equity SEC Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d

---

[8] The Transaction Approval Order and the Transaction Documents will be filed prior to the hearing on this Motion.

11

1063, 1070 (2d Cir. 1983); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Lionel Corp.* and requiring good faith); *In re Delaware and Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the *Abbotts Dairies* decision). Here, as is outlined below, there is clearly a business justification which warrants approval of the proposed Transactions.

A.    **The Debtor's Entry Into the APA and Related Agreements, And Transfer Of The Purchase Option, is a Sound Exercise of the Debtor's Business Judgment.**

The Debtor has previously obtained Bankruptcy Court approval of the Beverly Hills Settlement Agreement, and the Purchase Option strike prices, as well as two prior transactions regarding the monetization of the Beverly Hills Property through the exercise of the Beverly Hills Option. The Debtor is now in a position to monetize the Purchase Option. Failure to monetize the Purchase Option as described in the Transaction Documents will lead to a delay in the confirmation of a Plan in this case and the interfere with the potential stream of funds for payments to creditors holding allowed claims, regardless of whether it is the Debtor's Plan or the Committee's Plan. The proceeds of the contemplated Transactions will not only establish a source of funds for payment of the already approved administrative claims of the estate's professionals, but also AERC's administrative claim that the Debtor anticipates the Court will allow in the Debtor's estate.

The Debtor's Transactions with the LACMTA and the Debtor's monetization of the Purchase Option will position the Debtor to (a) successfully reorganize its financial affairs, (b) cause the exercise of the Purchase Option, (c) pay the Loan Balance to the Landlord's affiliates, (d) make a payment to unsecured creditors holding allowed claims, (e) create a reserve of funds which will provide adequate assurance of future performance to AERC and pay any Court-allowed and required administrative claims of AERC; (f) pay all administrative claims in full; and (g) propose and fund a plan of reorganization in this case. The Transactions will provide at least $19,000,000 of cash consideration to the Debtor. Absent the transactions with the LACMTA, the Debtor would not have access to the cash the Debtor needs to fund any of the foregoing obligations or implement its plan of reorganization in this case.

12

**B.**    **Debtor Should be Authorized to Sell the Beverly Hills Property to The LACMTA**

In the Ninth Circuit, "cause" exists for authorizing a sale of estate assets if it is in the best interest of the estate, and a business justification exists for authorizing the sale. *In re Huntington, Ltd.*, 654 F.2d 578 (9th Cir. 1981); *In re Walter*, 83 B.R. 14, 19-20 (9th Cir. B.A.P. 1988). The Ninth Circuit has also held that section 363 allows the sale of substantially all assets of a debtor's bankruptcy estate after notice and a hearing. *In re Qintex Entertainment, Inc.*, 950 F.2d 1492 (9th Cir. 1991).

In determining whether a sale satisfies the business judgment standard, courts have held that: (1) there be a sound business reason for the sale; (2) accurate and reasonable notice of the sale be given to interested persons; (3) the sale yields an adequate price (i.e., one that is fair and reasonable); and (4) the parties to the sale have acted in good faith. *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *see also*, *In re Walter*, 83 B.R. at 19-20.

The Debtor submits that its proposed transfer of the Purchase Option to the LACMTA is clearly in the best interests of the Debtor's bankruptcy estate and a sound exercise of the Debtor's business judgment.

**1.**    **Sound Business Purpose.**

There must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy court may order such disposition under section 363(b). *In re Lionel Corp.*, 722 F.2d at 1070. The Ninth Circuit Bankruptcy Appellate Panel in *Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19 (9th Cir. B.A.P. 1988) has adopted a flexible case-by-case test to determine whether the business purpose for a proposed sale justifies disposition of property of the estate under section 363(b). In *Walter*, the Bankruptcy Appellate Panel, adopting the reasoning of the Fifth Circuit in *In re Continental Airlines, Inc.*, 780 F.2d 1223 (5th Cir. 1986) and the Second Circuit in *In re Lionel Corp.*, *supra*, articulated the standard to be applied under section 363(b) as follows:

13

Whether the proffered business justification is sufficient depends on the case. As the Second Circuit held in *Lionel*, the bankruptcy judge should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the Debtor, creditors and equity holders, alike. He might, for example, look to such relevant facts as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value. This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

*In re Walter*, 83 B.R. at 19-20, citing *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986).

Here, the facts pertaining to the Debtor's entry into the Transaction Documents, exercise of the Purchase Option and sale of the Beverly Hills Property to the LACMTA clearly substantiate the Debtor's business decision that such contemplated Transactions serves the best interests of the Debtor's estate and its creditors, and merits the approval of the Bankruptcy Court. The monetization of the Purchase Option is necessary in order for the Debtor to realize the substantial consideration being offered to the Debtor by the LACMTA. Moreover, since the LACMTA has publicized its intention to commence the eminent domain of the Beverly Hills Property, a sale of the Beverly Hills Property to the LACMTA makes perfect sense and will yield the highest return to the Debtor for this valuable asset. Additionally, the Debtor's reorganization strategy is based upon the Debtor's monetization of the Purchase Option and sale of the Beverly Hills Property.

Under the conditions set forth in the Letter Agreement, and as will be reflected in the Transaction Documents, at closing the Debtor will receive the Sale Proceeds, as set forth above. The total value of the consideration that the Debtor will receive in excess of the Option Price is at least $19,000,000, plus the additional value in the future repurchase option which the Debtor can monetize at a future date, either by exercising it or selling it to a third party.

The Debtor, therefore, submits that its proposed Transactions are justified by sound business purposes, satisfying the first requirement under section 363(b) of the Bankruptcy Code.

14

2.    **Accurate and Reasonable Notice**.

In connection with a proposed sale under section 363 of the Bankruptcy Code, "four pieces of information must be presented to the creditors. The notice should: place all parties on notice that the debtor is selling its business; disclose accurately the full terms of the sale; explain the effect of the sale as terminating the debtor's ability to continue in business; and explain why the proposed price is reasonable and why the sale is in the best interest of the estate." *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 180 (D. Del. 1991). A notice is sufficient if it includes the terms and conditions of the sale and if it states the time for filing objections. *In re Karpe*, 84 B.R. 926, 930 (Bankr. M.D. Pa. 1988). The purpose of the notice is to provide an opportunity for objections and hearing before the court if there are objections. *Id*.

Here, it is important to note that the Debtor is not selling its "business" but rather only its *place of business*, with the right to continued use of the premises pursuant to the terms of a new lease with the LACMTA on more favorable terms than the existing Lease with the Lessor. While the Debtor's monthly rent under the current lease is the sum of approximately $106,000 per month, and is scheduled to increase on July 1, 2015, under the proposed lease with the LACMTA, the Debtor's monthly rent will be the current market value of $70,000 per month. This sale to the LACMTA will not terminate the Debtor's ability to continue to conduct business, as the Debtor will have the continued use of the premises through approximately October 2016, in addition to the Debtor's continued use of the Mid-Wilshire Gallery.

The Purchase Price paid by the LACMTA is more than the cash component of the two failed transactions that the Court previously approved; and is coupled with a repurchase option which none of the other offers contained. For proprietary reasons, the Debtor does not believe it would be appropriate to disclose the specific amount of those other offers, other than to state that they were all less valuable than the Purchase Price now being offered by the LACMTA. (See, Chrismas Declaration at §6 and §7.)

The Debtor has served the Motion and Notice upon the United States Trustee, the Lessor under the Beverly Hills Lease, and affected lienholders, counsel for the Official Committee of Unsecured Creditors, and all parties who have requested special notice in these cases. In addition,

15

the Debtor has served just the Notice upon all of its creditors. The Debtor submits that the foregoing satisfies the requirements of Bankruptcy Rules 6004(a) and (c), which provide as follows:

> (a) ... Notice of a proposed ... sale ... of property ... not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2),(c)(1),(i) and (k) ...

> (c) ... A motion for authority to sell property free and clear of liens or other interests shall be made in accordance with Rule 9014 and shall be served on the parties who have liens or other interests in the property to be sold.  The notice required by subdivision (a) of this rule shall include the date of the hearing on the motion and the time within which objections may be filed and served on the debtor in possession...

Fed. R. Bankr. P. 6004(a)(c).

### 3.    **Fair and Reasonable Price**.

In order to be approved under section 363(b) of the Bankruptcy Code, the purchase price must be fair and reasonable.  *Coastal Indus., Inc. v. U.S. Internal Revenue Service (In re Coastal Indus., Inc.)*, 63 B.R. 361, 368 (Bankr. N.D. Ohio 1986).  Several courts have held that "fair value" is given for property in a bankruptcy sale when at least 75% of the appraised value of such property is paid.  *See In re Karpe*, 84 B.R. at 933; *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149 (3d Cir. 1986); *Willemain v. Kivitz*, 764 F.2d 1019 (4th Cir. 1985); *In re Snyder*, 74 B.R. 872, 878 (Bankr. E.D. Pa. 1987); *In re The Seychelles, Partnership and Genius Corp. v. Banyan Corp.*, 32 B.R. 708 (N.D. Tex. 1983).  However, the Debtor also realizes that "its main responsibility, and the primary concern of the bankruptcy court, is the maximization of the value of the asset sold."  *In re Integrated Resources, Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992), *aff'd*, 147 B.R. 650 (S.D.N.Y. 1992).  "It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate."  *In re Atlanta Packaging Products, Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988); *see also In re Wilde Horse Enterprises*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991) ("in any sale of estate assets, the ultimate purpose is to obtain the highest price for the property sold").

Through the course of the negotiations with the LACMTA, the Debtor learned that the LACMTA had obtained an appraisal of the Beverly Hills Property in the sum of $30,000,000.

(See, Chrismas Declaration at §8.)  Mr. Chrismas, the sole shareholder of the Debtor similarly obtained a valuation of the Beverly Hills Property in the sum of $42,000,000.  (See, Chrismas Declaration at §8.)  Through protracted negotiations with the LACMTA, the Debtor was able to obtain the Purchase Price of $40,000,000, which is almost 96% of the Debtor's valuation.  Given the fact that the offers obtained by CBRE through its substantial marketing efforts had contingencies and did not provide for any repurchase option in favor of the Debtor, there is no question that the Debtor has maximized the value of this significant asset through the Transactions with the LACMTA. (See, Chrismas Declaration at §9.)

    **4.**    <u>**Good Faith.**</u>

When a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1), it is required to make a finding with respect to the "good faith" of the buyer.  *In re Abbotts Dairies*, 788 F.2d at 149.  Such a procedure ensures that section 363(b)(1) will not be employed to circumvent the creditor protections of Chapter 11, and as such, it mirrors the requirement of section 1129, that the Bankruptcy Court independently scrutinizes the debtor's reorganization plan and makes a finding that it has been proposed in good faith.  *Id*. at 150.

"Good faith" encompasses fair value, and further speaks to the integrity of the transaction.  *In re Wilde Horse Enterprises*, 136 B.R. at 842.  With respect to the debtor's conduct in conjunction with the sale, the good faith requirement "focuses principally on the element of special treatment of the Debtor's insiders in the sale transaction."  *See In re Industrial Valley Refrig. and Air Cond. Supplies, Inc.*, 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987).  With respect to the buyer's conduct, this Court should consider whether there is any evidence of "fraud, collusion between the purchaser and other bidders or the [debtor], or an attempt to take grossly unfair advantage of other bidders."  *In re Abbotts Dairies*, 788 F.2d at 147, *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978); *In re Wilde Horse Enterprises, Inc.*, 136 B.R. at 842; *In re Alpha Industries, Inc.*, 84 B.R. 703, 706 (Bankr. D. Mont. 1988).  In short, "[l]ack of good faith is generally determined by fraudulent conduct during the sale proceedings."  *In re Apex Oil Co.*, 92 B.R. 847, 869 (Bankr. E.D. Mo. 1988), <u>citing</u> *In re Exennium, Inc.*, 715 F.2d 1401, 1404-05 (9th Cir. 1983).

In the case of *In re Filtercorp, Inc.*, 163 F.3d 570 (9th Cir. 1998), the Ninth Circuit set forth the following test for determining whether a buyer is a good faith purchaser:

> A good faith buyer "is one who buys 'in good faith' and 'for value.'" [citations omitted.] [L]ack of good faith is [typically] shown by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" [citations omitted.]

*Filtercorp*, 163 F.3d at 577.

The LACMTA is not an insider of the Debtor, and in fact, it is widely publicized that the LACMTA is in the process of constructing an underground subway that will transverse the City of Los Angeles and pass through Beverly Hills, with the Beverly Hills Property being the specific target of the LACMTA's taking for purposes of building a subway station. Thus, it has been determined through substantial marketing efforts that the LACMTA is the best buyer for the Beverly Hills Property given its intended eminent domain action. The Debtor has negotiated the transactions with the LACMTA for more that one month. In addition to this, the Debtor actively marketed the Beverly Hills Property, the Purchase Option, and proposed transactions similar to the Transactions over the course of more than a year. No other potential buyer submitted an non-contingent offer or a repurchase option for the benefit of the Debtor which the LACMTA has offered. The Debtor believes that the LACMTA has made its offer in good faith. Accordingly, the Debtor submits that the proposed transactions with LACMTA are in good faith.

**C.** **Section 363(f) of the Bankruptcy Code Permits the Exercise of the Purchase Option and Sale of the Beverly Hills Property to Be Free and Clear of Any and All Liens, Claims and Interests.**

Other than the interests of the Lessor and its secured lender that will be satisfied by the exercise of the Purchase Option, the Debtor is unaware of any liens, claims, encumbrances or other interests asserted on or in the Beverly Hills Property.[9] The Debtor has given notice of the proposed

---

[9]    Although the State of California Employment Development Department and the State of California Board of Equalization had recorded notices purporting to establish liens against all real and personal property before the bankruptcy case (and as listed on Debtor's Schedule D as to the Employment Development Department), neither of their proofs of claim assert a secured claim. The New York State Department of Taxation and Finance filed a proof of claim alleging

sale to all interested parties in this case.  If any party asserts a lien, claim, encumbrance or other interest in advance of the hearing, the Debtor will address such asserted right or interest at the hearing.  In the absence of any asserted right or interest in advance of the hearing, the Debtor and the LACMTA are entitled to a sale order that provides the sale will be free and clear of all liens, claims, encumbrances and other interests as authorized by section 363(f) of the Bankruptcy Code.

## VI.

## <u>CONCLUSION</u>

**WHEREFORE**, the Debtor requests that the Court enter an order (in the form attached as Exhibit "B" to the Chrismas Declaration):

1.    Granting the Motion;

2.       Approving the Transaction Documents;

3.       Approving the Transactions;

4.       Entering the Transaction Approval Order;

5.       Authorizing the Debtor to enter into the APA with the LACMTA, the Lease with the LACMTA and the related agreements;

6.       Authorizing the Debtor to exercise the Purchase Option and sell the Beverly Hills Property to the LACMTA free and clear of interests pursuant to 11 U.S.C. § 363(f); and

7.       Granting such other relief as the Court deems just and proper.


Dated:  May 14, 2015                    ART AND ARCHITECTURE BOOKS OF
                                        THE 21ST CENTURY, dba ACE GALLERY

                                        By:   _/s/ Beth Ann R. Young_
                                              Ron Bender
                                              Beth Ann R. Young
                                              Kurt Ramlo
                                              Krikor J. Meshefejian
                                        LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
                                        Attorneys for Chapter 11 Debtor and Debtor in Possession

---

a $9,662.71 secured claim, but the proof of claim does not describe the nature of the lien or property subject to the lien or attach any documentation of the lien or its perfection.

### DECLARATION OF DOUGLAS CHRISMAS

I, Douglas Chrismas, hereby declare as follows:

1.      I am the President of Art And Architecture Books Of The 21st Century, dba Ace Gallery, chapter 11 debtor and debtor in possession (the "Debtor").  As President of the Debtor, I am involved in virtually all aspects of the Debtor's operations and financial condition.  I am also the director and chief curator of Ace Museum.

2.      This declaration is submitted in support of the Debtor's Motion for Order Authorizing Debtor to Exercise Purchase Option and Enter Into Agreement With Metropolitan Transportation Authority ("LACMTA") for Purchase and Sale of Real Property Located at 9430 Wilshire Boulevard, Beverly Hills, California 90212 (the "Beverly Hills Property") and to Enter Into Related Transactions Pursuant to 11 U.S.C. §363 (the "Sale Motion").

3.      I have personal knowledge of the facts set forth herein, and, if called to testify, could and would competently testify to such facts.  Capitalized terms not defined in this Objection have the meanings given to them in the Sale Motion.

### The Letter Agreement With the LACMTA

4.      On May 14, 2015, the Debtor and the LACMTA entered into that certain Letter Agreement (the "Letter Agreement") outlining the terms of the LACMTA's purchase from the Debtor of the Beverly Hills Property for the sum of $40,000,000 (the "Purchase Price"), subject to Bankruptcy Court approval.  A true and correct copy of the Letter Agreement is attached hereto as Exhibit "A" and is incorporated herein and made a part hereof.

5.      The sale to the LACMTA of the Beverly Hills Property is scheduled to close by June 15, 2015, or as soon as practical thereafter, but in no event later than June 30, 2015 and will provide the Debtor with the sum of approximately $21,000,000 (the "Sale Proceeds") after the Debtor exercises the Purchase Option which will enable the Debtor to (A) pay, among other

things, (i) administrative claims, (ii) the Loan Balance owing to the Landlord's affiliates due at the closing of the Transactions pursuant to the Beverly Hills Settlement Agreement, and (iii) any potential award to AERC Desmond Towers ("AERC"); and also (B) propose and fund a chapter 11 plan.

### The Purchase Price is Higher Than Other Transactions and Other Offers

6.     The Purchase Price paid by the LACMTA is without contingencies, and is more than the cash component of the two failed transactions that the Court previously approved; which none of the other offers contained.   Thus, I believe the LACMTA offer, which includes a repurchase option, is better for the Debtor than any of the offers received by CBRE, the commercial broker hired in December 2014 to market the Beverly Hills Property.   CBRE has extended its marketing efforts not only locally in California, but also nationally, and even internationally to potentially interested buyers for the past approximately six months.

7.     For proprietary reasons, the Debtor does not believe it would be appropriate to disclose the nature or specific amount of the offers received by CBRE, however I can state that having reviewed the other offers, given the pricing, contingencies and lack of a repurchase option which retained value for the Debtor, none of them were as valuable for the Debtor as is reflected in the Transactions offered by the LACMTA.

8.     Through the course of my direct negotiations with the LACMTA, I learned that the LACMTA had obtained an appraisal of the Beverly Hills Property in the sum of $30,000,000.   As part of the negotiations, I personally retained the services of a professional to provide me with a determination of the value of the Beverly Hills Property, and was advised that the value could be as much as the sum of $42,000,000.

9.     Through my protracted negotiations with the LACMTA over a more than two week period of time, I was able to obtain an agreement with the LACMTA that it would purchase the

21

Beverly Hills Property for the sum of $40,000,000, which is almost 96% of the determination of value that I obtained, and more than 30% higher than the LACMTA's stated appraised value. Given the fact that the offers obtained by CBRE through its substantial marketing efforts had contingencies and did not provide for any repurchase option in favor of the Debtor, there is no question that the Debtor has maximized the value of this significant asset through the Transactions with the LACMTA.

### **Debtor's Exercise of the Purchase Option; Sale of the Beverly Hills Property;**

### **and Lease of the Beverly Hills Property Back to the Debtor**

10.    The Transactions outlined in the Letter Agreement are being memorialized in documentation being prepared at this time and will be filed in advance of the hearing on this Sale Motion.

11.    It is important to note that through the Transactions, the Debtor is not selling its "business" but rather only its *place of business*, with the right to continued use of the premises pursuant to the terms of a new lease with the LACMTA on much more favorable terms than the existing Lease with the Lessor.  While the Debtor's monthly rent under the current lease is the sum of approximately $106,000 per month, and is scheduled to increase on July 1, 2015 by another $10,000, under the proposed lease with the LACMTA, the Debtor's monthly rent will be the current market value of $70,000 per month, thus saving the Debtor more than $40,000 per month.  Thus, the sale to the LACMTA will not terminate the Debtor's ability to continue to conduct business at the Beverly Hills location, as the Debtor will have the continued use of the premises through approximately October 2016, in addition to the Debtor's continued use of the Mid-Wilshire Gallery.

22

**The Court is Requested to Conduct A Hearing on the Sale Motion on Shortened Time to**

**Ensure that The Contemplated Transaction Can Close Prior to June 30, 2015**

12. The Debtor his filed the Sale Motion concurrently with its Application for Hearing on Shortened Time in order to make sure that the hearing on the Sale Motion can be conducted and hopefully approved on an expedited basis so that the Debtor can close its contemplated transaction with the LACMTA *prior to* June 30, 2015. This is important because on July 1, 2015, the price of the Purchase Option increases by almost $700,000, which would mean that there is less money available to pay the Debtor's creditors with allowed claims and as outlined above. Given the substantial difference in price in exercising the option, it is imperative to the Debtor that the transaction be considered as soon as practical on the Court's calendar.

13. Since the Transactions not only generate Sales Proceeds for the estate in the sum of approximately $21,000,000, and also substantially reduces the amount of rent to be paid by the Debtor by approximately $40,000 per month, it would seem highly unlikely that any interested party could have any valid objection to the Sale Motion.

14. I believe that this transaction with the LACMTA is in the Debtor's sound business judgment, for a legitimate purpose, and for a fair and reasonable price, and therefore respectfully request that the Court approve the Sale Motion in its entirety.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 14, 2015, at Los Angeles, California.

DOUGLAS CHRISMAS

23

# EXHIBIT "A"

# ACE GALLERY LOS ANGELES

5514 WILSHIRE BOULEVARD · LOS ANGELES · CALIFORNIA · 90036 ·
TEL 323.935.4411 · ACEGALLERY@ACEGALLERY.NET

May 14, 2015

Los Angeles County Metropolitan
  Transportation Authority
Att'n:  Velma C. Marshall
One Gateway Place
Los Angeles, CA  90012-2952

RE:    Westside Purple Line Extension Section 2
       APN: 4331-001-045
       9430 Wilshire Boulevard, Los Angeles
       LACMTA Parcel W-3003
       Counteroffer – Real Property

Dear Ms. Marshall:

Art and Architecture Books of the 21st Century ("Ace Gallery") understands that the Los Angeles County Metropolitan Transportation Authority ("LACMTA") is currently in the Engineering Phase of the Westside Purple Line Extension Project – Section 2 ("Project").  We further understand that the Project is approximately 2.55 miles and extends from the Wilshire/La Cienega Station (terminus of Section 1) to the Century City Constellation Station.  The property referenced above is located within the planned alignment of the Project and is hereinafter designated as the "Property" (see the attached legal description and plat map describing the Property and labeled as "Exhibits A & B").  LACMTA is seeking to acquire the fee simple interest in the Property.  Ace Gallery currently holds an option to purchase the Property ("Option").  This letter constitutes Ace Gallery's counteroffer to sell the aforementioned property interest to LACMTA for the Project.

## 1. OFFER TO SELL:

Subject to, and upon the terms and conditions set forth below, Ace Gallery offers to sell the Property that is identified as APN 4331-001-045.  We acknowledge that it is the policy of LACMTA to acquire property interests that is in private ownership only when it is necessary to do so, and through voluntary purchase if possible.  LACMTA has obtained and reviewed an appraisal to establish the fair market value of the Property. .

Los Angeles County Metropolitan Transportation Authority
Counteroffer – Real Property
May 14, 2015
Page 2

Case 2:13-bk-14135-RK   Doc 1129   Filed 05/15/15   Entered 05/15/15 10:48:31   Desc
Main Document   Page 32 of 38

## 2. PURCHASE PRICE:

Ace Gallery hereby offers to sell fee simple interest in the Property for the sum of **Forty Million Dollars ($40,000,000)** (the "Purchase Price"). .  This counteroffer is subject to the condition that ACE Gallery provide documentation that this sale will be accepted and supported by the Creditor Committee, that Ace Gallery will not consider or accept any other offers for the Property, and that Ace Gallery obtain approval of the sale from the court having jurisdiction over the pending Bankruptcy Case No. 2.13-bk-14135-RK. This sum does not include any relocation assistance, benefits, or payments (if any) which Ace Gallery may be entitled to receive.

## 3. ADDITIONAL TERMS AND CONDITIONS:

Ace Gallery will work diligently with LACMTA to enter into a Purchase and Sale Agreement ("PSA") reflecting mutually agreed upon terms no later than May 15, 2015 or such other date as mutually agreed to by the parties.  The Purchase Price will be paid at Closing and closing will take place no later than June 15, 2015; provided, however, that ACE Gallery will have the right, at no cost or risk to LACMTA, to extend the Closing by no more than 30 days.

As part of the counteroffer, LACMTA will lease (the "Ace Gallery Lease") the existing art gallery back to Ace Gallery at a rental rate equal to seventy thousand dollars ($70,000) per month, triple net until the earlier of (1) LACMTA requires the Property for construction of the Wilshire/Rodeo Station or (2) until LACMTA receives notice from Ace Gallery that it intends to vacate the Property.  The terms of the lease agreement will be based on LACMTA's standard lease form.

Ace Gallery will receive an Option to repurchase the Option Property (as defined below) (the "Repurchase Option") on the following terms and conditions:

(i)     After the date LACMTA purchases the Property ("Date of Closing") and upon request by Ace Gallery, LACMTA will grant Ace Gallery or its designee the right to pursue entitlements for development of the Property, and LACMTA will reasonably cooperate, at no cost or risk to LACMTA, with Ace Gallery's pursuit of entitlements, including without limitation signing applications for development and other documents related thereto. Under no circumstances will LACMTA be required or obligated to encumber its fee interest in the Property.

(ii)    Any time after January 1, 2017 and before July 1, 2021, Ace Gallery will have the right to make a written request for an appraisal to set the option price (the "Option Price") which Option Price will be determined within six (6) months of the written request (the "Option Price Determination Date").

Case 2:13-bk-14135-RK   Doc 1129   Filed 05/15/15   Entered 05/15/15 10:48:31   Desc
Main Document      Page 33 of 38

(iii)     The Option Price will be determined based on two appraisals performed
by MAI appraisers, one obtained by LACMTA and one obtained by Ace
Gallery, each at their own cost and expense.  The appraisers will agree
upon guidelines which will include the agreement that comparable
properties will include (a) no parcels less than 8,000 square feet in size,
and (b) primarily properties in the Beverly Hills "Golden Triangle",
Robertson, and Melrose areas.

(iv)     The Property to be appraised will exclude portions of the Property required
by the LACMTA as determined by LACMTA, including, without limitation, a
portal for the subway station which will include an elevator, escalator, and
set of stairs, and vents,  and other ancillary facilities, adjacent to and used
in the construction and operation of the portal and station (the Property, as
revised, to be called the "Option Property").

(v)      The appraised Fair Market Value for the Option Property will be based on
the highest and best use as determined by the appraisers using the
methodology described in subsection (iii) above, and will not take into
account any specific entitlements obtained by Ace Gallery or any
entitlements for which Ace Gallery have applied.  If the appraised value of
the appraisals is within 10% of each other, the purchase price will be
based on the average of the two appraisals.  If the appraised value of the
appraisals is greater than 10% of each other, a third appraiser will be
retained to review the appraisals and to determine the value of the Option
Property, which value must be within the range of the two appraisals.

(vi)     The Option Price will be the greater of (a) the appraised value as
determined in Section (v) above, or (b) $40 million. The Option Price will
be increased each year by the greater of the increase in Consumer Price
Index (CPI) or 3% per annum from the Option Price Determination Date.

(vii)    Ace Gallery will have until June 1, 2022 to exercise the Option by (a)
providing written notice to LACMTA that Ace Gallery is exercising the
Option, and (b) delivering an option fee of $350,000, which option fee will
be applied to the Option Price.  Ace Gallery and LACMTA will close the
sale of the Option Property within six months of Ace Gallery's written
notice of exercise of the Option.  If Ace Gallery fails to exercise its Option
by June 1, 2022, the Option shall expire and Ace Gallery shall no longer
have any interest in the Option Property.  Ace Gallery may assign the
Option subject to LACMTA consent which shall not be unreasonably
withheld, and which shall be provided or withheld within thirty (30)
business days after delivery of Ace Gallery's written request. References
herein to "Ace Gallery" after exercise of the Option shall mean Ace
Gallery's assignee if the Option has been assigned.

Los Angeles County Metropolitan Transportation Authority
Counteroffer – Real Property
May 14, 2015
Page 4

Case 2:13-bk-14135-RK   Doc 1129   Filed 05/15/15   Entered 05/15/15 10:48:31   Desc
Main Document    Page 34 of 38

(viii)   Should Ace Gallery timely exercise its Option and purchase the Option Property, LACMTA will continue to occupy the Option Property as a staging area under a Right of Entry Agreement  to be recorded in the County Recorder's office and pay rent to Ace Gallery in the amount of $70,000 per month, triple net commencing upon the date Ace Gallery purchases the Option Property.  The rent will be adjusted by 3% each year beginning on the first anniversary of the Right of Entry Agreement commencement date and continuing until the Option Property is turned over to Ace Gallery at the end of the construction.

(ix)   Ace Gallery's construction shall be subject to all rules and regulations applicable to construction on property adjacent to Metro facilities.  Ace Gallery shall provide at all times appropriate safety measures and protection to LACMTA's patrons from Ace Gallery's construction activities related to a future development.  Ace Gallery further understands and will agree that LACMTA provides essential transit service to its patrons and therefore LACMTA and any future development must be  constructed and operated in such a way to ensure LACMTA and its patrons have access to the portal and surrounding plaza at all times.

(x)   LAMCTA and Ace Gallery will cooperate with each other during the design phase of the LACMTA facilities so as to minimize logistical and other conflicts between the two projects so long as Ace Gallery provides the necessary funds to cover LACMTA staff time to review and coordinate with Ace Gallery's design plans and to cover any changes orders which result from Ace Gallery's future project.

(xi)   Ace Gallery acknowledges that LACMTA intends to construct, operate and maintain a rapid transit facility and any sale of the Option Property will include LACMTA's standard transit proximity release.

## 4. CONDITIONS OF COUNTEROFFER:

LACMTA's acceptance of this counteroffer is subject to and conditioned upon the following:

(a)   Approval by the LACMTA Board of Directors and the Federal Transportation Administration;

(b)   LACMTA's approval, at its sole discretion, of the results of such soils, geological, toxic waste, hazardous substance, and/or any kind of tests and analyses, as LACMTA, or its representative, may perform prior to the opening

of escrow, or in LACMTA's sole and absolute discretion, after the opening of escrow;

(c)     The execution of the PSA and escrow instructions;

(d)     The timely acceptance of this counteroffer in accordance with Paragraph 6 below.

(e)     Ace Gallery must take all actions necessary to comply with all obligations necessary to retain its right to exercise the Option to purchase the property, including, without limitation, timely paying all applicable rent payments.  Should Ace Gallery lose its right to exercise the Option, LACMTA shall have no obligation to purchase the Property from Ace Gallery.

(f)     Ace Gallery must exercise its Option to purchase the Property and pay the $100,000 Option Fee on or about May 15, 2015.

## 5.     LACMTA'S OFFER TO PAY REASONABLE COSTS OF AN INDEPENDENT APPRAISAL  PURSUANT TO CODE OF CIVIL PROCEDURE 1263.025:

LACMTA confirms that pursuant to Code of Civil Procedure Section 1263.025, LACMTA has offered to pay Ace Gallery's reasonable costs, up to $5,000.00 (Five Thousand Dollars), for an independent appraisal of the Property interests, that Ace Gallery has obtained such an appraisal as described in Section 4, that Ace Gallery has signed that certain separate agreement for release of the $5,000 payment as required by LACMTA and forwarded the invoice from Ace Gallery's appraiser to LACMTA, and that LACMTA will therefore pay the $5,000 to Ace Gallery's appraiser upon execution of this counteroffer.

## 6  ACCEPTANCE:

If the above counteroffer is acceptable to you, please indicate your acceptance by signing in the space provided below, and return an original signed copy of this letter to my attention.  Upon receipt of your acceptance of this counteroffer, the parties will immediately begin preparing the PSA and escrow instructions for execution.  LACMTA agrees to pay all of the conveyance and escrow costs.  All taxes and assessments will be prorated, and possession will be delivered to the LACMTA at the close of escrow, subject to the Ace Gallery Lease and the Repurchase Option.

/
/
/

Case 2:13-bk-14135-RK   Doc 1129   Filed 05/15/15   Entered 05/15/15 10:48:31   Desc
Main Document    Page 36 of 38
Los Angeles County Metropolitan Transportation Authority
Counteroffer – Real Property
May 14, 2015
Page 6

## 7. ADMISSIBILITY OF COUNTEROFFER:

If for any reason you do not accept Ace Gallery's counteroffer, please be advised that this letter and the counteroffer made herein are tendered under the provisions of the California Evidence Code Section 1152 and analogous federal law, as an offer to compromise, and shall not be admissible to prove Ace Gallery's liability, and may not be used as an admission of value in any eminent domain or other proceeding.

Sincerely,

Ace Gallery

Douglas Chrismas
President

Attachments:

1. Exhibit "A" Legal Description
2. Exhibit "B" Plat Map

## ACCEPTANCE

This counteroffer dated May 14, 2015 from Ace Gallery for $40,000,000 for the sale of the Property described above on the terms and conditions set forth in the counteroffer is hereby accepted.

LOS ANGELES COUNTY METROPOLITAN
TRANSPORTATION AUTHORITY

By:

Velma C. Marshall
Deputy Executive Officer – Real Estate

1

# PROOF OF SERVICE OF DOCUMENT

2

3

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

4

5

A true and correct copy of the foregoing document entitled **NOTICE OF SALE OF ESTATE PROPERTY** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

6

**1.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:   Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **May 15, 2015**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

7

8

9

☒ Service information continued on attached page

10

11

**2.  SERVED BY UNITED STATES MAIL**: On **May 15, 2015**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

12

13

14

☐ Service information continued on attached page

15

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **May 15, 2015**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

16

17

18

*Served via Attorney Service*
The Hon. Judge Robert N. Kwan
United States Bankruptcy Court
255 East Temple Street
Chambers 1682
Los Angeles, CA 90012

19

20

21

22

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

23

24

| May 15, 2015 | Stephanie Reichert | /s/ Stephanie Reichert |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

25

26

27

28

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                       **F 9013-3.1.PROOF.SERVICE**

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- Todd M Bailey    todd.bailey@ftb.ca.gov
- Jason Balitzer    jbalitzer@sulmeyerlaw.com,
  jbalitzer@ecf.inforuptcy.com;dwalker@ecf.inforuptcy.com
- Ron Bender    rb@lnbyb.com
- Bruce Bennett    bbennett@jonesday.com
- J Scott Bovitz    bovitz@bovitz-spitzer.com
- Peter M Bransten    PBransten@lgbfirm.com, ncereseto@lgbfirm.com;kmorin@lgbfirm.com
- Lisa W Chao    lisa.chao@doj.ca.gov
- Carol Chow    carol.chow@ffslaw.com
- Daniel Denny    ddenny@gibsondunn.com
- Caroline Djang    cdjang@rutan.com
- Mark C Fields    fields@markfieldslaw.com
- Marina Fineman    mfineman@stutman.com
- Michael F Frank    mfrankatty@aol.com
- Rachel A Franzoia    rfranzoia@lgbfirm.com, rachelfranzoia@gmail.com;rspahnn@lgbfirm.com
- Thomas M Geher    tmg@jmbm.com, we1@jmbm.com;fc3@jmbm.com;tmg@ecf.inforuptcy.com
- Eric D Goldberg    egoldberg@gordonsilver.com,
  BKNotices@gordonsilver.com;bankruptcynotices@gordonsilver.com
- Michael I Gottfried    mgottfried@lgbfirm.com,
  ncereseto@lgbfirm.com;kalandy@lgbfirm.com;marizaga@lgbfirm.com;cboyias@lgbfirm.com;rsp
  ahnn@lgbfirm.com
- Asa S Hami    ahami@sulmeyerlaw.com,
  agonzalez@sulmeyerlaw.com;agonzalez@ecf.inforuptcy.com;ahami@ecf.inforuptcy.com
- Sonia Y Lee    slee@raineslaw.com, tfukutomi@raineslaw.com;ssegovia@raineslaw.com
- Daniel A Lev    dlev@sulmeyerlaw.com,
  asokolowski@sulmeyerlaw.com;dlev@ecf.inforuptcy.com;dwalker@sulmeyerlaw.com
- Sidney P Levinson    slevinson@jonesday.com, kfloyd@ecf.inforuptcy.com;kfloyd@jonesday.com
- Alvin Mar    alvin.mar@usdoj.gov
- Krikor J Meshefejian    kjm@lnbrb.com
- Alan I Nahmias    anahmias@mbnlawyers.com, jdale@mirmanbubman.com
- Christine M Pajak    cpajak@stutman.com
- Danielle A Pham    dpham@gordonsilver.com
- Kurt Ramlo    kr@lnbyb.com
- David J Richardson    drichardson@sulmeyerlaw.com, drichardson@ecf.inforuptcy.com
- Christopher O Rivas    crivas@reedsmith.com
- Victor A Sahn    vsahn@sulmeyerlaw.com,
  agonzalez@sulmeyerlaw.com,agonzalez@ecf.inforuptcy.com;asokolowski@sulmeyerlaw.com;v
  sahn@ecf.inforuptcy.com
- Victor A Sahn    vsahn@sulmeyerlaw.com,
  agonzalez@sulmeyerlaw.com,agonzalez@ecf.inforuptcy.com;asokolowski@sulmeyerlaw.com;v
  sahn@ecf.inforuptcy.com
- Michael C Schneidereit    mschneidereit@jonesday.com
- David B Shemano    dshemano@robinskaplan.com
- Lori Sinanyan    lsinanyan@jonesday.com, lsinanyan@ecf.inforuptcy.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Howard J Weg    hweg@robinskaplan.com
- Steven Werth    swerth@sulmeyerlaw.com,
  asokolowski@sulmeyerlaw.com;slee@sulmeyerlaw.com;slee@ecf.inforuptcy.com;asokolowski
  @ecf.inforuptcy.com;swerth@ecf.inforuptcy.com
- Beth Ann R Young    bry@lnbyb.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                 **F 9013-3.1.PROOF.SERVICE**