FILED & ENTERED

DEC 06 2019

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY tatum        DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

In re:

ART & ARCHITECTURE BOOKS OF THE 21st CENTURY, a California corporation,

    Reorganized Debtor.

Case No. 2:13-bk-14135-RK

Chapter 11

**MEMORANDUM DECISION ON: (I) MOTION OF DOUGLAS CHRISMAS FOR ORDER PURSUANT TO BANKRUPTCY RULE 2004 AND BANKRUPTCY CODE SECTIONS 105 AND 1142; AND (II) MOTION OF PLAN AGENT SAM S. LESLIE FOR PROTECTIVE ORDER RE: 2004 EXAMINATION REQUESTED BY DOUGLAS CHRISMAS**

Pending before the court are: (1) the Motion of Douglas Chrismas ("Chrismas") for Order pursuant to Bankruptcy Rule 2004[1] and Bankruptcy Code[2] Sections 105 and 1142 ("Rule 2004 Motion"), filed on January 29, 2019, Electronic Case Filing ("ECF") Number 2423; and (2) the Motion of Plan Agent Sam S. Leslie ("Plan Agent") for Protective Order Re: 2004 Examination requested by Douglas James Chrismas ("Protective Order Motion"), filed on April 17, 2019, ECF 2445. The court has held multiple hearings on these motions, which were ongoing. The last scheduled hearing was for November 21,

---

[1]    "Bankruptcy Rule 2004" refers to Federal Rule of Bankruptcy Procedure ("FRBP") 2004.

[2]    "Bankruptcy Code" refers to Title 11 of the United States Code, 11 U.S.C.

**MEMORANDUM DECISION**

1  2019, which the court vacated upon application of the Plan Agent, which is further

2  discussed below.

3         In the Rule 2004 Motion, Chrismas requested the entry of an order compelling the

4  Reorganized Debtor Art and Architecture Books of the 21st Century to produce

5  documents in response to his 22 requests for production and the Plan Agent to appear for

6  oral examination.  Chrismas requested the order on grounds that as a party in interest[3], he

7  is entitled to relevant information about the performance of the Reorganized Debtor under

8  the confirmed reorganization plan.  According to the Rule 2004 Motion, Chrismas seeks

9  information about the post-confirmation Debtor to make an informed decision whether to

10  "give up on the plan" and/or pursue other options, such as moving to remove the Plan

11  Agent, converting the case, or exercising his right under the plan to move for approval of a

12  "Transaction"[4] in lieu of continuing post-confirmation operations of the Reorganized

13  Debtor by the Plan Agent[5].

---

14

15  [3]      Under 11 U.S.C. § 1109(b), "[a] party in interest, including . . . an equity security holder . . . may
raise and may appear and be heard on any issue in a case under this chapter."  Chrismas is a party in
16  interest based on his status as: (i) the post-confirmation equity interest holder of the Reorganized Debtor
under the confirmed plan of reorganization, and (ii) a creditor, because he holds a scheduled priority wage
claim of $5,000 and a scheduled general unsecured claim of $286,311.06 for an alleged loan.  *See* Second
17  Amended Plan of Reorganization of the Official Committee of Unsecured Creditors as Modified (the "Plan"),
ECF 1859 at 16 (the Plan providing for the "Replacement Share" as: "The single share of stock in the Post-
18  Confirmation Debtor issued to the Plan Trust that will be held by the Plan Trust for the benefit of
Chrismas."); Complaint, *Official Committee of Unsecured Creditors v. Chrismas, et al.,* Adv. No. 2:15-ap-
19  01680-RK (alleging Chrismas as having scheduled claims and seeking their disallowance or equitable
subordination).  The Plan also defined "Chrismas" as: "Douglas Chrismas, the President and sole
20  shareholder of the Debtor."  ECF 1859 at 8.

21  [4]      Pursuant to Sections 5.21 and 5.22 of the Plan: "If Chrismas presents a proposed transaction to the
Plan Agent after the Effective Date, and the Plan Agent after seven calendar days does not agree to the
22  transaction, Chrismas may file a motion with the Bankruptcy Court for authority to consummate the
transaction on behalf of the Post-Confirmation Debtor, which motion shall be served on all interested parties
23  including AERC and its bankruptcy counsel. At the hearing on approval of the transaction, the standard to
be applied by the Court is (a) whether the transaction will result in the occurrence of a Solvency Event, or (b)
24  if a Solvency Event will not result, whether the transaction is in the best interests of unsecured creditors and
the Post-Confirmation Debtor."  The Plan, ECF 1859 at 46-47 (§§ 5.21, 5.23).

25  [5]      In the Rule 2004 Motion, Chrismas framed the issue of the Reorganized Debtor's post-confirmation
performance under the Plan Agent's supervision as follows: "On April 6, 2016, the Post-Confirmation Debtor
26  was to pay Administrative Claims in full. Almost three years later, this still has not happened. Meanwhile,
under the sole control of Sam Leslie, the Post-Confirmation Debtor's administrative insolvency has
27  deepened markedly as it operates the gallery at a loss and incurs substantial fees in pursuit of uncertain
litigation recoveries. As of November 2018, the Post-Confirmation Debtor has incurred more than $5.6
28                                                                                          (Continued...)

1    On February 5, 2019, the Plan Agent filed a written opposition to the Rule 2004

2  Motion, requesting that the motion be denied in its entirety and arguing that the motion

3  was filed to harass or burden the Reorganized Debtor and not to propose any legitimate

4  transaction in the best interests of creditors.  ECF 2426.  Specifically, the Plan Agent

5  argued that the Rule 2004 Motion was an attempt by Chrismas to stop the Plan Agent's

6  fraud litigation against him in pending adversary proceedings[6] and to obtain confidential

7  sales information in furtherance of his efforts to compete with the post-confirmation

8  Debtor.  *Id.* at 1.  The Plan Agent also argued that Chrismas's counterclaims in the fraud

9  litigation, ECF 2425, mooted the motion because those claims addressed post-

10  confirmation administration of the Reorganized Debtor by the Plan Agent, and his

11  discovery could proceed in the adversary proceeding. *Id.* at 3-4.  On February 5, 2019,

12  Eric Wilson and his companies[7] filed a joinder in the Plan Agent's opposition to the Rule

13  2004 Motion.  ECF 2428.

14    On February 12, 2019, Chrismas filed a reply to the Plan Agent's opposition,

15  stating that he would limit his request for documents in a "reduced request" of 8 requests

16  for production.  ECF 2433 at Schedule A.  The "reduced request" asked that the

17  Reorganized Debtor produce: (i) inventories and schedules of assets; (ii) with respect to

18  any assets sold or gifted by the Reorganized Debtor on or after the effective date of the

19  confirmed reorganization plan, invoices and other documentation sufficient to evidence

20  any such sale or gift; (iii) documents sufficient to evidence the validity, priority and extent

---

million in legal and accounting fees; less than half of which has been paid. Whether Mr. Leslie should continue down this perilous path is a serious question."  Rule 2004 Motion, ECF 2423 at 4.

[6]    *See e.g.*, Fifth Amended Complaint, *Sam Leslie, Plan Agent for Art & Architecture Books of the 21st Century v. Ace Gallery New York Corporation, a California corporation, et al.*, Adv. No. 2:15-ap-01679-RK; Complaint, *Official Committee of Unsecured Creditors v. Chrismas, et al.*, Adv. No. 2:15-ap-01680-RK.

[7]    Eric Wilson is the President and sole shareholder of Wilson Administrative Services, Ltd., a Canadian corporation, and one of the largest remaining creditors of the Debtor, directly or indirectly, through his owned and controlled entities, including Wilson Administrative Services, and Telford Building, Ltd. Claims Nos. 10, 17, 33, 34.  Wilson and his owned and controlled entities are referred to herein as the "Wilson Parties."  The Wilson Parties are all creditors of the Debtor.

(Continued...)

**MEMORANDUM DECISION**

1    of secured claims; (iv) accountings and reconciliations relating to artist and consignor

2    claims; (v) documents relating to the post-confirmation Debtor's relationship with Eric

3    Wilson and his companies; and (vi) documents relating to the Plan Agent's and LEA

4    Accountancy LLP's[8] relationships with the Reorganized Debtor.[9]

5        After conducting two discovery dispute conferences, the parties filed a joint

6    statement on March 13, 2019, regarding their outstanding disputes concerning the Rule

7    2004 Motion and the "reduced" list of 8 requests for production of documents.  ECF

8    2443.[10]

9        At the hearing on the Rule 2004 Motion held on April 3, 2019, the court and the

10   parties discussed scheduling of further proceedings, and the Plan Agent indicated that he

11   intended to move for a protective order.  In a stipulated order, filed and entered on April

12   16, 2019, the court ordered that the Plan Agent was to file and serve his motion for a

13   protective order by April 17, 2019.  ECF 2444 at ¶ 1.  To address Chrismas's request in

14   the Rule 2004 Motion for information about the status of post-confirmation performance of

15   the Reorganized Debtor under the Plan, the court also ordered the Plan Agent to file a

16   detailed status report by May 31, 2019, providing the court and all parties in interest with

17   detailed information concerning the financial state of the Reorganized Debtor and its post-

18   confirmation operations and affairs.  *Id.* at ¶ 6.  The court further ordered an evidentiary

19   hearing on the status of the post-confirmation performance of the Reorganized Debtor

20   under the administration of the Plan Agent, set for July 19, 2019, at which time the Plan

21   Agent and other witnesses would be available to testify and be cross-examined by parties

22   in interest, including Chrismas.  *Id.* at ¶ 7.

23

24   _____

25   [8]    The Plan Agent is the managing partner of LEA Accountancy LLP, and he has engaged LEA to
     provide accounting services for the reorganized debtor, and in his capacity as Plan Agent, he is the client of
26   LEA.  ECF 2445 at 23; *Transcript of Testimony of Sam S. Leslie*, July 19, 2019, ECF 2513 at 50:25–51:02,
     67:10–68:18.

27   [9]    The requests in Schedule A, ECF 2433, covered these six areas of inquiry, but were separated into
     eight requests for production.

28   [10]   Each of the eight requests for production is discussed and ruled upon, in sequence, below.

-4-

**MEMORANDUM DECISION**

1    In the Protective Order Motion, the Plan Agent requested the issuance of a

2   protective order to quash the discovery requested by Chrismas in the Rule 2004 Motion.

3   ECF 2445.  The Plan Agent argued that the Rule 2004 motion was brought for improper

4   purposes and that the discovery sought is burdensome, harassing and detrimental to the

5   Reorganized Debtor, alleging that Chrismas seeks the commercially confidential business

6   records of the Reorganized Debtor in an effort to undermine the Debtor and Plan Agent.

7   *Id.* 1-3, 34.  However, in the Protective Order Motion, the Plan Agent offered to share with

8   Chrismas the following information subject to appropriate measures in a protective order:

9   (i) the Plan Agent would produce a copy of the inventory of artworks that are owned

10  outright by the Reorganized Debtor to be maintained in the possession of Jonathan

11  Shenson, Chrismas's counsel, but could be viewed by Chrismas in Shenson's office; (ii) to

12  the extent that the court would not be satisfied with the disclosures in the Plan Agent's

13  status report to be filed on May 31, 2019, the Plan Agent would provide further information

14  to the court for in camera review, which information would be produced to Chrismas or

15  creditors if the court determined that there would be a proper interest justifying such

16  production; and (iii) if there would be a legitimate investor who is willing to fund a

17  transaction to pay all creditors in full or any other material transaction that would fall within

18  the Plan Agent's right to propose under 11 U.S.C. § 1127, the Plan Agent would agree to

19  provide appropriate information to such investor following execution of a nondisclosure

20  agreement.  *Id.* at 33-34.

21      At the hearing on the Rule 2004 Motion and the Protective Order Motion on May

22  29, 2019, the court *sua sponte* raised the issue of applicability of the equitable doctrine of

23  unclean hands to Chrismas's Rule 2004 Motion, and it requested the parties to address

24  whether the doctrine applied to Chrismas and warranted denial of his Rule 2004 Motion.

25  *Transcript of Hearing on Rule 2004 and Protective Order Motions*, May 29, 2019, ECF

26  2483 at [page:line] 40:08 – 42:08.  As a result, the court directed the parties to file briefing

27

28

**MEMORANDUM DECISION**

1    on the applicability of the doctrine.  *Id.* at 53:01 – 57:06.  In June and July 2019, Chrismas

2    and the Plan Agent filed briefing[11] on the applicability of the doctrine of unclean hands.[12]

3            On May 31, 2019, the Plan Agent filed his status report on the post-confirmation

4    performance of the Reorganized Debtor under the plan and his declaration in support

5    thereof, as previously ordered by the court.  ECF 2478.  On July 19, 2019, the court

6    conducted the evidentiary hearing on the status of administration of the post-confirmation

7    Debtor, at which hearing the Plan Agent testified.  *Transcript of Evidentiary Hearing*, July

8    19, 2019, ECF 2513.  The hearing lasted a full day, but was not completed, and the court

9    continued the hearing to September 12, 2019.  *Id.* at 293:24 – 294:08.   During the

10   hearing on July 19, 2019, the Plan Agent indicated during his testimony that he was going

11   to amend and supplement the financial data and spreadsheets that accompanied his

12   status report filed on May 31, 2019.

13           On August 19, 2019, the Plan Agent filed an update to his status report filed on

14   May 31, 2019, which included supplemental financial data and spreadsheets addressing

15   inventory value reconciliation, secondary sales of artwork owned by Eric Wilson and

16   presentation of the estimated recovery on the pending adversary litigation.  ECF 2517.  In

17   a memorandum filed on the same date, August 19, 2019, the Plan Agent stated his

18   position that the initial evidentiary hearing on the status of post-confirmation performance

19   of the Reorganized Debtor and the scheduled further hearing were "beyond anything" to

20   which Chrismas, given his own conduct, was entitled, urging that the Rule 2004 motion

21   should be summarily denied.[13]  ECF 2518.

---

22   [11]    *See* ECF 2484 (Chrismas's Brief on unclean hands); ECF 2485 (Plan Agent's Brief on unclean
23   hands); ECF 2492 (Plan Agent's Reply Brief); ECF 2494 (Chrismas's Reply Brief); ECF 2496 (Chrismas's
     Brief regarding unclean hands and nexus requirement); ECF 2497 (Plan Agent's Brief regarding unclean
24   hands and nexus requirement); ECF 2498 (Plan Agent's Reply regarding unclean hands and nexus
     requirement); ECF 2499 (Chrismas's Reply regarding unclean hands and nexus requirement); ECF 2504
25   (Plan Agent's Sur-Reply regarding unclean hands and nexus requirement).

26   [12]    The Wilson Parties filed joinders in the Plan Agent's briefing.  ECF 2489; ECF 2495.

27   [13]    The Plan Agent's position stated in his August 19, 2019 memorandum implicitly retracts his previous
     offer to conditionally produce the Reorganized Debtor's inventory of artworks to Chrismas and to provide
28   information to a "legitimate" investor to fund a Solvency Transaction as stated in the Plan Agent's Protective
                                                                                          (Continued...)

1    On September 6, 2019, the Plan Agent filed a motion for continuance of the

2  hearing set for September 12, 2019, which the court granted, continuing the hearing from

3  September 12, 2019 to October 24, 2019.  ECF 2532.  The hearing was further continued

4  from October 24, 2019 to November 21, 2019, by stipulation and order filed and entered

5  on September 27, 2019.  ECF 2536.[14]

6  ————————————————

7  Order Motion, ECF 2445.  The court construes the Plan Agent's conditional disclosure offer in the Protective Order Motion as withdrawn.

8  [14]    There is an apparent difference in opinion between the court and the parties regarding scheduling

9  for the Rule 2004 Motion and the Protective Order Motion, particularly with respect to the court's rulings on the motions in relation to the continued evidentiary hearing.  The Rule 2004 motion was filed at the end of

10  January 2019 and opposed in February.  At the initial hearing, the Plan Agent indicated that he would seek a protective order, and the parties agreed that he would file a motion for protective order, which he did in April. ECF 2445.  At the further hearing on the Rule 2004 Motion and the initial hearing on the Protective Order

11  Motion in May 2019, the court *sua sponte* indicated that it would order the Plan Agent to file a written status report on the post-confirmation performance of the Reorganized Debtor under the plan, set an evidentiary

12  hearing and allow examination of the Plan Agent by parties in interest to address the concerns raised by the Rule 2004 Motion.  At this hearing in May 2019, the court raised *sua sponte* whether the equitable doctrine

13  of unclean hands applied to the Rule 2004 Motion.  In June and July, the parties filed extensive briefing on the applicability of unclean hands.  At the June 26, 2019 hearing on the motions, the court discussed the

14  case of *In re Everett*, 364 B.R. 711, 723 (Bankr. D. Ariz. 2007), which construed the case law as requiring a close nexus between the discovery sought and the alleged misconduct showing unclean hands, and the

15  parties requested an opportunity to brief the close nexus issue, which they completed on July 16, 2019, three days before the July 19, 2019 evidentiary hearing.  In his brief on unclean hands filed on June 19,

16  2019, Chrismas requested that if the court determines that it has the power to invoke the doctrine of unclean hands to the Rule 2004 motion, he urged that the court "defer making any decision here until after it has

17  conducted its evidentiary hearing on the Post-Confirmation Debtor's finances, operations and affairs, scheduled for the July 19, 2019, because Mr. Chrismas' allegations concerning Mr. Leslie's conduct must be

18  weighed in determining whether the doctrine applies."  ECF 2494 at 2, citing, *Northbay Wellness Group, Inc. v. Beyries*, 789 F.3d 956, 960 (9th Cir. 2015) (unclean hands defense in adversary proceeding).  At the time,

19  this seemed to the court a reasonable request because the July 19, 2019 evidentiary hearing was coming up shortly thereafter and the Ninth Circuit in *Northbay Wellness Group* counseled that courts should engage

20  in balancing when one party asserts the unclean hands defense against another party.  According to the Plan Agent, the motions were taken under submission after the completion of the briefing on unclean hands

21  and argument at the evidentiary hearing on July 19, 2019.  ECF 2561.  However, the July 19, 2019 evidentiary hearing was continued to September 12, 2019 because several attorneys had additional

22  examination questions for the Plan Agent.  By application of the Plan Agent and order thereon, the court continued the evidentiary hearing to October 24, 2019.  By stipulation and order, the court further continued

23  the evidentiary hearing to November 21, 2019 due to scheduling conflicts of several attorneys.  The court's understanding was that the ruling on the Rule 2004 and Protective Order Motions would be made when the

24  evidentiary hearing was concluded because the examination of the Plan Agent at the evidentiary hearing and the disclosure of financial data in his May 31, 2019 and August 16, 2019 status reports might obviate

25  the need for further discovery by Chrismas on his document production requests.  The court also understood that the evidentiary hearing testimony and Plan Agent's status reports would be sufficient

26  information for the court to balance the parties' interests under *Northbay Wellness Group*.  However, given that the evidentiary hearing was not completed on July 19, 2019 as contemplated, the continuances of the

27  hearing have made the delay of the court's ruling on the Rule 2004 and Protective Order Motions somewhat improvident.  Having said this, it has been beneficial for the court to have had time to review the information

28  (Continued...)

**MEMORANDUM DECISION**

1    On November 6, 2019, the court entered an order granting an application of the

2 Plan Agent to vacate the continued evidentiary hearing set for November 21, 2019 based

3 on cost and equitable considerations, and given the practicalities of the situation, the court

4 put the status of any further hearing in abeyance until other parties in interest could be

5 heard on the Plan Agent's concerns.  ECF 2563.  On November 13, 2019, the Wilson

6 Parties filed a joinder in the Plan Agent's application to vacate the continued evidentiary

7 hearing, ECF 2565, and Chrismas filed an objection, ECF 2566.

8    **I.    DISCUSSION**

9    In the Rule 2004 Motion, Chrismas asserts that the motion should be granted

10 because as a party in interest, he is entitled to relevant information about the post-

11 confirmation performance of the Reorganized Debtor under the plan.  As stated in his

12 moving papers, Chrismas seeks information about the post-confirmation performance of

13 the Reorganized Debtor to make an informed decision whether to "give up on the plan"

14 and/or pursue other options, such as moving to remove the Plan Agent, converting the

15 case, or exercising his right under the plan to move for approval of a transaction in lieu of

16 continuing operations of the post-confirmation Debtor by the Plan Agent.  At this time, the

17 outstanding requests for information from Chrismas's Rule 2004 Motion are: (1) the 8

18 requests for production of documents in the "reduced request" set forth in his reply to the

19 Plan Agent's opposition to the Rule 2004 Motion and (2) the request for an oral

20 examination of the Plan Agent under Federal Rule of Bankruptcy Procedure 2004 ("Rule

21 2004").

22    As set forth below, the court first addresses certain principles regarding

23 examinations under Federal Rule of Bankruptcy Procedure ("FRBP") 2004, and then

24 discusses the parties' arguments regarding the applicability of the doctrine of unclean

25 hands here.  Finally, the court determines that based on the substantial probative

26 evidence in support of the Plan Agent's allegations of fraud by Chrismas, the party who

27 ───────────────

28 in the Plan Agent's status reports and the testimony of the Plan Agent at the evidentiary hearing on July 19, 2019, all of which have some bearing on the court's ruling.

**MEMORANDUM DECISION**

1  controlled the management of the prepetition and post-petition, preconfirmation Debtor,

2  which evidence is not disputed by Chrismas in his papers, the doctrine of unclean hands

3  applies to Chrismas's Rule 2004 Motion, which the court will deny on grounds that the

4  undisputed evidence shows for the purposes of the Rule 2004 Motion and the Plan

5  Agent's Protective Order Motion that Chrismas is an unclean litigant and the court should

6  not exercise its judicial powers to grant him relief.[15]

7          **a.    Federal Rule of Bankruptcy Procedure 2004**

8          On motion of any party in interest, the court may order the examination of any

9  entity pursuant to Rule 2004(a).  "The purpose of a Rule 2004 examination is 'to show

10 the condition of the estate and to enable the Court to discover its extent and

11 whereabouts, and to come into possession of it, that the rights of the creditor may be

12 preserved.'"  *In re Coffee Cupboard, Inc.,* 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991)

13 (citing and quoting, *Cameron v. United States,* 231 U.S. 710, 717, 34 S.Ct. 244, 246,

14 58 L.Ed. 448 (1914) (discussing former § 21(a) of the Bankruptcy Act, from which

15 former Bankruptcy Rule 205 and current Rule 2004 are in part derived)).

16 "Examinations under Rule 2004 are allowed for the 'purpose of discovering assets and

17 unearthing frauds' and have been compared to a 'fishing expedition.'"  *In re Duratech*

18 *Industries, Inc.*, 241 B.R. 283, 289 (E.D.N.Y. 1999) (quoting *In re GHR Energy Corp.*, 33

19 B.R. 451, 453 (Bankr. D. Mass. 1983)); *see also In re Drexel Burnham Lambert Group,*

20 *Inc.*, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991) (comparing a Rule 2004 examination to a

21 "fishing expedition").

22         "The scope of a Rule 2004 examination is exceptionally broad and the rule itself is

23 'peculiar to bankruptcy law and procedure because it affords few of the procedural

24 safeguards that an examination under Rule 26 of the Federal Rules of Civil Procedure

25 ─────────────────────

26 [15]     The court is mindful that its evidentiary determinations regarding the allegations of misconduct by
Chrismas are solely for the purposes of resolving the issue of the applicability of the equitable doctrine of
unclean hands to the pending Rule 2004 and Protective Order Motions.  The issue of whether or not

27 Chrismas defrauded the bankruptcy estate and creditors of the preconfirmation Debtor is raised in the Plan
Agent's fraud claims in the pending adversary proceedings, and there are other parties who are litigating

28 such claims who have not necessarily participated in the determination of the pending motions.

**MEMORANDUM DECISION**

1   does.'" *In re Duratech Industries, Inc.*, 241 B.R. at 289 (quoting *In re GHR Energy Corp.*,

2   33 B.R. at 454). "There are, however, limits to the scope of Rule 2004 examinations.

3   Significantly, Rule 2004 examinations may not be used for the purposes of abuse or

4   harassment." *In re Duratech Industries, Inc.*, 241 B.R. at 283 (citing *In re Mittco, Inc.*, 44

5   B.R. 35, 36 (Bankr. E.D. Wis. 1984)). A Rule 2004 examination must be both "relevant

6   and reasonable" and "may not be used to annoy, embarrass or oppress the party being

7   examined." *In re Symington*, 209 B.R. 678, 685 (Bankr. D.Md.1997) (citations omitted).

8       "In evaluating a request to conduct a Rule 2004 examination, the court must

9   'balance the competing interests of the parties, weighing the relevance of and necessity of

10   the information sought by examination. That documents meet the requirement of

11   relevance does not alone demonstrate that there is good cause for requiring their

12   production.'" *In re SunEdison, Inc.*, 562 B.R. 243, 250 (Bankr. S.D.N.Y. 2017) (quoting *In*

13   *re Drexel Burnham Lambert Group, Inc.*, 123 B.R. at 712). Moreover, "[Rule] 2004 is not

14   a substitute for discovery authorized in either adversary proceedings or contested matters

15   which is governed by [Rule] 9014 [relating to contested matters]." *In re Dinubilo*, 177 B.R.

16   932, 942 (E.D.Cal.1993) (citation omitted). This limitation of Rule 2004 by distinction with

17   Rule 9014 is often referred to as the "pending proceeding" rule.

18       If an adversary proceeding or a contested matter is pending and related to the

19   dispute at issue, then the parties to that proceeding or matter may no longer utilize the

20   liberal provisions of Federal Rule of Bankruptcy Procedure 2004 and should utilize the

21   discovery devices provided for in Federal Rules of Bankruptcy Procedure 7026 through

22   7037. *In re National Assessment, Inc.*, 547 B.R. 63, 65 (Bankr. W.D.N.Y. 2016). Courts,

23   however, will allow a party to utilize a Rule 2004 examination when the matter is not

24   related to the pending adversary litigation. *In re International Fibercom, Inc.*, 283 B.R.

25   290, 292-293 (Bankr. D. Ariz. 2002) (citations omitted).

26       Those courts allowing Rule 2004 examinations in pending litigation attempt to

27   balance the expansive nature of a Rule 2004 examination, which offers limited protection

28   to the examinee, with the more protected discovery process of the federal discovery rules.

**MEMORANDUM DECISION**

1    *See e.g.*, *In re M4 Enterprises, Inc.*, 190 B.R. 471, 475 (Bankr. N.D. Ga. 1995).  The court

2    "holds the ultimate discretion whether to permit" or deny the use of Rule 2004, and the

3    determination is best left on a case by case basis.  *In re International Fibercom, Inc.*, 283

4    at 292-293.

5        **b.    The Doctrine of Unclean Hands**

6        The doctrine of unclean hands derives from the equitable maxim that "he who

7    comes into equity must come with clean hands."  *Ellenburg v. Brockway, Inc.,* 763 F.2d

8    1091, 1097 (9th Cir. 1985).  This maxim "closes the doors of a court of equity to one

9    tainted with inequitableness or bad faith relative to the matter in which he seeks relief,

10   however improper may have been the behavior of the defendant."  *Id.* (quoting *Precision*

11   *Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806,

12   814, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945)).  In applying the doctrine, "[w]hat is material

13   is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring the right he

14   now asserts, or that the manner of dirtying renders inequitable the assertion of such rights

15   against the defendants."  *Id.* (quoting *Republic Molding Corp. v. B.W. Photo Utilities*, 319

16   F.2d 347, 349 (9th Cir. 1963).  Thus, equity requires that those seeking its protection shall

17   have acted fairly and without fraud or deceit as to the controversy in issue.  *Id.* (citing

18   *Johnson v. Yellow Cab Transit Co.,* 321 U.S. 383, 387, 64 S.Ct. 622, 624, 88 L.Ed. 814

19   (1944) and *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245, 54 S.Ct.

20   146, 147, 78 L.Ed. 293 (1933)).

21        **i.  Plan Agent's Contentions**

22       In his brief filed on June 12, 2019, the Plan Agent argues that Chrismas has

23   unclean hands and should be prevented from using the Rule 2004 examination procedure

24   to obtain any relief in this court of equity, and therefore, the court should deny Chrismas's

25   Rule 2004 motion, or, alternatively, enter a protective order barring or quashing the

26   discovery sought by the Rule 2004 motion.  Citing *Johnson v. Yellow Cab Transit Co.*, 321

27   U.S. 387 (1944), the Plan Agent asserts that it is a fundamental principle that a party

28   seeking equitable relief must come with clean hands.  321 U.S. at 387.  The Plan Agent

-11-

1  also cites and quotes *Precision Instrument Manufacturing Co. v. Automotive Maintenance*

2  *Machinery Co.*, 324 U.S. 806 (1945):

3  > This maxim [that a party seeking equitable relief must come with clean hands]
   > necessarily gives wide range to the equity court's use of discretion in refusing to aid
4  > the unclean litigant.  It is not bound by formula or restrained by any limitation that
   > tends to trammel the free and just exercise of discretion.  Accordingly, one's
5  > misconduct needs not necessarily have been of such a nature as to be punishable
   > as a crime or as to justify legal proceedings of any character.  Any willful act
6  > concerning the cause of action which rightfully can be said to transgress equitable
   > standards of conduct is sufficient cause for the invocation of the maxim by the
7  > chancellor.

8  324 U.S. at 815 (citations omitted).  As further asserted by the Plan Agent, "[a]lthough

9  'precise similarity' between plaintiff's inequitable conduct and the plaintiff's claims is not

10  required, the misconduct 'must be relative to the matter in which [the plaintiff] seeks

11  relief[.]'"  *Pom Wonderful LLC v. Welch Foods, Inc.*, 737 F.Supp.2d 1105, 1110 (C.D. Cal.

12  2010) (quoting *Precision Instrument Manufacturing Co. v. Automotive Maintenance*

13  *Machinery Co.*, 324 U.S. at 814).

14          Specifically, the Plan Agent argues that the unclean hands doctrine applies here

15  because the undisputed evidence in the record as primarily set forth in his declarations in

16  support of his status report filed on May 31, 2019, ECF 2478, and in support of his

17  supplemental brief on the doctrine of unclean hands, ECF 2486, and the declaration of an

18  expert consultant retained by him, a forensic accountant, Jennifer Ziegler, Certified Public

19  Accountant ("CPA"), ECF 2486-1, demonstrate that Chrismas engaged in fraudulent

20  business practices as Debtor's principal immediately before this bankruptcy case was filed

21  and during the pendency of the bankruptcy case, from the petition date to the effective

22  date of the confirmed reorganization plan.  The Plan Agent alleges that Chrismas diverted

23  substantial sums of money belonging to the bankruptcy estate, totaling over $17 million,

24  from the proceeds of sales of artwork owned or consigned to Debtor and the proceeds of

25  Debtor in Possession ("DIP") financing loans, to non-debtor entities controlled by

26  Chrismas, namely, Ace New York Corporation ("Ace NY") and Ace Museum.  *Status*

27  *Report and Declaration of Sam S. Leslie in Support Thereof,* ECF 2478; *Declaration of*

28  *Sam S. Leslie in Support of Plan Agent's Supplemental Brief re: Unclean Hands,* ECF

**MEMORANDUM DECISION**

1  2486 at 5-14; Declaration of Jennifer Ziegler, Exhibit 2 to the *Declaration of Sam S. Leslie*

2  *in Support of Plan Agent's Supplemental Brief Re: Unclean Hands,* ECF 2486-1 at 14-123

3  (hereinafter, including the exhibits attached thereto, the "Ziegler Declaration").

4      The Plan Agent contends that the undisputed evidence described in his

5  declarations and the Ziegler Declaration shows that diversions of estate assets during

6  Chrismas's management and control of the preconfirmation Debtor, to his controlled

7  nondebtor entities, were concealed from the oversight of the court and the parties in

8  interest in this case, including the official committee of unsecured creditors, through the

9  filing of false Monthly Operating Reports signed by Chrismas and filed on behalf of the

10  Debtor-in-Possession and the making of other false statements by Chrismas in connection

11  with the case.

12          **ii.  The Plan Agent's Declarations and Ziegler Declaration**

13      In support of his opposition to the Rule 2004 Motion and his Protective Order

14  Motion, the Plan Agent has filed a copy of the declaration of Jennifer Ziegler ("Ziegler"),

15  which was first prepared and filed in support of the Plan Agent's motion to clarify the

16  interpretation of the Plan in the adversary proceeding involving the Plan Agent's fraud

17  claims, Adv. No. 2:15-ap-01679-RK, ECF 542, filed on March 21, 2019.[16]  The Plan Agent

18  retained Ziegler, an accountant[17], to provide forensic accounting services.  Specifically,

19  _____

20  [16]      Citations to the Ziegler Declaration hereafter make reference to the paragraph numbers included in
the original declaration, which are included on the record, ECF 2486-1 at 14-123.

21  [17]      Ziegler is a certified public accountant (CPA) licensed to practice in California and Oregon and holds
designations of CFF (Certified in Financial Forensics) and CFE (Certified Fraud Examiner).  She has worked
22  in accounting for more than 30 years, specializing in forensic accounting for over 20 years.  Over the last 20
years, Ziegler has worked on hundreds of accounting matters involving many types of businesses, including
23  insurance providers, public companies, government agencies, homeowners' associations, retailers,
wholesalers and startup companies.  Many of her accountancy engagements were litigation and/or forensic
24  engagements which included matters pending in bankruptcy and probate courts, and many of the forensic
engagements were like the engagement for the Plan Agent in this bankruptcy case for the purpose of tracing
25  funds and identifying and tracking the use of funds.  Ziegler is currently a managing director at the Berkeley
Research Group at its Century City (Los Angeles) office.  Berkeley Research Group is a global strategic
26  advisory and expert consulting firm that provides independent advice, data analytics, authoritative studies,
expert testimony, investigations, and regulatory and dispute consulting to Fortune 500 corporations, financial
27  institutions, government agencies, major law firms and regulatory bodies around the world, and has 1,200
employees, and the firm has been recognized by Forbes Magazine on its Forbes List of Best Management
28                                                                                                (Continued...)

**MEMORANDUM DECISION**

1  Ziegler evaluated and verified the conclusions of Timothy Kincaid ("Kincaid"), an

2  accountant[18] and a partner at LEA Accountancy, LLP, the Plan Agent's accountancy firm,

3  in his declaration filed in the adversary proceeding, Adv.  No. 2:15-ap-01679-RK, ECF

4  216, filed on October 19, 2017. ECF 2486-1, Ziegler Declaration at ¶ 4.

5         As discussed below, the court has reviewed the testimony of the Plan Agent,

6  Kincaid and Ziegler in their respective declarations and determines for purposes of the

7  pending Rule 2004 Motion and the Protective Order Motion that their testimony is credible

8  and supported by evidence that is undisputed and makes out a prima facie showing that

9  Chrismas is an unclean litigant.

10        The court notes that Chrismas has had a full and fair opportunity to offer evidence

11 to rebut the evidentiary showing by the Plan Agent that Chrismas is an unclean litigant,

12 but Chrismas has remained silent in the face of this adverse evidence, apparently

13 exercising his Fifth Amendment right not to give testimony which would be self-

14 incriminating.  *See Memorandum Regarding August 7, 2019 Deposition Session of*

15 *Douglas Chrismas and Continued Hearing on Examination of Plan Agent,* ECF 2518, filed

16 on August 19, 2019, at 2-4; *Transcript of Evidentiary Hearing,* July 19, 2019, ECF 2513 at

17 7-11, 60-64, 111-112 (internal page citations: 3-7, 57-60, 107-108) (discussions between

18 the court and counsel regarding Chrismas's oral motion or request to quash the witness

19 subpoena served on him by the Plan Agent to testify at the July 19, 2019 hearing based

20 on Fifth Amendment self-incrimination concerns).  Chrismas's only evidence on the issue

21 _____

22 Consulting Firms for 2019.  Listing for Berkeley Research Group,
   https://www.forbes.com/companies/berkeley-research-group (accessed on November 19, 2019).  Ziegler
   has previously been a partner at the Gursey Schneider and Hemming Morse accounting firms and an
23 auditor with KPMG and UCLA.  She is a former chair of the California Society of CPAs, the largest state
   CPA society in the United States, and currently serves as a California State delegate on the American
24 Institute of CPAs Council, the governing and standard-setting body for CPAs in the United States.

25 [18]      As an accountant, Kincaid had provided 23 years of accounting services in private practice and for
   Chapter 7 and Chapter 11 bankruptcy trustees and debtors.  Based on this experience, Kincaid is familiar
26 with the interplay between accounting in and out of bankruptcy cases for individuals, corporations, limited
   liability companies and closely held corporations on one hand and bankruptcy estates on the other hand.
27 Kincaid has performed numerous fraud analyses and other forensic accounting works in numerous
   bankruptcy and nonbankruptcy cases.

28                                                                              (Continued...)

**MEMORANDUM DECISION**

1  of unclean hands is his three-paragraph declaration filed in support of his Brief on the

2  Doctrine of Unclean Hands Regarding Nexus, ECF 2496, filed on July 3, 2019.[19]

3  Chrismas's sole declaration on the issue on unclean hands was completely unresponsive

4  to the Plan Agent's evidence of fraudulent diversions presented in the Plan Agent's

5  declarations and the Ziegler Declaration filed on June 12, 2019 in support of the

6  allegations of fraud.

7         The testimony of the Plan Agent and Ziegler in their respective declarations

8  provides extensive detail about the alleged fraudulent diversion of assets belonging to the

9  bankruptcy estate by Chrismas to non-debtor entities controlled by him, namely, Ace NY

10  and Ace Museum, and the court briefly describes this testimony as it relates to the court's

11  ruling upon the issue of the applicability of the doctrine of unclean hands to the pending

12  Rule 2004 Motion and Protective Order Motion:

13         (1)     On the effective date of the Plan, April 6, 2016, Chrismas told the Plan

14              Agent that the Debtor's general operating account had no significant funds that

15              could be used to pay payroll for Debtor's employees, which expenses were

16              imminently due, in part because Chrismas had caused $50,000 of the Debtor's

17  _____

18  [19]  The Chrismas Declaration stated as follows:

        I, Douglas Chrismas, do hereby declare:

19
20      1.    I am over eighteen years of age and make this declaration in support of my Motion for Order
              Pursuant to Bankruptcy Rule 2004 and Bankruptcy Code Sections 105 and 1142 (DKT #2423,
21            the "Motion").  Capitalized terms not otherwise defined in this Declaration shall have the
              meaning ascribed to them in the Motion.  Except as expressly noted, each of the facts contained
22            in this declaration is based on my personal knowledge, and, if called as a witness to do so, I
              could competently testify thereto.

23      2.    Since November 2018, I have been interested in proposing a transaction in the best interests of
              creditors, in accordance with Plan sections 5.21 & 5.22, in which a newly-formed, properly
24            capitalized entity would acquire the Post-Confirmation Debtor's art assets for consideration in
              the form of a cash payment at closing and the elimination or satisfaction of other claims against
              the Debtor.

25
        3.    In order to obtain capital necessary to consummate any transaction, I need information about
26            the Post-Confirmation Debtor's art inventories and sales.

27      I declare under penalty of perjury that the foregoing is true and correct.

        Executed this 3rd day of July 2019, at Los Angeles, California.

28                                    /s/ Douglas Chrismas

-15-

**MEMORANDUM DECISION**

1  funds to be transferred from Debtor's account to that of Ace Museum on March

2  30, 2016, in order to pay rent that Ace Museum owed to its landlord, 400 S. La

3  Brea, LLC.  *Declaration of Sam S. Leslie in Support of Plan Agent's Supplemental*

4  *Brief re: Unclean Hands,* ECF 2486 at ¶ 16.  The Plan Agent soon learned that

5  the amount of this March 31, 2016 diversion of estate funds to pay the rent of Ace

6  Museum was much greater than the amount Chrismas represented to the Plan

7  Agent on the plan effective date, as confirmed by a letter from Chrismas's then

8  lawyer, David Shemano, to the Plan Agent's lawyer, dated April 25, 2016, stating

9  that the amount of the diversion was $264,000.   *Status Report and Declaration of*

10  *Sam S. Leslie in Support Thereof,* ECF 2478 at 4, 5, 24 and Exhibit A attached

11  thereto (April 25, 2016 letter from Shemano stating, "Sam [i.e., the Plan Agent] is

12  correct that, on or about March 30, 2016, Douglas [Chrismas] caused Ace Gallery

13  [i.e., Debtor's trade name] to transfer approximately $264,000 to Ace Museum.

14  The purpose of the transfers were to enable Ace Museum to pay April rent, which

15  was crucial at the time because Douglas was attempting to finalize the terms of a

16  monetization event sufficient to pay Ace Gallery creditors in full.").  This diversion

17  meant that the Reorganized Debtor had no operating funds on the effective date

18  of the plan— April 6, 2019—that would allow the Plan Agent to operate the

19  postconfirmation business of the Reorganized Debtor, causing the Plan Agent to

20  seek a line of credit from the primary unsecured creditor, Eric Wilson, to address

21  necessary operational expenses and the many outstanding legal matters of the

22  case.  *Status Report and Declaration of Sam S. Leslie in Support Thereof,* ECF

23  2478 at 4, 5, 24 and Exhibits A and C attached thereto*; see also, Transcript of*

24  *Testimony of Sam S. Leslie*, July 19, 2019, ECF 2513 at 48:10–54:17.  This

25  evidence supporting the Plan Agent's fraud allegations is not disputed by

26  Chrismas, and this undisputed evidence supports the Plan Agent's allegations

27  that Chrismas emptied the coffers of the bankruptcy estate of over a quarter of a

28  million dollars immediately before the turnover of control of the estate, which

1
2
3

deprived the Plan Agent of any operating funds to manage the Reorganized Debtor.  This undisputed evidence, by itself, supports application of the doctrine of unclean hands here.

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

(2)    In assisting the Plan Agent in this bankruptcy case, Kincaid's responsibilities included review of all Debtor, Ace NY, and Ace Museum bank records, sales invoices and other financial and business records, the vast majority of which were housed with Debtor's records.  In conducting a forensic review of Debtor's records, Kincaid prepared, among other work product, a spreadsheet based on information contained in those records that documented all of the artwork sales of Debtor's owned and consigned artwork between the petition date of February 19, 2013 and the plan effective date of April 6, 2016, for which Ace NY received the sales proceeds.  ECF 216, Adv. No. 2-15-ap-01679-RK.  The spreadsheet documented which sales were made according to invoices in the name of the Debtor or Ace NY, the date of the invoice, the name of the purchaser, the name of the artist who created the artworks, and the sales price received by Ace NY or Debtor, among other things, which enabled Kincaid to calculate various amounts, including the total amount of sales proceeds that Ace NY received for Debtor's artworks prior to the effective date and the total amount of sales proceeds received by Ace NY for particular artists.  *Id.*  Based on his analysis of the Debtor-in-Possession's financial books and records during the preconfirmation phase of the bankruptcy case (i.e., from the petition date to the plan effective date), Kincaid concluded that $14,275,813.50 in proceeds of sales of artwork[20] that should have been deposited in the Debtor-in-Possession's bank accounts were instead deposited into the bank accounts of Ace NY, a shell corporation newly formed by Chrismas before Debtor's bankruptcy case.  Kincaid also concluded that some of

26
27
28

[20]    The sales Kincaid documented included sales of artworks by artists with whom the Debtor had an exclusive contractual relationship, sales that represented business opportunities that were property of the Debtor, and sales from secondary art sales organized by one of the Debtor's customers in which the Debtor's location and staff were used.  ECF 216, Adv. No. 2-15-ap-01679-RK.

**MEMORANDUM DECISION**

1    these proceeds were improperly transferred to Ace Museum, another entity

2    controlled by Chrismas, rather than properly returned to Debtor.  *Id.*  Kincaid

3    stated that his review of Debtor's and Ace NY's business records, including sales

4    invoices and records of commissions due, showed that the sales of Debtor's

5    artworks resulting in the diversion of its funds to Ace NY were carried out by

6    employees and principals of Debtor, including Chrismas and his wife, Jennifer

7    Kellen, and that the sales of artwork were facilitated, shipped and crated by

8    Debtor's employees and stored and shown in Debtor's premises.  *Id.*

9    (3)     As described in the Plan Agent's Supplemental Brief re: the Doctrine of

10   Unclean Hands, ECF 2485, supported by the Plan Agent's declaration, there is

11   substantial, probative and undisputed evidence that Chrismas was knowingly

12   complicit in the apparent scheme to divert proceeds either from Debtor's artwork

13   or subject to Debtor's consignment rights to Ace NY.  ECF 2485 at 10-11 (internal

14   page citation: 6-7).  An email in March 2015 from Chrismas to Debtor's customer,

15   Paul Balson ("Balson"), offered a 30% discount on certain artwork, explaining that

16   the price reduction was abnormal for the Debtor and was prompted by Debtor's

17   need to make a major expense payment that same week.  March 17, 2015 e-mail

18   from Chrismas to Balson, Exhibit 3 to the *Declaration of Sam S. Leslie in Support*

19   *of Plan Agent's Supplemental Brief Re: Unclean Hands,* ECF 2486-1 at 124-125.

20   After reaching an agreement on the discounted sale with Balson, Chrismas stated

21   in an email to the customer, Balson, two days later, "The wire instructions are to

22   Ace Gallery New York which is a different account to the last wire that you sent

23   but my accounting office wants to process these sales through that account.

24   Since time is of the essence please . . . find wire instructions attached."  March

25   19, 2015 e-mail from Chrismas to Balson, Exhibit 4 to the *Declaration of Sam S.*

26   *Leslie in Support of Plan Agent's Supplemental Brief Re: Unclean Hands,* ECF

27   2486-1 at 126-130.  Related emails from Debtor's controller, Lauren Gullotta, to

28   Balson included as attachments a bill of sale for the art on Ace NY letterhead and

-18-

**MEMORANDUM DECISION**

wire instructions to the Ace NY account—Debtor's "new account number."  March

19, 2015 e-mail from Lauren Gullotta to Balson, Exhibit 5 to the *Declaration of*

*Sam S. Leslie in Support of Plan Agent's Supplemental Brief Re: Unclean Hands,*

ECF 2486-1 at 131-136. Chrismas signed the Ace NY bill of sale, invoice #2073,

as "Director & Chief Curator."  *Id.*  Records produced by City National Bank

indicate that Balson wired the sale price of $258,000 to Ace NY on March 19,

2015, and that same day, Chrismas caused at least $228,000 to be wired from

Ace NY to Ace Museum, and $226,000 was then wired from Ace Museum to 400

S. La Brea, LLC.  City National Bank Wire and Account Records, Exhibits 6, 7

and 8 to the *Declaration of Sam S. Leslie in Support of Plan Agent's*

*Supplemental Brief Re: Unclean Hands,* ECF 2486-1 at 137-147.  This

uncontroverted evidence directly implicates Chrismas in the scheme to divert

Debtor's assets to his controlled nondebtor entity, Ace NY, while he was acting as

a fiduciary for Debtor's bankruptcy estate as the person controlling Debtor during

this Chapter 11 bankruptcy case.   This evidence by itself is sufficient to show that

Chrismas is an unclean litigant for purposes of the pending Rule 2004 Motion and

the Protective Order Motion.

(4)      The forensic analysis of the Plan Agent's expert consultant, Ziegler, shows

that during Chrismas's management of the Debtor-in Possession, more than

$790,000 of DIP financing proceeds approved by the court during the post-

petition, preconfirmation phase of the bankruptcy case, which proceeds were

estate property, were deposited into the bank accounts of non-debtor entities

controlled by Chrismas, Ace NY and Ace Museum, instead of Debtor-in-

Possession accounts.  The uncontroverted Ziegler analysis also demonstrates

that the diverted DIP proceeds were used not for the benefit of the estate, but for

the benefit of Chrismas personally (through his controlled entities).  ECF 2486-1,

Ziegler Declaration at ¶ 11.  As the analysis shows, the funds were first deposited

into the Ace NY and Ace Museum accounts, and then transferred to Debtor's

**MEMORANDUM DECISION**

accounts.  The Ace Museum accounts were then credited with payments on a loan it had received from Debtor, which in effect meant that Ace Museum was using Debtor's money, not its money, to receive a reduction on its loan debt to Debtor, which would be a fraud on the estate.  This evidence is not disputed by Chrismas, and this evidence supports the Plan Agent's allegations that Chrismas funneled the estate's DIP financing money through his controlled entities to give his controlled entity, Ace Museum, unjustified loan payment credits during his supervision of the bankruptcy estate, depriving the estate and its creditors of value in that amount, which evidence by itself supports application of the doctrine of unclean hands here.

(5)    To complete her forensic analysis of Debtor's financial transactions during the preconfirmation phase of the case, Ziegler reviewed thousands of documents supporting the business activity of the Debtor for the time period of February 2013 through April 2016, which included the Monthly Operating Reports prepared by the Debtor and signed by Chrismas, bank statements of the Debtor referenced in the Monthly Operating Reports, the electronic general ledgers of the Debtor, and sales invoices of the Debtor, among other documents.  Ziegler also interviewed staff and accounting personnel who worked for the Debtor during this time period in order to understand their accounting processes, such as sales invoice processing, inventory maintenance, cash processing and bill payments.  Ziegler also reviewed accounting documents and correspondence independently obtained from Debtor's computers, as well as bank records of Ace NY and Ace Museum.

(6)    According to Ziegler, the documents that she reviewed pertaining to Ace NY included its initial tax return for the period of February 1, 2013 through October 31, 2013, which was filed on an IRS Form 1120 corporate income tax return (the "Form 1120").  Ace NY's Form 1120 included an opening balance sheet showing no assets or capital at its corporate formation, and thus, reflected that Ace NY did

**MEMORANDUM DECISION**

1    not have any artwork or assets at the time that Debtor filed its Chapter 11

2    bankruptcy case in February 2013, the month Debtor filed its petition.  Yet as

3    Ziegler noted, and as reported on Ace NY's Form 1120, Ace NY received

4    $2,103,866 in artwork sales revenue during the same period of February 1, 2013

5    through October 31, 2013, the nine-month period after its corporate formation.

6    Based on her review of sales invoices, wire transfer instructions, bank

7    statements, deposit information, artist contracts, consignment agreements of

8    Debtor and Ace NY, and other documents, Ziegler determined that the $2 million

9    in artwork sales revenue reported by Ace NY on its Form 1120 for the period of

10   February 1, 2013 through October 31, 2013 was diverted from the Debtor.

11   Accordingly, Ziegler opined that although Ace NY had no assets when it was

12   formed in February 2013, it was able to produce $2 million of revenue, and she

13   confirmed that this $2 million was from the sale of the Debtor's artwork.  Chrismas

14   does not offer any evidence to dispute Ziegler's analysis and conclusions that

15   Ace NY's $2 million in revenue in 2013 was from the sale of Debtor's artwork.

16   (7)    In her analysis, Ziegler described how these funds were diverted from the

17   Debtor to Ace NY when discussing the Debtor's artist consignment agreements[21].

18   Ziegler reviewed Debtor's internal inventory records, artist contracts, and

19   consignment sheets, and found that all of the contracts[22] she reviewed were

20   signed by Chrismas on behalf of the Debtor.  Ziegler stated that she was unable

21

22   [21]    The Plan Agent in his status report and declaration filed on May 31, 2019 stated that both before
23   and during the Chapter 11 bankruptcy case of Debtor, Chrismas many times failed to inform the artists of
     sales of their work, falsely reported the amount of the sale or simply delayed payment of the artist's share.
24   ECF 2478.  The Plan Agent further stated that although some of this was related to sales for which the funds
     were diverted to the Ace NY bank account, Debtor as consignee is obligated to pay the artists for their share
25   of such sales, and thus, Debtor was not only deprived of its revenue due on the sales, but is liable to pay the
     artists for their artist shares which Chrismas diverted.  The Plan Agent has confirmed that Debtor owes
26   artists approximately $ 5 million for prepetition art sales and $3 million for art sales during the pendency of
     this Chapter 11 bankruptcy case.  Chrismas does not offer any evidence in his Rule 2004 Motion to dispute
27   this testimony of the Plan Agent.

     [22]    The majority of the contracts Ziegler reviewed were signed before Debtor's bankruptcy petition filing,
28   and some contracts were signed after the bankruptcy filing.

**MEMORANDUM DECISION**

1   to review or locate any contracts between Ace NY and any artist, indicating that

2   there were no such contracts (which is not disputed by Chrismas).  Additionally,

3   Ziegler found that many pieces of art were listed on both Debtor and Ace NY

4   invoices, including artwork that appeared to be owned and/or contracted by the

5   Debtor but was sold under the name of Ace NY.

6       (8)      Ziegler cited the example of Charles Fine's Flor De Incino artwork, which

7   was on an inventory list in the Debtor's Exhibit Binder Volume 3, and was sold on

8   an Ace NY invoice, and the $172,000 check payment (the "Fine Artwork

9   Proceeds") for that invoice was deposited into Ace NY's bank account on August

10  2, 2013.[23]  Ziegler found that of the Fine Artwork Proceeds, $165,000 was

11  transferred from Ace NY to Ace Museum's bank account on August 6, 2013, and

12  on the same day, $165,000 was wire transferred out of the Ace Museum account

13  in two wire transfers: one transfer of $150,000 to pay Ace Museum's rent

14  expense and one transfer of $15,000 to Debtor's general bank account.[24]  This

15  specific example shows a diversion of Debtor's funds totaling $172,000, though a

16  small amount, $15,000, was returned to the Debtor, with a resulting net loss to

17  the Debtor of $157,000.[25]  Ziegler found that in similar transactions, funds that

18  belonged to the Debtor through sales of its artwork were deposited first into Ace

19  NY's bank account and then transferred into Ace Museum's bank account, and

20  afterwards, portions of these transfers were deposited into the Debtor's bank

21  account or used to pay non-Debtor expenses.  Chrismas does not offer any

22  evidence to dispute Ziegler's analysis and conclusions that artwork sold under the

23

24  _____

[23]     Copies of the cancelled check and bank statement showing the deposit were attached to the Ziegler
25  Declaration.  See ECF 2486-1, Ziegler Declaration at Exhibits K, L, M, N, O, P.

[24]     Copies of the Ace NY and Ace Museum bank statements showing the deposits and transfers were
26  attached to the Ziegler Declaration.  Id.

27  [25]     The Ziegler Declaration does not determine whether the $15,000 might be an additional loss if
credited to Ace Museum as a reduction of Debtor's note receivable from Ace Museum.

28                                                                                              (Continued...)

**MEMORANDUM DECISION**

1    name of Ace NY was owned and/or contracted by the Debtor, and that proceeds

2    from such sales were diverted from the Debtor to Ace NY and Ace Museum.

3    (9)    Consistent with the analysis described above, Ziegler found that customers

4    purchasing Debtor's artwork were sometimes instructed to wire transfer funds to

5    bank accounts other than the Debtor's.  In one instance, an Ace Gallery (Debtor)

6    invoice for $200,000 included wire instructions for an Ace NY bank account.[26]

7    Similarly, three checks for sales of Debtor's artwork by Mary Corse and De Wain

8    Valentine, totaling $393,000 were deposited into Ace Museum's bank account

9    instead of Debtor's.  These examples alone demonstrate that Debtor's funds were

10   diverted to non-Debtor accounts totaling $593,000, not an insignificant sum.

11   Chrismas does not offer any evidence to dispute Ziegler's analysis and

12   conclusions that customers purchasing Debtor's artwork were instructed to wire

13   transfer funds to bank accounts other than Debtor's bank accounts.

14   (10)   Ziegler also analyzed the Debtor's accounts receivable[27] as shown on its

15   Monthly Operating Reports.  As Ziegler notes, Debtor's business was the sale of

16   artwork that results in either a payment of cash or a promise to pay in the future,

17   which is recorded as an account receivable.  The first Monthly Operating Reports

18   filed by the Debtor indicated that there were no accounts receivable as of

19   February 28, 2013, which demonstrated to Ziegler that the Debtor typically

20   received payment in full at the point of sale.  The Debtor reported an accounts

21   receivable balance of $318,990.61, however, on its Monthly Operating Report for

22   the period ending April 30, 2013.  The amount of accounts receivable reported on

23   Debtor's Monthly Operating Reports increased to $4,359,643.13 as reported on

24   the Monthly Operating Report for the period ending November 30, 2014.

25

26   [26]    Copies of Debtor's invoice and Ace NY wire instructions were attached to the Ziegler Declaration.
See ECF 2486-1, Ziegler Declaration, Exhibit Q.

27   [27]    Accounts receivable is an account to record amounts owed for services or sales that have not been
paid as of the reporting period, and accounts receivable usually have shorter terms than notes receivable.
28   See ECF 2486-1, Ziegler Declaration, ¶ 15.

-23-

**MEMORANDUM DECISION**

According to Ziegler, if this were accurate, the increase in unpaid sales indicates that some person or entity, or a combination of entities, owes the Debtor $4.3 million for artwork sold for which payment has not been made.

(11)    Based upon her review of accounts receivable records, Ziegler found that the majority of the Debtor's accounts receivable were not supported by actual or prospective sales.  Ziegler determined that there were approximately 50 outstanding invoices that comprised the accounts receivable balance on the Monthly Operating Reports, but, based on her analysis of the detailed invoices, most of the invoices did not reflect valid accounts receivable, or the invoices had already been paid.  Ziegler provided some illustrative examples to explain why this was the case: (1) Invoice #1660 for $153,000, which was Debtor's invoice, was included in the accounts receivable detail; the invoice was paid in February 2014; the funds were deposited into Ace NY's bank account; but the invoice remained on Debtor's accounts receivable detail; (2) Invoice #1739 for $200,000, which was Debtor's invoice, was included in the accounts receivable detail; was paid in August 2014; the funds were deposited into Ace NY's bank account; but the invoice remained on Debtor's accounts receivable detail; and (3) Invoice #1632 for $95,000, which was Debtor's invoice, was included in the accounts receivable detail; had a mark crossed through it, saying it was cancelled in November 2015; but, the invoice remained on Debtor's accounts receivable detail.[28]  These three examples show that the accounts receivable listed on the Monthly Operating Reports were incorrect and overstated by at least $448,000.  Chrismas does not offer any evidence to dispute Ziegler's analysis and conclusions that the Debtor's accounts receivable stated on its Monthly Operating

---

[28]    See ECF 2486-1, Ziegler Declaration, ¶ 16.

(Continued...)

**MEMORANDUM DECISION**

1  Reports were overstated and inaccurate because the accounts receivable were

2  either already paid or otherwise invalid.[29]

3  (12)  Ziegler's analysis of the Debtor's notes receivable[30], as reflected on Debtor's

4  Monthly Operating Reports, is similarly indicative of fraud.  The first Monthly

5  Operating Report filed by the Debtor for the period ending February 28, 2013

6  indicated a notes receivable balance of $4,501,971.82, which purportedly

7  reflected the amount due from Ace Museum to Debtor, as shown on the Debtor's

8  amended and corrected schedules of assets and liabilities and statement of

9  financial affairs, filed in April 2013.  The Debtor reported a notes receivable

10  balance of $3,306,959.80 on its Monthly Operating Report for the period ending

11  November 30, 2014, including repayments of the notes receivable totaling

12  $1,195,012.02 over a 22-month period from February 2013 to November 30,

13  2014.  According to Ziegler's analysis, Ace Museum's payments on the notes

14  receivable balance were illegitimate.  Ziegler's uncontroverted testimony

15  describes a scheme whereby millions of dollars of the Debtor's money were

16  diverted into the bank accounts of Ace Museum and Ace NY during the 22-month

17  period, and that same money was then transferred back to the Debtor and

18

19

20  _____

[29]  The accounts receivable scheme described by Ziegler is corroborated by the Plan Agent's
21  undisputed testimony.  According to the Plan Agent in his status report and declaration filed on May 31,
2019, the alleged $6,039,444 in accounts receivable on the latest Monthly Operating Report for Debtor,
22  which was filed by Chrismas and signed under penalty of perjury, did not reflect Debtor's actual accounts
receivable from clients as a result of sales, but rather reflected an amount based primarily on falsified
23  invoices for sales that had already been completed through Ace NY and for which purchasers had already
made payment to the Ace NY bank account.  According to the Plan Agent, the false invoices relied upon by
24  Ziegler and the Plan Agent in their analyses were part of a scheme designed, in part, to hide transfers of the
Debtor's proceeds from Ace NY and Ace Museum back to Debtor when expenses or obligations of the
25  Debtor became due.  The Plan Agent's investigation determined that the collectible accounts receivable that
were owed to Debtor on the effective date were only $58,256, rather than the $6,039,444 in accounts
26  receivable on the latest Monthly Operating Report for Debtor filed by Chrismas.  See ECF 2478, Exhibit C.
Chrismas does not offer any evidence in his Rule 2004 Motion to dispute this testimony of the Plan Agent.

27  [30]  According to Ziegler, notes receivable is an account to record amounts owed for services or sales
that have not been paid as of the reporting period, though in contrast to accounts receivable which usually
28  have shorter terms than notes receivable.

**MEMORANDUM DECISION**

1    represented as Ace Museum's repayments of its debt to Debtor as reflected in the

2    notes receivable balance.  ECF 2486-1, Ziegler Declaration at ¶ 10.

3    (13)    Ziegler also reviewed and analyzed Debtor's monthly cash receipts and

4    disbursements on a cash basis (also referred to as a profit and loss statement)

5    stated on its Monthly Operating Reports and found that these statements were

6    inaccurate.  Ziegler found that the last Monthly Operating Report reported total

7    sales of $11,061,741 since the petition date, which approximated the Debtor's

8    sales but failed to take into account the $14.5 million in the Debtor's sales

9    proceeds that were deposited into the Ace NY bank account.  For example,

10    Debtor's May 2013 Monthly Operating Report reflected artwork sales proceeds of

11    $362,977.06 listed as "Accounts Receivable – Post filing - $318,990.61" and

12    "General Sales - $92,807.50."  ECF 2486-1, Ziegler Declaration at ¶ 18.  Debtor's

13    bank account deposits and artwork sales invoices only showed that Debtor

14    received $92,807.50 that month from artwork sales, however, indicating that

15    Debtor did not receive invoices totaling $270,169.56 from sales.  That same

16    month, Ziegler found that Ace NY received $671,615 in bank deposits from sales

17    of Debtor's artwork and transferred $255,000 to the Debtor's general bank

18    account to pay rent, payroll, taxes and other expenses.  As another example,

19    Ziegler found more than $1 million in sales of Debtor's artwork on Debtor's

20    invoices and Ace NY's invoices for June 2014, but Debtor's bank account only

21    received sales proceeds of $548,650.77.[31]  Ziegler found only $517,456.65 in

22    deposits into Debtor's bank accounts attributable to invoiced artwork sales in

23    Debtor's name for June 2014, and found that bank deposits for the remaining

24    amount of the $1 million in sales of Debtor's artwork totaling $521,380 went into

25    Ace NY's bank account.  ECF 2486-1, Ziegler Declaration at ¶ 19.  Chrismas

26    _____

27    [31]    The sales proceeds were reported on the June 2014 Monthly Operating Report as "Accounts
Receivable – Post filing - $541,760.00," "Accounts Receivable – Pre filing - $6,360.00," and "General Sales -
28    $530.77" for a total of $548,650.77.  ECF 2486-1, Ziegler Declaration, ¶ 19 and Exhibit Y.

**MEMORANDUM DECISION**

1    does not offer any evidence to dispute Ziegler's analysis and conclusions that the

2    Debtor's proceeds from its sold artwork were deposited into the bank account of

3    Ace NY, and not the Debtor's bank account, indicating that funds were diverted

4    outside the bankruptcy estate.

5    (14)    In sum, according to Ziegler, over the time period when Chrismas ran

6    Debtor's operations from February 2013 to April 2016, more than $14 million from

7    sales of Debtor's artwork was deposited into Ace NY's bank accounts, and during

8    the 22 months of Debtor's Chapter 11 bankruptcy case through November 30,

9    2014, approximately $5.4 from sales of Debtor's artwork was deposited into Ace

10    NY's bank account, of which Ace NY transferred a net total of $2.5 million to Ace

11    Museum.  Ziegler concluded that the funds deposited into Ace NY's bank account

12    and then transferred from Ace NY to Ace Museum were Debtor's funds and that

13    many of the deposits into Ace Museum's bank account were also Debtor's funds.

14    Ziegler attached to her declaration a schedule showing sales proceeds of

15    Debtor's artwork into Ace NY's bank account, and her schedule is consistent with

16    Kincaid's analysis and schedule of sales proceeds.  Chrismas does not offer any

17    evidence to dispute Ziegler's analysis and conclusions that under his

18    management and control of Debtor during the pendency of this bankruptcy case

19    from February 2013 through April 2016, $14 million of Debtor's money from sales

20    of its artwork was diverted from the estate to his controlled entities, Ace NY and

21    Ace Museum, resulting in losses of millions of dollars for the bankruptcy estate

22    and its creditors.  Nor does Chrismas offer any evidence disputing that the losses

23    to the estate and its creditors during Chrismas's management were compounded

24    by the use of approximately $1.1 million of Debtor's money to improperly reduce

25    Ace Museum's loan debt owed to Debtor.

26    Based on the undisputed evidence in the Plan Agent's declarations and the Ziegler

27    Declaration, the court finds that the Plan Agent has made a prima facie showing that

28

-27-

**MEMORANDUM DECISION**

1   Chrismas is an unclean litigant to warrant the application of the doctrine of unclean hands

2   here.

3           ### iii.  Chrismas's Contentions

4           In his brief addressing the applicability of the doctrine of unclean hands, filed on

5   June 12, 2019, Chrismas specifically argues that: (1)  the doctrine of unclean hands

6   cannot apply to his Rule 2004 motion because the Rule 2004 motion is not an "action,"

7   citing *Securities and Exchange Commission v. McCarthy*, 322 F.3d 650, 657 (9th Cir.

8   2003), (2) the doctrine of unclean hands cannot be applied here because Chrismas was

9   the sole shareholder and solely in control of the Debtor when the alleged misconduct

10  occurred, so the alleged misconduct is imputed to the post-confirmation Debtor; and (3)

11  the alleged misconduct is not directly related to "plaintiff's use of acquisition of the right in

12  suit[]," citing *inter alia*, *Pom Wonderful LLC v. Welch Foods, Inc.*, 737 F.Supp.2d at 1110.

13  According to Chrismas, he "seeks information as [a] 'creditor' under Bankruptcy Rule 2004

14  concerning the post-confirmation Debtor's assets, operations and affairs which, in turn,

15  will enable him to make an informed decision about how value can be best realized for the

16  Debtor's creditor constituency *going forward* (e.g., whether to support the status quo in

17  which [the Plan Agent] is liquidating the Debtor's remaining inventory at fire-sale prices).

18  This request for information has nothing to do with the Plan Agent's allegations of

19  misconduct against Chrismas more than three years ago when Chrismas was in control of

20  the Debtor."  ECF 2484 at 5 (internal page citation: 4)(emphasis in original).

21          The arguments made by Chrismas in opposition to the application of the doctrine of

22  unclean hands are technical, as he does not address the evidence of his alleged

23  misconduct described in the declarations of the Plan Agent and Ziegler and the

24  documentary evidence in support thereof.  Chrismas is silent about this adverse evidence

25  other than his assertion that any misconduct that he may have engaged in was over three

26  years ago, or in other words, "that was then," and thus unrelated to the current situation

27  and his reported invocation in the related adversary proceedings of his Fifth Amendment

28  privilege against testimonial self-incrimination about the transactions for which the Plan

-28-

1   Agent offers evidence in the contested matters of the Rule 2004 Motion and the Protective

2   Order Motion (i.e., when asked about the alleged diversions of estate assets in the related

3   adversary proceedings).  *See Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264

4   (9th Cir. 2000) (an adverse inference in a civil proceeding may be drawn "when

5   independent evidence exists of the fact to which the party refuses to answer") (citations

6   omitted).

7           **c.**    **Application**

8           The court rejects the first defense raised by Chrismas, that the doctrine of unclean

9   hands is limited to actions and does not apply to motions or applications, because the

10  case cited by Chrismas, *Securities and Exchange Commission (SEC) v. McCarthy,* 322

11  F.3d 650 (9th Cir. 2003), distinguishes between actions and motions or applications, but

12  does not involve the applicability of the unclean hands doctrine.  In *McCarthy,* the Ninth

13  Circuit distinguished "applications" from "actions" for the purpose of determining whether

14  United States Securities and Exchange Commission applications brought under Section

15  21(e) of the Securities Exchange Act of 1934, 15 U.S.C. [s] 78u(e), require a formal

16  complaint and full formal proceedings pursuant to the Federal Rules of Civil

17  Procedure.  *SEC v. McCarthy,* 322 F.3d at 656-657 (holding that the SEC in its

18  enforcement proceedings under the Securities Exchange Act could proceed by motion or

19  application).  *McCarthy* did not involve the subject matter of these contested matters of

20  the motion under Federal Rule of Bankruptcy Procedure 2004 and related protective order

21  motion, and the applicability of the doctrine of unclean hands.  Supreme Court case

22  precedent on the doctrine of unclean hands does not distinguish between actions and

23  motions in determining whether the doctrine applies, and even if there is some distinction

24  to be made, unlike in *SEC v. McCarthy*, the Rule 2004 motion here is made within the

25  bankruptcy case, which is an action itself, and does not involve the initiation of a new

26  litigation proceeding.  The court does not find the distinction in *SEC v. McCarthy* involving

27  the initiation of SEC enforcement proceedings in district court applicable to the issue of

28  whether the doctrine of unclean hands may bar a litigant from taking an examination

-29-

**MEMORANDUM DECISION**

pursuant to Federal Rule of Bankruptcy Procedure 2004.  *SEC v. McCarthy* also does not

concern the court's broad authority to apply the doctrine of unclean hands.  *Precision*

*Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. at 815

("[The doctrine of unclean hands] necessarily gives wide range to the equity court's use of

discretion in refusing to aid the unclean litigant.  It is 'not bound by formula or restrained

by any limitation that tends to trammel the free and just exercise of discretion.'").

Accordingly, the court rejects Chrismas's argument based on *McCarthy* that the doctrine

of unclean hands is not applicable here because his Rule 2004 motion is not an action.

In the case cited by the Plan Agent, *Precision Instrument Manufacturing Co. v.*

*Automotive Maintenance Machinery Co.*, which addresses the unclean hands doctrine

directly, the Supreme Court broadly defined the doctrine of unclean hands as closing "the

doors of a court of equity to one tainted with inequitableness or bad faith relative to the

matter in which he seeks relief[.]"  *Precision Instrument Manufacturing Co. v. Automotive*

*Maintenance Machinery Co.*, 324 U.S. at 814.  In making this statement, the Supreme

Court did not draw any distinction between actions on one hand and motions or

applications on the other hand, but broadly stated that courts should not exercise their

judicial powers in aid of an unclean litigant.  Based on this expansive language, the court

therefore finds no cause to restrict the application of the doctrine of unclean hands to Rule

2004 motions.

The primary legal authority relied upon by Chrismas to argue that the equitable

doctrine of unclean hands does not apply to motions under Rule 2004 is *In re Harris*

*Group, Inc.,* 64 B.R. 417 (Bankr. E.D. Pa. 1986).  ECF 2484 at 2.  Chrismas cites and

quotes the court's opinion in *Harris Group* for the following proposition: "Equity must

comport with the rule making power vested by Congress in the Supreme Court.  Such

rules, as represented here by Bankruptcy Rule 2004, are not easily amenable to the

engraftment of equitable exception."  ECF 2484 at 2, *citing and quoting, In re Harris*

*Group, Inc.,* 64 B.R. at 420.  The legal authority for this proposition is not apparent from

the court's opinion in *In re Harris Group, Inc.,* because the court did not cite any in support

**MEMORANDUM DECISION**

1  of its proposition.  *Id.*  The other cases cited by the court in *In re Harris Group, Inc.,* in its

2  discussion of whether the doctrine of unclean hands applies to motions under Rule 2004

3  are not cited for the specific proposition described above, but in any event, do not relate

4  either to Rule 2004 or the doctrine of unclean hands.  *In re Harris Group, Inc.,* 64 B.R. at

5  420 (citing *United States v. Wilson,* 707 F.2d 304, 311-312 (8th Cir. 1982) (considering

6  whether the United States is subject to application of equitable defenses if it raises an

7  equitable claim) and *Waldschmidt v. Ranier (In re Fulgham Construction Corp.),* 706 F.2d

8  171, 173 (6th Cir. 1983) (considering the long-standing judicially evolved application

9  of the "net result rule" as the criteria for determining a preferential transfer as defined

10  in 11 U.S.C. § 547 under the then newly enacted Bankruptcy Reform Act of 1978)).  *In*

11  *re Harris Group, Inc.* is problematic because it neither discusses the case law construing

12  Rule 2004, such as *In re GHR Energy Corp.*, 33 B.R. at 454 (inequitable to conduct Rule

13  2004 examination in bad faith) and *In re Mittco, Inc.*, 44 B.R. at 36 (inequitable to conduct

14  Rule 2004 examination for abuse or harassment), nor the case law relating to the doctrine

15  of unclean hands, such as *Precision Instrument Manufacturing Co. v. Automotive*

16  *Maintenance Machinery Co.*, 324 U.S. at 819 (applying the doctrine to plaintiff who comes

17  to the court with unclean hands relative to the dispute at issue, stating "the facts all add up

18  to the inescapable conclusion that [plaintiff] has not displayed that standard of conduct

19  requisite to the maintenance of [a] suit in equity."). The opinion in *In re Harris Group, Inc.,*

20  is incompatible with the case law construing equitable exceptions to Rule 2004 for the

21  purposes of abuse or harassment.  *See e.g., In re Duratech Industries, Inc.*, 241 B.R. at

22  283; *In re Mittco, Inc.*, 44 B.R. at 36; *In re Symington*, 209 B.R. at 685.  In conducting a

23  Westlaw database search of *In re Harris Group, Inc.,* the court observed that there was no

24  reported case decision following it on this point.  Accordingly, the court determines that

25  the opinion in *In re Harris Group, Inc.,* holding that the doctrine of unclean hands does not

26  apply to a Rule 2004 motion, is unpersuasive and does not follow it.

27  　　　The court rejects the second defense raised by Chrismas that any alleged

28  misconduct by him as the sole person in control of debtor is imputed to the post-

-31-

**MEMORANDUM DECISION**

1  confirmation Reorganized Debtor.  Although there is apparently no definitive case law in

2  the Ninth Circuit regarding whether the so-called *in pari delicto* defense may be asserted

3  against a bankruptcy trustee, or here, the plan agent, as to the bad acts of prior

4  management post-petition, as recognized by the court in *C&S Wholesale Grocers, Inc. v.*

5  *Delano Retail Partners, LLC (In re Delano Retail Partners, LLC)*, , 2014 WL 4966476, slip

6  op. at *3-6 (Bankr. E.D. Cal. 2014), this court finds persuasive the Third Circuit's decision

7  and opinion in *In re Personal and Business Insurance Agency*, 334 F.3d 239 (3d Cir.

8  2003), which held that under the doctrine of imputation, or *in pari delicto,* the bad acts of a

9  debtor's principal could only be imputed to a bankruptcy trustee in the case of prepetition

10  acts relating to a prepetition claim brought into the bankruptcy estate under 11 U.S.C. §

11  541, but rights arising under the Bankruptcy Code, such as avoidance claims for

12  fraudulent transfer under 11 U.S.C. § 548, which are not brought into the bankruptcy

13  estate by virtue of 11 U.S.C. § 541, may not be affected by imputation.  334 F.3d at 242-

14  247 (citing and distinguishing *Official Committee of Unsecured Creditors v. R.F. Lafferty &*

15  *Co.,* 267 F.3d 340 (3d Cir. 2001), the case relied upon by Chrismas, involving prepetition

16  claims brought into the estate under 11 U.S.C. § 541 to hold that the so-called "sole actor

17  exception" does not apply to rights arising under other provisions of the Bankruptcy Code,

18  i.e., 11 U.S.C. § 548).  The acts of Chrismas as the person in control of the Debtor-in-

19  Possession during the post-petition administration of the Chapter 11 bankruptcy case are

20  not prepetition acts relating to a prepetition claim brought into the bankruptcy estate under

21  11 U.S.C. § 541, and therefore, do not implicate the doctrine of imputation, so that any

22  bad acts by him are imputed to the Reorganized Debtor and the Plan Agent.  *Id.; see also,*

23  *Notinger v. Migliaccio (In re Financial Resources Mortgage, Inc.).* 454 B.R. 6, 24 (Bankr.

24  D. N.H. 2011) ("Courts have reasoned that it is inequitable to impute a debtor's bad

25  conduct to a trustee who comes to the court with clean hands to pursue claims on behalf

26  of innocent creditors."), *citing inter alia, In re Personal & Business Insurance Agency,* 334

27  F.3d at 246-247 and *Cooper v. United States,* 362 F.Supp.2d 649, 656 (W.D.N.C.

28  2005)("Imputing the bad acts of the debtor onto the bankruptcy trustee in the present case

-32-

1 renders a categorically inequitable result, that is, the innocent victimized creditors get

2 nothing.").  The Plan Agent argues that "Chrismas' imputation argument is particularly

3 galling," as it argues that Chrismas' personal malfeasance throughout this bankruptcy case

4 must be imputed to the post-confirmation Plan Agent who was appointed *because* of

5 Chrismas' fraudulent activities, and as Chrismas seeks to personally benefit from such

6 imputation of his own bad acts."  ECF 2492 at 4-5.  The court agrees with the Plan Agent

7 that it is not equitable, if not in bad taste, for Chrismas to argue that if he committed bad

8 acts as debtor's principal, they are imputed to the Plan Agent who, under the Plan, is

9 attempting to recover the value of the estate for payment of the claims of innocent

10 creditors who were apparently victimized by such bad acts.  For the foregoing reasons,

11 the court rejects Chrismas's imputation defense to the application of the doctrine of

12 unclean hands.

13      The court rejects the third defense raised by Chrismas, that the alleged misconduct

14 is not directly related to "plaintiff's use of acquisition of the right in suit[]," citing *inter alia*,

15 *Pom Wonderful LLC v. Welch Foods, Inc.*, 737 F.Supp.2d at 1110.  Chrismas argues that

16 his "request for information has nothing to do with the Plan Agent's allegations of

17 misconduct against Chrismas more than three years ago when Chrismas was in control of

18 the Debtor."  ECF 2484 at 4.   The gist of Chrismas's argument that he is entitled to the

19 requested information under Rule 2004 is concisely stated in his responsive Brief on the

20 Doctrine of Unclean Hands Regarding Nexus, ECF 2499 at 1:

21      The Plan provides Mr. Chrismas the right to propose and more for Court-
        approval of a transaction not resulting in a Solvency Event if in the best
22      interests of unsecured creditors (a "Transaction") [citing Plan sections 5.21
        and 5.22].  It also provides him the right to request information about the
23      Debtor's assets for the purpose of proposing a Transaction.  As the Plan
        Agent, Mr. Leslie is obligated to "furnish such information concerning the
24      estate and the estate's administration *as is requested by a party in interest*
        [citing Plan section 5.4.2 and 11 U.S.C. §§ 704(a) and 1106(a)(1)].  And
25      through the 2004 Motion, Mr. Chrismas requests information on the Post-
        Confirmation Debtor's art inventory and sales for the purposes of
26      proposing an asset sale transaction in the best interests of creditors [citing
        the moving papers].
27

28

**MEMORANDUM DECISION**

1  *Id.* (footnotes omitted and italics in original).

2  　　　Regarding the relationship of his request with the alleged misconduct, Chrismas

3  argues:

4  　　　"Mr. Leslie's allegations of misconduct (more than 3 years ago when Mr.
Chrismas controlled the Debtor) do not *immediately and necessarily relate*

5  to Mr. Chrismas' request for information (as a party in interest) to propose
an asset sale transaction that will enhance recoveries for the Debtor's

6  stakeholders.  The only "connection" alleged by Mr. Leslie does not even
exist because the Transaction would NOT restore Mr. Chrismas to his

7  prior role as a fiduciary of the Debtor's creditors.  And Mr. Leslie cannot
credibly contend that Mr. Chrismas is acting with fraud or deceit with

8  respect to the requested relief.  Mr. Chrismas has a right to obtain court
approval of a Transaction; and the Plan provides him, as a party in

9  interest, with the right to the information requested [citing Plan section

10  5.4.2 and 11 U.S.C. §§ 704(a) and 1106(a)(1)]."

11  *Id.* at 3 (footnotes omitted and italics in original).

12  　　　The Supreme Court's decision in *Precision Instrument Manufacturing Co. v.*

13  *Automotive Maintenance Machinery Co.*, holding that application of the unclean hands

14  doctrine requires that the misconduct alleged be "relative to the matter in which [the

15  plaintiff] seeks relief," is controlling here. 324 U.S. at 815.  The Ninth Circuit follows this

16  interpretation, *see e.g.*, *Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1097 (9th Cir. 1985).

17  　　　"Relative to" is a broad phrase meaning "with regard to" or "in connection with."

18  Merriam-Webster's Online Dictionary 2019, available at https://www.merriam-

19  webster.com/dictionary/relative%20to (last visited November 5, 2019); *see also Wisconsin*

20  *Winnebago Business Committee v. Koberstein*, 762 F.2d 613, 618 (7th Cir. 1985)

21  (characterizing 'relative to' in a statute as "broad language").  Additionally, "relative to" is

22  synonymous with 'related to,' a term the Supreme Court and Ninth Circuit have likewise

23  interpreted generously.  Although the "the breadth of the words 'related to' does not mean

24  the sky is the limit," the Supreme Court has repeated that the "ordinary meaning of . . .

25  [the] words ['related to'] is a broad one," meaning "having a connection with or reference

26  to."  *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) (citations and internal

27  quotation marks omitted).  The Ninth Circuit has consistently acknowledged the Supreme

28

**MEMORANDUM DECISION**

1  Court's broad definition of "related to" or "relative to."  *Pakootas v. Teck Cominco Metals,*

2  *Ltd.*, 905 F.3d 565, 585 (9th Cir. 2018) (citing and quoting *Dan's City Used Cars, Inc.*);

3  *California Tow Truck Association v. City & County of San Francisco*, 807 F.3d 1008, 1021

4  (9th Cir. 2015) (same).

5       Some courts have stated that in order to apply the doctrine of unclean hands, there

6  must be a "close nexus between a party's unethical conduct and the transactions on

7  which that party seeks relief," *In re Everett*, 364 B.R. 711, 723 (Bankr. D. Ariz. 2007)

8  (citing and quoting *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245

9  (1933) (predicate act underlying an unclean hands defense must have an "immediate and

10  necessary relation to the equity that [one] seeks in respect of the matter in litigation.").

11       In *Keystone Driller Co. v. General Excavator Co.*, the Supreme Court examined the

12  limits of the application of the doctrine of unclean hands, stating as follows:

13           But courts of equity do not make the quality of suitors the test.  They apply
          the maxim requiring clean hands only where some unconscionable act of one
14           coming for relief has immediate and necessary relation to the equity that he seeks
          in respect of the matter in litigation.  They do not close their doors because of
15           plaintiff's misconduct, whatever its character, that has no relation to anything
          involved in the suit, but only for such violations of conscience as in some measure
16           affect the equitable relations between the parties in respect of something brought
          before the court for adjudication. They apply the maxim, not by way of punishment
17           for extraneous transgressions, but upon considerations that make for the
          advancement of right and justice. They are not bound by formula or restrained by
18           any limitation that tends to trammel the free and just exercise of discretion.

19  290 U.S. at 245 (citations omitted).  This passage from the opinion in *Keystone Driller Co.*

20  *v. General Excavator Co.*, contains the "immediate and necessary relation" language

21  quoted by the court in *In re Everett* for its conclusion that a close nexus must be shown

22  between the inequitable conduct and the request for relief.  The language in the *Keystone*

23  *Driller Co.* opinion, however, does not use the term "close nexus," but rather, "immediate

24  and necessary relation," which is qualified by the following language in the next sentence,

25  "They [i.e., the courts of equity] do not close their doors because of plaintiff's misconduct,

26  whatever its character, that has *no relation* to anything involved in the suit, but only such

27  violations of conscience as *in some measure* affect the equitable relations between the

28  parties in respect of something brought before the court for adjudication."  290 U.S. at 245

**MEMORANDUM DECISION**

1  (citations omitted and emphasis added).  That is, the stricter sounding language in this

2  passage from the *Keystone Driller Co.* opinion—that the request for relief must have an

3  "immediate and necessary relation" with the prior inequitable conduct—is qualified by less

4  restrictive language that the unclean hands doctrine is inapplicable where there is "no

5  relation," and that there must be a relation "in some measure."  *Id.*  Moreover, this

6  passage from the opinion in *Keystone Driller Co.* also indicates that the courts of equity

7  have broad discretion in applying the unclean hands doctrine as "[t]hey are not bound by

8  formula or restrained by any limitation that tends to trammel the free and just exercise of

9  discretion."  *Id.*

10      The Supreme Court further examined the unclean hands doctrine in *Precision*

11  *Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, citing *Keystone*

12  *Driller Co.,* and clarified what "relation" and "measure" a court of equity may evaluate to

13  preclude relief by application of the doctrine of unclean hands.  The Supreme Court stated

14  in *Precision Instrument* that the doctrine of unclean hands "necessarily gives wide range

15  to the equity court's use of discretion in refusing to aid the unclean litigant."  324 U.S. at

16  815.  As discussed above, the Supreme Court applied a broad "relative to" standard in

17  *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, which

18  this court must follow.

19      Here, the Plan Agent has sufficiently demonstrated that Chrismas's alleged

20  misconduct, which evidence put on by the Plan Agent's forensic accountant is undisputed,

21  is "relative to" the Rule 2004 Motion.  The Plan Agent has presented substantial, probative

22  and undisputed evidence in support of his allegations that transfers of more than $14

23  million from sales of the Debtor's owned and consigned artwork were made under

24  Chrismas's management and control of Debtor during the pendency of this bankruptcy

25  case to Chrismas's newly formed non-debtor entity, Ace NY.  ECF 2486-1, Ziegler

26  Declaration at ¶ 10.  The undisputed evidence also supports the Plan Agent's allegations

27  that Chrismas caused the transfer of more than $790,000.00 in the estate's DIP financing

28  proceeds, which financing this court authorized on August 30, 2013, ECF 336, to the

**MEMORANDUM DECISION**

1  same non-debtor entity.  *Id.,* ¶ 11.  The substantial, probative and undisputed evidence

2  offered by the Plan Agent further shows inequitable conduct warranting application of the

3  unclean hands doctrine; the Monthly Operating Reports that Chrismas signed and

4  submitted to the court on behalf of the Debtor under penalty of perjury and while serving

5  as a fiduciary to creditors of the estate, were false and misleading.  ECF 2486-1, Ziegler

6  Declaration at ¶ 10-19.  There is also substantial, probative and undisputed evidence

7  offered by the Plan Agent that Chrismas ignored Debtor's counsel's warnings in

8  connection with the apparent diversion of DIP financing proceeds to non-debtor entities,

9  which demonstrates Chrismas's blatant disregard for this court's authority.  Exhibits 17

10  and 18 to the *Declaration of Sam S. Leslie in Support of Plan Agent's Supplemental Brief*

11  *Re: Unclean Hands,* ECF 2486-1 at 181-199.  All of the uncontroverted evidence

12  described above is indicative of inequitable conduct that merits the application of the

13  doctrine of unclean hands here.

14       The direct answer to Chrismas's argument that there is no immediate and

15  necessary relationship to the controversy in issue is that if the court and the parties in

16  interest, including the official committee of unsecured creditors, had known before plan

17  confirmation of the Plan Agent's substantial, probative and uncontroverted evidence of the

18  fraudulent acts of Chrismas—who was in control of the Debtor-in-Possession—resulting in

19  the diversion of millions of dollars of Debtor's assets to his controlled nondebtor entities,

20  no doubt, the committee would have immediately moved for appointment of a Chapter 11

21  trustee based on fraud or mismanagement under 11 U.S.C. § 1104, which the court would

22  have almost certainly granted.  But for this diversion of the Debtor's assets that Chrismas

23  caused while he served in his post-petition fiduciary capacity as the person controlling

24  Debtor as the Plan Agent's substantial, probative and uncontroverted evidence shows, a

25  plan of reorganization may have paid creditors in some significant amount and perhaps

26  left Chrismas in control of the post-confirmation Debtor.

27       If the Plan Agent's undisputed evidence of fraud had been known preconfirmation,

28  it is unlikely that Chrismas would have ever received any rights to propose a transaction in

**MEMORANDUM DECISION**

the Plan.  Thus, here the alleged misconduct immediately and necessarily relates to the

requested relief, and the litigant has not acted fairly and without fraud or deceit as to the

controversy in issue.  *See* Chrismas's Responsive Brief on the Doctrine of Unclean Hands

Regarding Nexus, ECF 2499 at 3, *citing inter alia, Keystone Driller Co. v. General*

*Excavator Co.* 290 U.S. at 245 and *Precision Instrument Manufacturing Co. v. Automotive*

*Maintenance Machinery Co.*, 324 U.S. at 814-815.

The court cannot ignore the Plan Agent's substantial probative and undisputed

evidence in support of his allegations of fraud by Chrismas while in control of the Debtor-

in-Possession, which indicates that Chrismas obtained his plan rights to propose a

"Transaction" by fraud as well.  Chrismas now seeks to enforce his plan rights by

obtaining information ostensibly for that purpose.  To allow this would be inequitable.

Chrismas does not have an absolute right to request information concerning the estate or

its administration under Plan § 5.4.2 and 11 U.S.C. §§ 704(a).   In his recitation of his right

to request information as a party in interest pursuant to 11 U.S.C. §§ 704(a) and

1106(a)(1), Chrismas left out a relevant and important qualifier to such right in 11 U.S.C. §

704(a)(7)—that such right is subject to the condition, "unless the court orders otherwise."

Fully stated, 11 U.S.C. § 704(a) provides: (a) The trustee shall— . . . (7) unless the court

orders otherwise, furnish such information concerning the estate and the estate's

administration as is requested by a party in interest;  . . . ."  Based on the opposition of

the Plan Agent and the Wilson Parties and the evidence in support of their opposition, the

court orders otherwise based on the doctrine of unclean hands.

Chrismas's post-confirmation conduct is consistent with his preconfirmation

conduct of not acting in the best interests of creditors of the bankruptcy estate and now of

the Reorganized Debtor.  Chrismas has refused to answer interrogatories or respond to

requests for admission in the related adversary proceedings before this court, invoking his

Fifth Amendment privilege.  *Declaration of David J. Richardson in Support of Motion of*

*Plan Agent for Protective Order re 2004 Examination Requested by Douglas James*

*Chrismas,* ECF 2447 at 2-4, ¶¶ 10 and 11 and Exhibits G through N (Plan Agent's

-38-

**MEMORANDUM DECISION**

1   discovery requests and Chrismas's responses thereto).  Chrismas has also reportedly

2   invoked his Fifth Amendment privilege extensively during depositions related to the

3   adversary proceedings as asserted by the Plan Agent.  *Memorandum Regarding August*

4   *7, 2019 Deposition Session of Douglas Chrismas and Continued Hearing on Examination*

5   *of Plan Agent,* ECF 2518 at 1-4.  In considering the equities, Chrismas cannot obstruct

6   discovery in one matter before this court and seek it zealously in another.  *Lyons v.*

7   *Johnson,* 415 F.2d 540, 542 (9th Cir. 1969).  An adverse inference may be drawn "when

8   independent evidence exists of the fact to which the party refuses to answer."  *Doe ex rel.*

9   *Rudy-Glanzer v. Glanzer*, 232 F.3d at 1264 (9th Cir. 2000) (citations omitted).  The

10  evidence in support of the Plan Agent's allegations of Chrismas's fraud in his declarations

11  and in the Ziegler Declaration, ECF Nos. 2486 and 2486-1, which is undisputed,

12  establishes the existence of independent indicia of fraud, and based on this independent

13  evidence, the court may draw an adverse inference from Chrismas's invocation of the

14  Fifth Amendment privilege in connection with the Plan Agent's allegations of fraud in the

15  related adversary proceeding, all of which supports a finding that Chrismas is an unclean

16  litigant to apply the unclean hands doctrine to the pending Rule 2004 Motion and

17  Protective Order Motion.

18        In *Northbay Wellness Group, Inc. v. Beyries*, 789 F.3d 956 (9th Cir. 2015), the

19  Ninth Circuit held that "determining whether the doctrine of unclean hands precludes relief

20  requires balancing the alleged wrongdoing of the plaintiff against that of the defendant,

21  and 'weighing the substance of the right asserted by the plaintiff against the transgression

22  which, it is contended, serves to foreclose that right.'"  789 F.3d at 960 (citation omitted).

23  The outcome of a balancing analysis here is plain.  The record for this contested matter

24  reflects substantial, probative and undisputed evidence that Chrismas engaged in

25  fraudulent acts that harmed the bankruptcy estate and creditors while he was in charge of

26  the Debtor-in-Possession, resulting in losses to the estate and creditors of over $17

27  million.  These losses had and continue to have a direct impact on the current

28  predicament that the Reorganized Debtor is in, being deprived of over $17 million in

**MEMORANDUM DECISION**

1  estate assets, including the depletion of any operating funds in the estate at the time of

2  the turnover of the estate to the Plan Agent to the tune of over a quarter of a million

3  dollars.  The evidence further indicates that these bad acts were concealed from the court

4  and the creditors of the estate by Chrismas's signing and filing of false Monthly Operating

5  Reports during his administration of the Debtor-in-Possession.  Chrismas' statement that

6  the Reorganized Debtor has not been able to repay the estate's administrative claims

7  rings hollow when the substantial, probative and undisputed evidence offered by the Plan

8  Agent indicates that Chrismas's bad acts resulted in a diversion of estate assets of $17

9  million putting the Reorganized Debtor into a deep financial hole that the Plan Agent is

10  attempting to help the Reorganized Debtor recover from.  In contrast, the Plan Agent, has

11  been transparent and cooperative, filing status reports[32] regarding the post-confirmation

12  Debtor's operations and providing testimony during the evidentiary hearing.[33]  The court

13  therefore concludes that the balance of the equities lies overwhelmingly in favor of the

14  Plan Agent, and finds that the doctrine of unclean hands precludes Chrismas from

15  conducting a Rule 2004 examination of the Reorganized Debtor and the Plan Agent.

16  Chrismas's Rule 2004 Motion should be denied as a classic example of abuse and

17  harassment that the court should prevent.  *In re Mastro*, 585 B.R. 587, 597 (9th Cir. BAP

18  2018) (citing *In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002)).

19        Even if a "close nexus between a party's unethical conduct and the transactions on

20  which that party seeks relief," *In re Everett*, 364 B.R. at 723, was the standard to be

21  applied here—it is not—the court finds that for purposes of the Rule 2004 Motion and

22  related Protective Order Motion, the substantial, probative and uncontroverted evidence of

23  Chrismas's misconduct shows an "immediate and necessary relation to" the relief

24  Chrismas seeks.  *Id.* (citation omitted).  The substantial, probative and undisputed

25  evidence offered by the Plan Agent shows the postpetition diversion of the estate's assets

26

27  [32]    ECF Nos. 2478, 2517.

28  [33]    *Transcript of Evidentiary Hearing*, July 19, 2019, ECF 2513.

**MEMORANDUM DECISION**

1    under Chrismas's watch as the person in control of the post-petition, preconfirmation

2    Debtor left the Plan Agent and post-confirmation Debtor in a financial quagmire with "no

3    money for payroll day one." *Transcript of Testimony of Sam S. Leslie*, July 19, 2019, ECF

4    2513 at 68:02–68:18.  The discovery Chrismas seeks by the Rule 2004 Motion concerns

5    the Plan Agent's post-confirmation operation of the Debtor, which is necessarily related to,

6    and significantly affected by, the Plan Agent's substantial, probative and undisputed

7    evidence of defrauding the bankruptcy estate and its creditors at Chrismas's behest.

8         Chrismas's assertion that his request for information has nothing to do with the

9    Plan Agent's allegations of misconduct against Chrismas and the related adversary

10   proceedings before this court, *see* ECF 2484 at 4, is nothing short of fanciful.  Chrismas

11   has stated that "he wants ACE Gallery back," ECF 2443 at 4, but Chrismas has not

12   presented any evidence to the court that any transaction providing payment to all creditors

13   in full is forthcoming.  Moreover, the Plan Agent has offered probative, substantial and

14   undisputed evidence that Chrismas has established himself as a competitor to the

15   Reorganized Debtor.  *Declaration of David J. Richardson in Support of Motion of Plan*

16   *Agent for Protective Order re 2004 Examination Requested by Douglas James Chrismas,*

17   ECF 2447 at 4-5, ¶¶ 14-17 and Exhibits P, Q,R-1 through R-22 and S (incorporation

18   documents for Chrismas's new business, Art Collection Development, LLC, and email

19   correspondence between Chrismas on behalf of his business, "Ace Gallery New York,"

20   and prospective customers and agents regarding artwork sales).  Without any evidence

21   put on the record by Chrismas of a transaction that would pay all claims or benefit all

22   creditors, nor any specific allegations of misconduct by the Plan Agent put forth by a

23   single party in interest other than Chrismas, the court is unable to conclude that the

24   request for the Rule 2004 examination is for any legitimate purpose beyond burdening

25   and harassing the Plan Agent.

26        Finally, the court rejects the Plan Agent's argument that Chrismas's counterclaims

27   in the pending adversary proceeding mooted the Rule 2004 motion because those

28   counterclaims addressed post-confirmation administration of the Reorganized Debtor by

**MEMORANDUM DECISION**

1    the Plan Agent, and thus, Chrismas could have discovery in the adversary proceeding, but

2    the Rule 2004 Motion should be denied.  The court rejects the Plan Agent's pending

3    proceeding argument because the scope of Chrismas's counterclaims in the adversary

4    proceeding has a different focus than his Rule 2004 Motion.  Chrismas's counterclaims

5    seek to recover artwork in possession of the Reorganized Debtor that allegedly belongs to

6    Chrismas and his controlled entity, Ace Museum, while the Rule 2004 Motion seeks

7    information about post-confirmation administration of the Reorganized Debtor by the Plan

8    Agent so that Chrismas may propose a "Transaction" pursuant to the terms of the Plan,

9    which information does not strictly relate to assets that Chrismas and Ace Museum may

10   own in the possession of the Reorganized Debtor.  Because the focus of Chrismas's

11   separate requests is different, the discovery sought by the Rule 2004 Motion is not

12   mooted by the counterclaims under the pending proceeding exception to Rule 2004.

13        As to the outstanding specific requests in the Rule 2004 Motion and in the

14   Protective Order Motion, the court further makes the following rulings:

15        REQUEST FOR PRODUCTION NO. 1:  ALL DOCUMENTS EVIDENCING

16   inventories and schedules of ASSETS which YOU hold or have held a legal or beneficial

17   interest.

18        Ruling:  Deny because the doctrine of unclean hands precludes the requested

19   discovery.  Even though the Plan Agent voluntarily agreed to produce an inventory of

20   artworks that are owned outright by the post-confirmation Debtor to be maintained in the

21   possession of Jonathan Shenson, Chrismas's counsel, but could be viewed by Chrismas

22   in Shenson's office, the Plan Agent later withdrew that concession.  The court agrees with

23   the Plan Agent that the inventory of the post-confirmation Debtor is sensitive commercial

24   information that should be protected against the competitors of the post-confirmation

25   Debtor, which include Chrismas since he is trying to work as an arts dealer on his own.

26   The court therefore will construe the Plan Agent's offer to produce an inventory as

27   withdrawn and will not enforce such offer.

28

-42-

**MEMORANDUM DECISION**

1    REQUEST FOR PRODUCTION NO. 2:  With respect to ANY AND ALL ASSETS

2  sold by the POST-CONFIRMATION DEBTOR as of or at any time after the EFFECTIVE

3  DATE, DOCUMENTS sufficient to evidence the sale of such ASSETS including copies of

4  ANY invoices.

5    Ruling: Deny because the doctrine of unclean hands precludes the requested

6  discovery.  The court specifically denies this request because Chrismas is demanding

7  sales information from the Plan Agent, while at the same time asserting his Fifth

8  Amendment privilege in related litigation—refusing to answer a single question about *his*

9  sales practices during his tenure operating the business.

10    REQUEST FOR PRODUCTION NO. 3:  With respect to ANY AND ALL ASSETS

11  gifted by the POST-CONFIRMATION DEBTOR as of or at any time after the EFFECTIVE

12  DATE, DOCUMENTS sufficient to evidence the gifting of such ASSETS including copies

13  of ANY invoices.

14    Ruling:  Deny because the doctrine of unclean hands precludes the requested

15  discovery.  Alternatively, as the Plan Agent stated in the parties' joint statement with

16  respect to outstanding disputes concerning the Rule 2004 motion, "The Plan Agent also

17  confirms that there are no documents responsive to Request No. 3, as there have been

18  no gifts made by the Plan Agent."  ECF 2443 at 7.  Chrismas did not dispute the Plan

19  Agent's assertion that there are no documents to produce.

20    REQUEST FOR PRODUCTION NO. 4:  ALL DOCUMENTS AND

21  COMMUNICATIONS CONCERNING WILSON and ANY OF WILSON'S BUSINESS

22  ENTITIES (including WASL) on or at any time after the EFFECTIVE DATE, including but

23  not limited to ANY DOCUMENTS AND COMMUNICATIONS RELATING TO (a)

24  agreements or arrangements for loans and/or other financial accommodations to the

25  POST-CONFIRMATION DEBTOR, (b) the BEVERLY HILLS PROPERTY and/or the

26  BEVERLY HILLS PROPERTY PURCHASE OPTION and (c) consignment of ANY

27  ASSETS.

28

**MEMORANDUM DECISION**

1    <u>Ruling</u>:  Deny because the doctrine of unclean hands precludes the requested

2    discovery.  In the alternative, denial is appropriate because the matter has been

3    adjudicated to finality.  Chrismas requests all documents and communications regarding

4    Eric Wilson and his business entities, including but not limited to all agreements or

5    arrangements for loans and/or other financial accommodations to the post-confirmation

6    Debtor, and the Beverly Hills property, the purchase option for the Beverly Hills property

7    and all asset consignments because Chrismas says there are "legitimate questions" about

8    the settlement agreement between Wilson and the post-confirmation Debtor and whether

9    the Plan Agent was a "disinterested fiduciary acting in the best interests of creditors (as

10   opposed to himself)."  Chrismas acknowledged that the settlement agreement was

11   approved by the court and subsequently consummated, which may limit the prospects for

12   undoing the transaction.

13   Chrismas does not identify what "legitmate questions" exist about the settlement

14   agreement between Wilson and the post-confirmation Debtor, and if there were such

15   legitimate questions, they should have been raised in an objection to the motion for

16   approval of the settlement agreement under Federal Rule of Bankruptcy Procedure 9019.

17   Chrismas's suspicions do not constitute good cause to impose the cost of response to his

18   burdensome document production request on the post-confirmation Debtor relative to a

19   matter that has been adjudicated to finality.

20   REQUEST FOR PRODUCTION NO. 5:  ALL DOCUMENTS AND

21   COMMUNICATIONS CONCERNING SECURED CLAIMS including but not limited to

22   BOOKS AND RECORDS EVIDENCING ANY accountings or reconciliations prepared by

23   the POST-CONFIRMATION DEBTOR and whether and to what extent ANY such CLAIM

24   is DISPUTED and/or has been ALLOWED or DISALLOWED and the extent to which such

25   CLAI< has been paid.

26   <u>Ruling</u>:  Deny because the doctrine of unclean hands precludes the requested

27   discovery.  Alternatively, denial is appropriate because there are no documents to

28   produce.  As the parties stated in their joint statement with respect to outstanding disputes

-44-

concerning the Rule 2004 motion, "Based on representations made by the Plan Agent's

counsel that – other than Mr. Wilson's claims and claims by artists/consignors – there are

no Secured Claims against the post-confirmation Debtor; Mr. Leslie indicated there is

nothing to produce."  As to secured claims of Mr. Wilson and the artists/consignors,

Chrismas's requests for production nos. 4 and 6 address secured claims of those parties,

but otherwise, there are no documents to produce since it is not disputed that there are no

other secured claims.

REQUEST FOR PRODUCTION NO. 6:  ALL DOCUMENTS AND

COMMUNICATIONS with respect to ANY AND ALL artists and consignors CONCERNING

(a) ANY requests or demands for payment and/or an accounting or reconciliation, (b) ANY

missing or damaged artwork or other ASSETS, and (c) ANY accountings or reconciliations

prepared by the POST-CONFIRMATION DEBTOR.

Ruling: Deny because the doctrine of unclean hands precludes the requested

discovery.  Specifically, the court finds that Chrismas's failure to pay artists more than $2

million of consignment payments that were due to artists for sales of their artworks

precludes the court from allowing this request for production pursuant to the doctrine of

unclean hands.

REQUEST FOR PRODUCTION NO. 7:  ALL DOCUMENTS AND

COMMUNICATIONS CONCERNING ANY AND ALL agreements and other arrangements

between YOU and LESLIE and ANY AND ALL TRANSFERS between YOU and LESLIE.

Ruling:  Deny because the doctrine of unclean hands precludes the requested

discovery.  Additionally, Chrismas's document request is vague, overbroad and

burdensome.  Chrismas requests each and every document and communication

regarding all agreements and other arrangements between the post-confirmation Debtor

and the Plan Agent because Chrismas has questions regarding the Plan Agent's

compensation.  The court notes that the document request, however, is not limited to the

Plan Agent's compensation.  While the document request could be narrowly tailored to

request the calculation of the Plan Agent's compensation and the documentary support for

-45-

**MEMORANDUM DECISION**

1    the calculation, the application of the unclean hands doctrine precludes enforcement of

2    this request.  To request every document and communication regarding every agreement

3    and communication, formal and informal, without any limit on the subject matter is unduly

4    burdensome and excessive.

5        REQUEST FOR PRODUCTION NO. 8:  ALL DOCUMENTS AND

6    COMMUNICATIONS CONCERNING ANY AND ALL agreements and other arrangements

7    between YOU and LEA Accountancy LLP and ANY AND ALL TRANSFERS between

8    YOU and LESLIE.

9        Ruling: Deny because the doctrine of unclean hands precludes the requested

10   discovery.  Alternatively, Chrismas's document request is vague, overbroad and

11   burdensome.  Chrismas requests each and every document and communication

12   regarding all agreements and other arrangements between the post-confirmation Debtor

13   and LEA Accountancy, LLP, the Plan Agent's accounting firm, because Chrismas believes

14   that the employment of LEA Accountancy, LLP, "is precluded under [the] Plan Trust," and

15   Chrismas has questions about whether the Plan Agent is "pushing off" his duties to his

16   firm employed by the post-confirmation Debtor, forcing the post-confirmation Debtor to

17   incur undue expense.  If Chrismas believes that the employment of LEA Accountancy,

18   LLP, is precluded by the Plan Trust, there is no apparent need for the document request

19   because such preclusion would be evident in the Plan Trust, which issue could be raised

20   by motion.  While the document request could be narrowly tailored to request the

21   calculation of the amounts paid to LEA Accountancy, LLP, as an operating expense of the

22   post-confirmation Debtor and the documentary support for the calculation, the application

23   of the unclean hands doctrine precludes enforcement of this request.  To request every

24   document and communication regarding every agreement, communication, and transfer,

25   without any limit on the subject matter, is unduly burdensome and excessive.

26       REQUEST FOR ORAL EXAMINATION OF PLAN AGENT

27       Ruling:  Deny because the doctrine of unclean hands precludes the requested

28   discovery.  As ordered by the court, the Plan Agent filed detailed status reports on May

-46-

**MEMORANDUM DECISION**

31, 2019 and August 19, 2019 regarding the financial performance of the Reorganized

Debtor postconfirmation and appeared for examination at the evidentiary hearing on July

19, 2019.  The July 19, 2019 evidentiary hearing allowed parties in interest, including

Chrismas, to examine the Plan Agent.  The information which has been provided by the

Plan Agent regarding the financial performance of the Reorganized Debtor is substantial,

probative and undisputed, and addressed the court's need for information regarding the

Reorganized Debtor's financial performance in implementing the confirmed plan.  The

court finds that the Plan Agent provided sufficient information regarding the Reorganized

Debtor's financial performance under the confirmed plan to address the need for such

information for purposes of Rule 2004 and declines to permit further examination of the

Plan Agent at this time.

## II.    CONCLUSION

For the foregoing reasons, the court will deny the Rule 2004 Motion on the merits.

The court will also deny the Plan Agent's Protective Order Motion as moot since no

protective order is needed because the court is denying the relief requested by Chrismas.

A separate final order consistent with this memorandum decision is being filed and

entered concurrently herewith.

IT IS SO ORDERED.

# # #

Date: December 6, 2019

_____

Robert Kwan
United States Bankruptcy Judge

**MEMORANDUM DECISION**